# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

THE STATE OF LOUISIANA,
by and through its Attorney General,
Elizabeth B. Murrill;

AMERICAN PETROLEUM INSTITUTE;

GULF ENERGY ALLIANCE;

THE STATE OF ALABAMA,
by and through its Attorney General,
Steve Marshall;

THE STATE OF ALASKA,
by and through its Attorney General,
Treg R. Taylor;

THE STATE OF GEORGIA,
by and through its Attorney General,
Christopher M. Carr;

THE STATE OF MISSISSIPPI,
by and through its Attorney General,
Lynn Fitch,

                              PLAINTIFFS,

v.

JOSEPH R. BIDEN, JR., in his official capacity
as President of the United States;

DEB HAALAND, in her official capacity as
Secretary of the Interior;

ELIZABETH KLEIN, in her official capacity as
Director of the Bureau of Ocean Energy
Management;

GIVEY KOCHANOWSKI, in his official capacity
as Regional Director of the Bureau of Ocean
Energy Management Alaska Office;

JAMES KENDALL, in his official capacity as
Regional Director of the Bureau of Ocean
Energy Management Gulf of Mexico Office;

DOUGLAS BOREN, in his official capacity as
Regional Director of the Bureau of Ocean
Energy Management Pacific Office,

                              DEFENDANTS.

CIVIL ACTION NO. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Enacted in 1953, the Outer Continental Shelf Lands Act (OCSLA) was landmark legislation designed to ensure the "expeditious and orderly development" of the Shelf. 43 U.S.C. § 1332(3). As the Bureau of Ocean Energy Management tells it, "the primary purpose of OCSLA is to facilitate the federal government's leasing of its offshore mineral resources and energy resources." *BOEM Governing Statutes*, tinyurl.com/4wjmr75d (last visited Jan. 17, 2025). Today, those leasing activities comprise an extraordinary portion of our oil and gas industry. And in turn, they create American jobs, power American life, and generate over $7 billion in revenue per year—revenue that is shared among the federal government and coastal States, as well as distributed into preservation and conservation funds designed to protect America's historical places and recreation opportunities.

2.      This case involves President Biden's asserted authority—under OCSLA—to withdraw (forever) nearly all OCSLA lands adjoining the Lower 48 States (and a significant portion of those adjoining Alaska) from oil and gas leasing.

3.      Three years ago, this Court permanently enjoined President Biden's unlawful attempt to "pause" oil and gas leases on public lands and in offshore waters governed by OCSLA. *See Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022). In so holding, the Court recognized that the President's "pause"-by-executive-order gambit was "*ultra vires*, beyond the authority of the President of the United States." *Id.* at 289.

4.      Fast forward three years: After his party lost the 2024 presidential election—and two weeks before Inauguration Day in 2025—President Biden tried once again to accomplish much of what this Court barred three years ago. This time, President Biden issued two memoranda purporting to "withdraw from disposition by oil or natural gas leasing" *more than half a billion acres* of offshore waters from Alaska to the Gulf Coast that fall under OCSLA. *See Memorandum on the Withdrawal of Certain Areas of the United States Outer Continental Shelf from Oil or Natural Gas Leasing (Gulf of Mexico,*

1

*Atlantic, and Pacific areas)* (Jan. 6, 2025), tinyurl.com/bdd49s4h (Ex. A); *Memorandum on the Withdrawal of Certain Areas of the United States Outer Continental Shelf from Oil or Natural Gas Leasing (Alaska area)* (Jan. 6, 2025), tinyurl.com/4hwaac8x (Ex. B) (together, the Withdrawal Memos).

5.      The Withdrawal Memos purport to stand forever—that is, "without specific expiration." *Id.* They also purport to "prevent[] consideration of the withdrawn areas for any future oil or natural gas leasing for purposes of exploration, development, or production." *Id.* And thus, by the stroke of a pen, President Biden claims to have eternally barred the federal government, the States, and the industry from carrying out OCSLA's promise of "expeditious and orderly development," 43 U.S.C. § 1332(3), on nearly all of the outer Continental Shelf.

6.      President Biden's claimed authority comes from a single sentence in the United States Code: "The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf." *Id.* § 1341(a).

7.      Among other legal infirmities (for example, the Withdrawal Memos gut Congress's mandate to facilitate expeditious development of the Shelf), that sentence is a walking non-delegation violation—and thus, President Biden had no authority to issue the Memos.

8.      Both this Court and the Supreme Court have unequivocally stated that "Congress has the *sole* authority under the Property Clause to regulate property." *Louisiana*, 622 F. Supp. 3d at 288 (emphasis added) (citing U.S. Const. art. IV, § 3, cl. 2); *see Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987) ("the Property Clause gives Congress plenary power"); *Gibson v. Chouteau*, 80 U.S. 92, 99 (1871) ("[T]he Constitution vests in Congress the power of disposition and of making all needful rules and regulations."). Indeed, the Supreme Court has long expressly held that "the power of Congress" under the Property Clause "is exclusive." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 404 (1917).

2

9.      It is equally well-established that Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality op.). Hence, "a statutory delegation" of Congress's authority is constitutional only if "Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id.*

10.     This is the rare case where Congress did not even try to articulate an "intelligible principle." As interpreted by President Biden in the Withdrawal Memos, § 1341(a) gives the President carte blanche to remove OCSLA-covered property from disposition—at any time, and for any reason or for no reason at all. This is precisely the sort of unbounded delegation of authority that has led the Supreme Court to find non-delegation violations on the ground that "Congress had failed to articulate *any* policy or standard to confine discretion." *Id.* at 146 (quotation marks omitted) (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)). Under *Schechter Poultry* and *Panama Refining*, therefore, § 1341(a) is unconstitutional. *See Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022) ("If the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible.").

11.     That fundamental defect is flanked by two others that illustrate the illegality of the Withdrawal Memos. *First*, the Constitution's Property Clause gives Congress the power only to enact "needful" rules and regulations on public lands. But there is no indication in OCSLA that Congress deemed it necessary to give the President authority to effectively rescind OCSLA on a whim. So, even if Congress could delegate its Property Clause power to the President without an intelligible principle, Congress has no power in the first instance to promulgate unnecessary rules and regulations. *Second*, the major questions doctrine underscores the folly in the Withdrawal Memos. The purported withdrawal of more than half a billion acres from oil and gas leasing is major by any measure. That doing so functionally overrides OCSLA's detailed leasing scheme, moreover, reinforces that there is

3

no sufficiently clear congressional statement giving President Biden the sweeping authority that no other President has claimed to have.

12.    In sum, this Court need only apply binding Supreme Court precedent to declare unlawful—and enjoin the enforcement of—President Biden's Withdrawal Memos. Congress cannot lawfully delegate unbounded legislative power to the President. And if (for example) a federal judge may "exercise the judicial power of the United States" only "for life, not for eternity," *Yovino v. Rizo*, 586 U.S. 181, 186 (2019) (per curiam), *a fortiori* the President cannot *ever* exercise unlimited legislative power that is not his to begin with—much less for eternity.

13.    Because the issues in this case are purely legal, Plaintiffs will ask this Court to set an expedited briefing schedule that will allow the Court to dispose of the case on cross-dispositive motions.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 2201, because Plaintiffs' claims arise under the Constitution and laws of the United States.

15.    This Court has authority to issue declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, and 1361, as well as this Court's precedent, *see Louisiana*, 622 F. Supp. 3d 267.

16.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1). Defendants are federal officers sued in their official capacities. Moreover, Plaintiff State of Louisiana is a resident of this District, and a substantial part of the events giving rise to the Complaint occurred and will continue to occur within this District.

## THE PARTIES

17.    Plaintiff Louisiana is a sovereign State of the United States. This action is brought on behalf of Louisiana by Attorney General Elizabeth B. Murrill, who is legally authorized to sue on its behalf. Her offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802. Louisiana

sues to vindicate its sovereign, proprietary, and quasi-sovereign interests. Louisiana is one the Nation's major producers of oil and gas, including production from the Outer Continental Shelf. Moreover, Louisiana and its parishes and municipalities receive hundreds of millions of dollars every year from leasing sales under OCSLA and the Gulf of Mexico Energy Security Act (GOMESA). Additionally, critical coastal-restoration and hurricane-protection projects are funded in part by the proceeds of OCSLA lease sales and royalties. These funds are vital to the preservation of Louisiana's coastline and the protection of its ports, through which billions of dollars' worth of food, fuel, and other products pass annually on their way to Americans and other consumers. Finally, oil and gas development in the Gulf of Mexico and on public lands is a key contributor to Louisiana's economy, generating substantial tax revenue and jobs, including from Louisiana-based businesses that provide vessel and other specialized services for offshore exploration, production, and decommissioning.

18.     Plaintiff American Petroleum Institute (API) is the primary national trade association that represents all facets of the oil and natural gas industry, which supports nearly 11 million U.S. jobs and 8 percent of the U.S. economy. API's approximately 600 members include large integrated companies as well as firms engaged in exploration and production, refining, marketing, pipeline, marine business, and service and supply. API's members provide most of the Nation's energy and are actively involved in the foregoing activities in the Outer Continental Shelf, including in Alaska, the Gulf of Mexico, and the Pacific regions.

19.     Plaintiff Gulf Energy Alliance is a coalition of leading independent oil and natural gas producers and allied organizations supporting policies and regulations that encourage sustainable investment, innovation, and job creation in the Gulf of Mexico. Almost all of the Alliance's members are focused exclusively on producing oil and natural gas from the Gulf. Independent oil and gas companies may not be household names, but independents are responsible for approximately 35% of the total Outer Continental Shelf ("OCS") oil and natural gas production. Independent oil and natural

5

gas companies are small businesses that also support a host of other small businesses and professions across the Gulf South and throughout the country, including steel manufacturers, longshoremen, vessel providers, seamen, laborers, construction workers, shipyard workers, and equipment manufacturers. GEA's headquarters are located in the Woodlands, Texas

20.    Plaintiff Alabama is a sovereign State of the United States. This action is brought on behalf of Alabama by Attorney General Steve Marshall, who is legally authorized to sue on its behalf. Alabama sues to vindicate its sovereign, proprietary, and quasi-sovereign interests.  Alabama and its local governments receive tens of millions of dollars each year from leasing sales under OCSLA and GOMESA. For example, for the 2024 fiscal year, Alabama received nearly $50 million in GOMESA disbursements. *See* U.S. Dep't of the Interior, Natural Resources Revenue Data, "Gulf of Mexico Energy Security Act," tinyurl.com/yv78pc9b (last visited Jan. 17, 2025). Additionally, oil and gas development in the Gulf of Mexico and on public lands is a key contributor to Alabama's economy, generating substantial tax revenue and jobs. *See* U.S. Dep't of the Interior, Bureau of Ocean Energy Management, "Economic Contribution," tinyurl.com/yyfyd9z (last visited Jan. 17, 2025) (reporting that for FY 2020, "[t]he highest numbers of offshore oil and gas jobs were in Texas, Louisiana, Mississippi, Florida, Alabama, California, Oklahoma, Pennsylvania, Ohio, and Virginia.").

21.    Plaintiff Alaska is a sovereign State of the United States. This action is brought on behalf of Alaska by Attorney General Treg R. Taylor, who is legally authorized to sue on its behalf. Alaska sues to vindicate its sovereign, proprietary, and quasi-sovereign interests. The State of Alaska has a constitutional duty both to protect its natural resources and to promote development of both natural resources and economic opportunities. Alaska Const. art. VIII. The area in the North Bering Sea being withdrawn from oil and gas leasing contains trillions of cubic feet of natural gas. *See* Bureau of Ocean Management, *2021 Assessment of Undiscovered Oil and Gas Resources of the Nation's Outer Continental Shelf: 2021 Resource Assessment Fact Sheet*, tinyurl.com/y663az5t (last visited Jan. 17, 2025).

The federal OCS is adjacent to state offshore and onshore property. Because of this proximity, successful oil and gas production in the federal OCS stands to encourage and benefit development of Alaska's adjacent property. Conversely, a prohibition on development in the federal OCS renders development on adjacent state property potentially uneconomical and unattractive to investors. Alaska has significant interest in royalty payments and revenue derived from oil and gas production and in the exploration potential of the Outer Continental Shelf surrounding Alaska. Royalties and taxes associated with oil and gas provides billions in revenues to the state and local governments. AS 43.20, AS 43.55, AS 43.56, AS 29.45, AS 38.05.180; Alaska Const. Art. 8, §1; *see* Alaska Department of Revenue, *Revenue Sources Book Fall 2024*, tinyurl.com/4mdz4s8p. Alaska has interests in the economic opportunities and well-being of Alaska's citizens, including in jobs and energy security, that responsible petroleum development provides. The removal of this area from oil or natural gas leasing harms Alaska's interests in development of its abundant resources, revenues, energy security, and economic and socioeconomic well-being of Alaska's citizens.

22.     Plaintiff Georgia is a sovereign State of the United States. This action is brought on behalf of Georgia by Attorney General Christopher M. Carr, who is legally authorized to sue on its behalf. Georgia sues to vindicate its sovereign, proprietary, and quasi-sovereign interests. As in other coastal States, offshore oil and gas development and on public lands is a key contributor to Georgia's economy, generating substantial tax revenue and jobs, including from Georgia-based businesses that provide vessel and other specialized services for offshore exploration, production, and decommissioning. A recent forecast projects that, due to development activity on the Atlantic coast, Georgia will experience thousands of new jobs and tens (and potentially hundreds) of millions of dollars in contributions to Georgia's economy. API, *The Benefits of U.S. Offshore Oil and Natural Gas Development in the Atlantic*, tinyurl.com/msk9a6he (last visited Jan. 17, 2025).

23.    Plaintiff Mississippi is a sovereign State of the United States. This action is brought on behalf of Mississippi by Attorney General Lynn Fitch, who is legally authorized to sue on its behalf. Mississippi sues to vindicate its sovereign, proprietary, and quasi-sovereign interests. Mississippi and its local governments receive tens of millions of dollars each year from leasing sales under OCSLA and GOMESA. For example, for the 2024 fiscal year, Mississippi received nearly $52 million in GOMESA disbursements. *See* U.S. Dep't of the Interior, Natural Resources Revenue Data, "Gulf of Mexico Energy Security Act," tinyurl.com/yv78pc9b (last visited Jan. 17, 2025). Additionally, oil and gas development in the Gulf of Mexico and on public lands is a key contributor to Mississippi's economy, generating substantial tax revenue and jobs. *See* U.S. Dep't of the Interior, Bureau of Ocean Energy Management, "Economic Contribution," tinyurl.com/yyfyd9z (last visited Jan. 17, 2025) (reporting that for FY 2020, "[t]he highest numbers of offshore oil and gas jobs were in Texas, Louisiana, Mississippi, Florida, Alabama, California, Oklahoma, Pennsylvania, Ohio, and Virginia.").

24.    Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity.

25.    Defendant Deb Haaland is the Secretary of the Interior. She is sued in her official capacity.

26.    Defendant Elizabeth Klein is the Director of the Bureau of Ocean Energy Management. She is sued in her official capacity.

27.    Defendant Givey Kochanowski is the Regional Director of the Bureau of Ocean Energy Management Alaska Office. He is sued in his official capacity.

28.    Defendant James Kendall is the Regional Director of the Bureau of Ocean Energy Management Gulf of Mexico Office. He is sued in his official capacity.

29.    Defendant Douglas Boren is the Regional Director of the Bureau of Ocean Energy Management Pacific Office. He is sued in his official capacity.

## BACKGROUND

### I.    The Outer Continental Shelf Lands Act

30.    "[M]ore than seventy years ago," Congress passed OCSLA, "declar[ing] that 'the subsoil and seabed of the outer Continental Shelf' ... are subject to the jurisdiction, control, and power of disposition of the United States." *Louisiana*, 622 F. Supp. 3d at 277 (citing 43 U.S.C. § 1332(1)).

31.    OCSLA "establishes the Shelf as 'a vital national resource reserve held by the Federal Government for the public.'" *Id.* (quoting § 1332(3)). It also requires the Secretary of the Interior "to make this national resource reserve subject to expeditious, orderly development." *Id.* (citing § 1332(3)).

32.    "To facilitate this expeditious development of the Shelf," OCSLA sets a detailed scheme requiring the Secretary "to administer a leasing program that sells exploration interests in portions of the Shelf to the highest bidder." *Id.* In broad strokes, that scheme directs the Secretary to "(1) create a Five-Year Leasing Program, (2) hold lease sales, (3) grant or deny exploration permits and plans, and (4) grant or deny final development and production plans." *Id.* And "[a]fter submission of the original leasing program, the Secretary must maintain an oil and gas leasing program that contains a schedule of proposed lease sales and the size, timing, and location of leasing activity for the next five-year period." *Id.* at 278.

33.    Several lengthy provisions within OCSLA regulate in minute detail the various aspects of the leasing program. For instance, § 1334—entitled "Administration of leasing"—articulates several of the Secretary's responsibilities, addressing such specific items as the flaring of natural gas and rates of production. Similarly, § 1337 sets forth the rules of the road governing "[l]eases, easements, and

rights-of-way on the outer Continental Shelf," including extraordinarily intricate rules for the bidding process and royalty calculations.

34.    Three aspects of OCSLA's leasing-program scheme warrant particular emphasis here.

35.    *First*, Congress repeatedly limited the Secretary's delegated authority through certain standards. In general, the Secretary may administer OCSLA only "as he determines to be necessary and proper." 43 U.S.C. § 1334(a). He also has specific authority to issue regulations that, for example, are "in the national interest," or account for "a threat of serious, irreparable, or immediate harm or damage to life," or ensure "the prompt and efficient exploration and development of a lease area." *Id.* § 1334(a)(1), (7). Similarly, before he may authorize a permit for geological explorations, he must make specific "determin[ations]," including that the exploration "will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or archeological significance." *Id.* § 1340(g). Likewise, OCSLA directs the Secretary, in prescribed circumstances, to "require ... the use of the best available and safest technologies which the Secretary determines to be economically feasible, wherever failure of equipment would have a significant effect on safety, health, or the environment, except where the Secretary determines that the incremental benefits are clearly insufficient to justify the incremental costs of utilizing such technologies." *Id.* § 1347(b).

36.    More generally, the Secretary's "[m]anagement of the outer Continental Shelf shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments." *Id.* § 1344(a)(1). Indeed, OCSLA's rigorous framework for the

consideration of areas for oil and gas leasing direct the Secretary to evaluate and weigh eight specific, enumerated factors. *Id.* § 1344(a)(2).

37.     *Second*, OCSLA recognizes—and respects—the States' fundamental and profound interests implicated by OSCLA-related activities. Here are just a few examples:

- "[T]he rights and responsibilities of all States and, where appropriate, local governments, to preserve and protect their marine, human, and coastal environments through such means as regulation of land, air, and water uses, of safety, and of related development and activity should be considered and recognized[.]" *Id.* § 1332(5).

- "To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf[.]" *Id.* § 1333(a)(2)(A).

- "In the enforcement of safety, environmental, and conservation laws and regulations, the Secretary shall cooperate with the relevant departments and agencies ... of the affected States." *Id.* § 1334(a).

- "The Secretary shall provide for coordination and consultation with the Governor of any State or the executive of any local government that may be affected by a lease, easement, or right-of-way under this subsection." *Id.* § 1337(p)(7).

- "The Secretary shall not grant any license or permit for any activity described in detail in an exploration plan and affecting any land use or water use in the coastal zone of a State with a coastal zone management program approved pursuant to section 1455 of Title 16, unless the State concurs or is conclusively presumed to concur with the consistency certification accompanying such plan pursuant to section 1456(c)(3)(B)(i) or (ii) of Title 16, or the Secretary of Commerce makes the finding authorized by section 1456(c)(3)(B)(iii) of Title 16." *Id.* § 1340(c)(2).

- "After such preparation and at least sixty days prior to publication of a proposed leasing program in the Federal Register pursuant to paragraph (3) of this

subsection, the Secretary shall submit a copy of such proposed program to the Governor of each affected State for review and comment." *Id.* § 1344(c)(2).

- "Any Governor of any affected State ... may submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale or with respect to a proposed development and production plan." *Id.* § 1345(a).

- "The Secretary shall accept recommendations of the Governor ... if he determines, after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." *Id.* § 1345(c).

38.    *Third*, and most important for this case, OCSLA includes a single sentence purporting to give the President authority to effectively withdraw from disposition (*i.e.*, sale or lease) all unencumbered land covered by OCSLA: "The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf." *Id.* § 1341(a).

39.    In years past, Presidents of both parties have exercised their asserted § 1341(a) power in limited respects. For example, President George H.W. Bush withdrew for ten years areas off the coast of California, Oregon, Washington, the North Atlantic, and portions of the Eastern Gulf of Mexico. *See Statement on Outer Continental Shelf Oil and Gas Development*, 26 Weekly Comp. Pres. Doc. 1006 (June 26, 1990). But he recognized that his withdrawal was "subject to revocation should the president determine the scheduling of a lease sale to be required in the interest of national security." *Statement on Outer Continental Shelf Oil and Gas Program for 1992-1997* (Aug. 4, 1992). Similarly, in 2007, President George W. Bush used the same asserted § 1341(a) power to reinstate previously withdrawn

lands. *See Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition*, 1 Pub. Papers 15-16 (Jan. 9, 2007).

## II.    President Biden's Withdrawal Memos

40.    President Biden previously attempted, and failed, to "pause" oil and gas leasing on public lands and in offshore waters—that was unlawful, said this Court. *See Louisiana*, 622 F. Supp. 3d at 294. His party also lost the 2024 presidential election.

41.    Yet despite these legal and political rebukes, two weeks before Inauguration Day in 2025, President Biden invoked § 1341(a) in two Withdrawal Memos that purport to accomplish what he previously failed to accomplish—halt oil and gas leasing—and to do so in a way that allegedly binds President-elect Trump and every president thereafter.

42.    Specifically, the Withdrawal Memos claim to "withdraw from disposition by oil or natural gas leasing for a time period without expiration" the following areas:

- "the areas designated by the Bureau of Ocean Energy Management as the North Atlantic, Mid-Atlantic, South Atlantic, and Straits of Florida Planning Areas of the Outer Continental Shelf";

- "the areas of the Outer Continental Shelf designated by section 104(a) of the Gulf of Mexico Energy Security Act of 2006 (Public Law 109-432)," otherwise known as the Eastern Gulf of Mexico planning area;

- "the areas designated by the Bureau of Ocean Energy Management as the Washington/Oregon, Northern California, Central California, and Southern California Planning Areas of the Outer Continental Shelf"; and

- "the remaining areas that are part of the Northern Bering Sea Climate Resilience Area, designated in Executive Order 13754 of December 9, 2016 (Northern Bering Sea Climate Resilience), and that are not currently withdrawn from disposition by leasing."

43.    Each Withdrawal Memo includes an attached map depicting the remarkable breadth of the purported ban:



Pacific, Gulf of Mexico, and Atlantic OCS Planning Areas Withdrawn from Oil and Gas Leasing



| Planning Area | Total Acreage | Current Acreage Withdrawn | New Acreage Withdrawn |
|---|---|---|---|
| Hope Basin | 12.82 | 0.00 | 4.65 |
| Navarin | 34.02 | 0.00 | 4.03 |
| North Aleutian Basin | 32.45 | 0.28 | 0.00 |
| Norton Basin | 24.25 | 24.25 | 0.00 |
| St. Matthew-Hall | 54.57 | 1.58 | 35.90 |
| TOTAL | | | 44.58 |
| *Acreage reported in millions | | | |

Alaska OCS Planning Areas
Withdrawn from Oil and Gas Leasing

44.    In total, the Withdrawal Memos claim to withdraw more than 627 million acres from consideration for future leasing for oil and gas production. That includes approximately *90%* of the Pacific, Gulf of Mexico, and Atlantic OCS Planning Areas spanning the Lower 48 States.

45.    President Biden did not consult with any affected State prior to issuing the Withdrawal Memos.

46.    The Withdrawal Memos themselves offer only vague introductory paragraphs as the purported justification:

> (Alaska) Consistent with principles of responsible public stewardship, and with due consideration of the irreplaceable marine and coastal environments, including wildlife and wildlife habitat, of the Bering Sea; and independently with due consideration of the vulnerability of these ecosystems and coastal communities, where limited or no oil and natural gas development has yet occurred, to oil spills; and independently with due consideration of the national need to curtail, mitigate, build resilience against, and adapt to the devastating and irreversible consequences of climate change for the human environment and for the marine and coastal environments, I hereby direct as follows ....

> (Gulf Coast, Atlantic, Pacific) Consistent with principles of responsible public stewardship, and with due consideration of the irreplaceable marine and coastal environments, including wildlife and wildlife habitat, of the Gulf of Mexico, Atlantic, and Pacific areas of the Outer Continental Shelf; and independently with due consideration of the vulnerability of these ecosystems and coastal communities, where limited or no oil and natural gas development has yet occurred, to oil spills; and independently with due consideration of the benefits of expeditious and orderly development of the vital renewable energy resources of the Gulf of Mexico, Atlantic, and Pacific areas of the Outer Continental Shelf; and independently with due consideration of the national need to curtail, mitigate, build resilience against, and adapt to the devastating and irreversible consequences of climate change for the human environment and for the marine and coastal environments, I hereby direct as follows ....

## III.    The Detrimental Effects of the Withdrawal Memos

47.    As the sheer breadth of the Withdrawal Memos suggests, President Biden's withdrawal—if upheld—threatens sweeping consequences for everyone involved.

48.    That is principally so with respect to Plaintiff API's and Plaintiff Gulf Energy Alliance's members, which include oil and gas companies that bid on offshore leases and are directly engaged in the resulting exploration and production on the outer Continental Shelf. Those members— particularly including those who wish to seek and obtain leases in the covered areas—will, according to the Withdrawal Memos, *forever* be denied the opportunity to engage in precisely the sort of leasing activities OCSLA was intended to promote and facilitate.

49.     This harm is clear and unquestionable. In connection with the development of the five-year leasing program that is currently in effect, API, its members, and Gulf Energy Alliance's members advised the federal government of their interest in the exploration and leasing of areas that are now expressly withdrawn in the Withdrawal Memos. *See National Outer Continental Shelf Oil and Gas Leasing Draft Proposed Program* Section 9.1 and App. A (Jan. 2018), tinyurl.com/yc7fkwkj.

50.     That harm, in turn, has profound impacts on the Plaintiff States. Coastal States are entitled to a significant portion of the proceeds from Outer Continental Shelf leasing and production. States receive these proceeds under three separate programs. *First*, under OCSLA's revenue-sharing program, a State with one or more offshore federal leases within the first three miles from its seaward boundary receives 27% of the revenue generated from those leases. 43 U.S.C. §1337(g)(5)(A). *Second*, the Coastal Impact Assistance Program provides payments to Plaintiffs Alaska, Alabama, Louisiana, and Mississippi from funds generated by leases. *Id.* § 1356a. *Third*, GOMESA provides for the sharing 37.5% of qualified Outer Continental Shelf revenues among Plaintiffs Alabama, Louisiana, and Mississippi to aid in coastal-restoration efforts. *Id.* § 1331 note. As a result, in fiscal year 2024 alone, Louisiana received over $150 million in revenue sharing from OCSLA leases under GOMESA, while Alabama received over $49 million, and Mississippi received over $51 million. *See Natural Resources Revenue Data, Gulf of Mexico Security Act*, tinyurl.com/yv78pc9b (last visited Jan. 16, 2025). By purporting to foreclose new leases on the outer Continental Shelf, therefore, the Withdrawal Memos effectively foreclose the States from receiving revenue to which they would otherwise be entitled.

51.     That monetary harm to the States, moreover, does not stand alone. As detailed above, Congress expressly recognized in OCSLA that the States have a profound and unique interest in the development of the outer Continental Shelf, which abuts their own shores. By purporting to prohibit any future development whatsoever, therefore, the Withdrawal Memos strip the States of the very sovereign interests that even Congress recognized in OCSLA.

52.     In addition, the Plaintiff States' respective economies significantly depend on the oil and gas industry. One recent study, for example, found that the industry supported some 350,000 jobs in Louisiana alone in 2019. PwC, *Impacts of the Oil and Natural Gas Industry on the US Economy in 2019* at 25 (July 2021), tinyurl.com/3trun9hx. Similarly significant numbers underscore the importance of the industry to Louisiana's sister Plaintiff States: Alaska (approximately 47,000 jobs); Alabama (approximately 128,000 jobs); Georgia (approximately 243,000 jobs); Mississippi (approximately 103,000 jobs). *Id.* As a result, the shutting down of future leasing effectively attacks Plaintiff States themselves, which supply the necessary workforce and whose economies are built on the success of the industry.

## CLAIMS FOR RELIEF

### COUNT ONE
### The Withdrawal Memos Are Unlawful Because § 1341(a) Violates Article I, Article IV, and the Separation of Powers
### (Ultra Vires – Non-Delegation Doctrine)

82.     Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

83.     As this Court and others have held, "reviewing [a presidential order] as to whether it was *ultra vires* is appropriate to determine whether the President has violated the Constitution, the statute under which the challenged action was taken violated the Constitution or conflicted with other statutes, or whether there was no statutory authority to take a particular action." *Louisiana*, 622 F. Supp. 3d at 288; *accord Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002); *Associated Builders & Contractors of Se. Tex. v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016); *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011). In addition, this case falls "[u]nder the *Larson* doctrine" because it asserts both that "a federal official acted *ultra vires* of statutorily delegated authority" and that "the officer acted in an unconstitutional manner or pursuant to an unconstitutional grant of authority." *See, e.g., Texas v. Biden*, 2021 WL

4552547, at *4–5 (N.D. Tex. July 19, 2021); *see also Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under ... separation-of-powers principles"); *Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge.").

84.     This is a case where "the portion of the statute under which the challenged action was taken violated the Constitution"—and thus, actions taken pursuant to that statute are *ultra vires*. *Louisiana*, 622 F. Supp. 3d at 288.

53.     Both this Court and the Supreme Court have unequivocally stated that "Congress has the *sole* authority under the Property Clause to regulate property." *Id.* (emphasis added) (citing U.S. Const. art. IV, § 3, cl. 2); *see Cal. Coastal Comm'n*, 480 U.S. at 581 ("the Property Clause gives Congress plenary power"); *Gibson*, 80 U.S. at 99 ("[T]he Constitution vests in Congress the power of disposition and of making of all needful rules and regulations."). Indeed, the Supreme Court has long held that "the power of Congress" under the Property Clause "is exclusive." *Utah Power & Light Co.*, 243 U.S. at 404. *See* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States ....").

54.     It is equally well-established that Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy*, 588 U.S. at 135 (plurality op.). Hence, "a statutory delegation" of Congress's authority is constitutional only if "Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id.*

55.     Section 1341(a) violates the non-delegation doctrine. It purports to give the President Congress's exclusive power to, "from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf." 43 U.S.C. § 1341(a). As the plain text reveals, Congress did not

even try to articulate an "intelligible principle." As interpreted by President Biden in the Withdrawal Memos, Congress simply gave the President carte blanche to effectively rewrite OCSLA itself at any time by removing OCSLA-covered property from disposition—all on the President's whim. This is precisely the sort of unbounded delegation of legislative authority that previously led the Supreme Court to find non-delegation violations on the ground that "'Congress had failed to articulate *any* policy or standard' to confine discretion." *Gundy*, 588 U.S. at 146 (plurality op.). "If the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible"— and § 1341(a) reflects a total absence of guidance. *Jarkesy*, 34 F.4th at 462.

56.    Under squarely binding precedent (*i.e.*, *Schechter Poultry* and *Panama Refining*, as reaffirmed by the *Gundy* plurality), therefore, § 1341(a) is unconstitutional—and thus, the Withdrawal Memos themselves, which are based on § 1341(a), are *ultra vires*.

57.    Finally, although binding precedent resolves this case, out of an abundance of caution Plaintiffs preserve for Supreme Court review an argument that § 1341(a) would especially violate a reinvigorated form of the non-delegation doctrine. To borrow Justice Gorsuch's reasoning, § 1341(a) is independently unlawful because (a) the statute does not "assign to the executive only the responsibility to make factual findings," (b) it does not "set forth the facts that the executive must consider and the criteria against which to measure them," and (c) the President, not Congress, has the sole power under § 1341(a) to "make the policy judgments." 588 U.S. at 166 (Gorsuch, J., dissenting). In that respect too, therefore, § 1341(a) is unconstitutional—and the Withdrawal Memos themselves, which are based on § 1341(a), are *ultra vires*.

**COUNT TWO**
**The Withdrawal Memos Are Unlawful Because § 1341(a) Violates the Property Clause**
**(Ultra Vires)**

85.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

86.    Section 1341(a) is independently unlawful because it exceeds Congress's power under the Property Clause. *See Louisiana*, 622 F. Supp. 3d at 288; *Texas*, 2021 WL 4552547, at *4–5.

87.    The Property Clause provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const., art. IV, § 3, cl. 2. Key to the Clause is the term "needful," which reflects our Founders' recognition that Congress's delegated authority, while plenary, is not literally unbounded. *See Needful*, Merriam-Webster Online, tinyurl.com/2497b9ua (defining "needful" as "necessary; requisite"). Indeed, despite opining that Congress's "power over the public land ... is without limitations," the Supreme Court has, at the same time, suggested that *some* limits must exist, stating that "the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved," *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976).

88.    Of course, Congress has plenary authority to enact "needful" rules and regulations—but OCSLA reflects no congressional finding suggesting that Congress deemed it "necessary" to give the President boundless (and eternal) authority to ban the disposition of nearly all of the outer Continental Shelf.

89.    Accordingly, even if Congress could delegate its Property Clause power to the President, Congress has no authority in the first instance to promulgate rules and regulations that are not "needful"—and because no "needful" finding undergirds § 1341(a), that provision is unlawful. As a result, the Withdrawal Memos themselves are *ultra vires*.

### COUNT THREE
### The Withdrawal Memos Violate § 1341(a)
### (Ultra Vires – Major Questions Doctrine)

90.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

91.     The Withdrawal Memos rest on an impermissible interpretation of § 1341(a). *See Louisiana*, 622 F. Supp. 3d at 288; *Texas*, 2021 WL 4552547, at \*4–5. That statute is necessarily limited by Congress's stated purposes in passing OCSLA. And where, as here, the President has purported to exercise sweeping authority that would gut the very reasons for OCSLA's existence, such claimed authority runs into the major questions doctrine.

92.     That doctrine is implicated where the "'history and the breadth of the authority that [the executive branch] has asserted,' and the 'economic and political significance' of that assertion," suggest that Congress never "meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); *see Louisiana v. Biden*, 55 F.4th 1017, 1029 (5th Cir. 2022) (the doctrine "serves as a bound on Presidential authority"). Even where a "colorable textual basis" exists for such executive action, separation-of-powers principles and "'common sense as to the manner in which Congress [would have been] likely to delegate' such power to" warrant careful scrutiny in assessing the Executive's claim to far-reaching power. *West Virginia*, 597 U.S. at 722–23. Indeed, to justify "the exercise of broad power" in those circumstances, the President "must point to 'clear congressional authorization' for the power [he] claims." *Id.* at 723.

93.     The doctrine applies here because, by President Biden's logic, in the same breath that Congress passed OCSLA to facilitate oil and gas development, it also gave the President unilateral authority to withdraw all nearly *one billion* acres comprising the outer Continental Shelf from oil and gas leasing—that is, the authority to gut OCSLA itself. Forever.

94.     No President in history has claimed such authority under OCSLA. And OCSLA's reticulated leasing scheme itself is the best evidence that Congress never intended to grant such authority to the President—and there certainly is no clear statement to that effect.

95.     These fatal problems, particularly combined with the constitutional defects highlighted above, illustrate that President Biden's Withdrawal Memos do not satisfy even a straightforward

reading of § 1341(a)'s plain text and a straightforward application of the major questions doctrine. For that reason, too, the Withdrawal Memos are *ultra vires*.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an order and judgment that grants the following relief:

a. Declare that the Withdrawal Memos are an unconstitutional exercise of legislative power in violation of Article I, the Property Clause, and separation-of-powers principles.

b. Declare that § 1341(a) violates the Property Clause.

c. Declare that the Withdrawal Memos unlawfully exceed the President's authority under OCSLA.

d. Declare that the Withdrawal Memos violate § 1341(a) as underscored by the major questions doctrine.

e. Declare that the Withdrawal Memos are *ultra vires*.

f. Enjoin Defendants from enforcing the Withdrawal Memos.

g. Grant all other relief to which Plaintiffs are entitled, including but not limited to attorneys' fees and costs.

Dated: January 17, 2025

Respectfully submitted,

James A. Holmes (LA #20571)
Charles M. Lanier, Jr. (LA # 18299)
CHRISTOVICH & KEARNEY, LLP
2300 Pan American Life Center
601 Poydras Street
New Orleans, LA 70130-6078
(504) 561-5700
jaholmes@christovich.com
cmlanier@christovich.com

Tommy P. Beaudreau*
Daniel S. Volchok*
WILMER CUTLER PICKERING HALE
AND DORR
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
Tommy.Beaudreau@wilmerhale.com
Daniel.Volchok@wilmerhale.com

*Counsel for Plaintiff American Petroleum Institute*

Tyler R. Green*
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

*Counsel for Plaintiff Gulf Energy Alliance*

TREG TAYLOR
  Attorney General
Trevor Consoliver *
  Assistant Attorney General
ALASKA DEPARTMENT OF LAW
P.O. Box 110300
Juneau, AK 99811-0300
(907) 465-3600
Trevor.Consoliver@alaska.gov

*Counsel for Plaintiff State of Alaska*

LIZ MURRILL
  Attorney General
J. Benjamin Aguiñaga*
  Solicitor General
Zachary Faircloth (LA #39875)
  Principal Deputy Solicitor General
Caitlin Huettemann (LA #40402)
  Assistant Solicitor General
OFFICE OF THE LOUISIANA
ATTORNEY GENERAL
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6705
AguinagaB@ag.louisiana.gov
FairclothZ@ag.louisiana.gov
HuettemannC@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

STEVE MARSHALL
  Attorney General
Edmund G. LaCour*
  Solicitor General
OFFICE OF THE ALABAMA ATTORNEY
GENERAL
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

LYNN FITCH
  Attorney General
Justin L. Matheny*
  Deputy Solicitor General
MISSISSIPPI ATTORNEY
GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

24

CHRISTOPHER M. CARR
  Attorney General
Justin T. Golart*
  Deputy Solicitor General
OFFICE OF THE GEORGIA ATTORNEY
GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3252
jgolart@law.ga.gov

*Counsel for Plaintiff State of Georgia*         *pro hac vice forthcoming