# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| THE STATE OF LOUISIANA, by and through its Attorney General, ELIZABETH B. MURRILL, et al., | | |
| *Plaintiffs,* | Civ. No.: | 2:25-cv-00071-JDC-TPL |
| *v.* | Judge: | James D. Cain, Jr. |
| JOSEPH R. BIDEN, in his official capacity as President, et al., | Mag. Judge: | Thomas P. LeBlanc |
| *Defendants*, | | |
| and | | |
| FRIENDS OF THE EARTH, et al., | | |
| *Applicant-Intervenor-Defendants.* | | |

## MEMORANDUM IN SUPPORT OF APPLICANT-INTERVENORS' MOTION TO INTERVENE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .......................................................................................................... 1

    A.    Legal Background ................................................................................ 1

    B.    Factual Background ............................................................................. 3

        1.    Eastern Gulf of Mexico ......................................................... 4

        2.    Pacific ................................................................................... 5

        3.    Atlantic ................................................................................. 6

        4.    Climate Resilience Area in the Northern Bering Sea .................. 7

    C.    Impacts of Oil and Gas Activity, Including Oil Spills ............................ 7

MOVANTS FOR INTERVENTION ................................................................................ 10

ARGUMENT ................................................................................................................ 12

I.    THE APPLICANTS SATISFY RULE 24(A)'S TEST FOR INTERVENTION AS OF RIGHT. ......................................................................................................... 12

    A.    The Applicants' Motion to Intervene Is Timely. .................................. 13

    B.    The Applicants and Their Members Have Legally Protectable Interests at Stake .................................................................................................. 14

    C.    Disposition of this Case May Impair or Impede the Applicants' Interests ........... 16

    D.    None of the Existing Parties Adequately Represent Applicants' Interests ........... 17

II.    ALTERNATIVELY, THE COURT SHOULD PERMIT THE APPLICANTS TO INTERVENE PERMISSIVELY. ................................................................................ 23

CONCLUSION ............................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                            **Page(s)**

*Am. Great Lakes Ports Ass'n v. Zukunft*,
    No. 16-cv-1019, 2016 WL 8608457 (D.D.C. Aug. 26, 2016) ................................................19

*Ass'n of Pro. Flight Attendants v. Gibbs*,
    804 F.2d. 318 (5th Cir. 1986) ........................................................................................13

*Berger v. N.C. State Conf. of the NAACP*,
    597 U.S. 179 (2022)................................................................................................18, 22

*Brumfield v. Dodd*,
    749 F.3d 339 (5th Cir. 2014) ...............................................................16, 18, 20, 21

*Coal. of Ariz./N.M Cntys. for Stable Econ. Growth v. Dep't of the Interior*,
    100 F.3d 837 (10th Cir. 1996) ......................................................................................15

*Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*,
    788 F.3d 312 (D.C. Cir. 2015)................................................................................21, 22

*DeOtte v. Nevada*,
    20 F.4th 1055 (5th Cir. 2021) .......................................................................................14

*Diamond v. Charles*,
    476 U.S. 54 (1986)........................................................................................................14

*Edwards v. City of Houston*,
    78 F.3d 983 (5th Cir. 1996) ..........................................................................................20

*Entergy Gulf States La., L.L.C. v. EPA*,
    817 F.3d 198 (5th Cir. 2016) ........................................................................................12

*Field v. Anadarko Petroleum Corp.*,
    35 F.4th 1013 (5th Cir. 2022) .......................................................................................13

*Gulf Restoration Network v. Salazar*,
    683 F.3d 158 (5th Cir. 2012) ........................................................................................14

*Hanover Ins. Co. v. Superior Lab. Servs., Inc.*,
    179 F. Supp. 3d 656 (E.D. La. 2016)...........................................................................24

*Healthy Gulf v. Haaland*,
    No. 23-cv-00604 (D.D.C. filed Mar. 6, 2023) .........................................................23

*Healthy Gulf v. Haaland*,
    No. 23-cv-02487 (D.D.C. filed Aug. 25, 2023)..........................................................23

*Healthy Gulf v. Haaland*,
    No. 24-1024 (D.C. Cir. filed February 12, 2024) ................................................23

*United States ex rel. Hernandez v. Team Finance, L.L.C.*,
    80 F.4th 571 (5th Cir. 2023) ..............................................................................23

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ..............................................................................15

*Kleissler v. United States Forest Serv.*,
    157 F.3d 964 (3d Cir. 1998)................................................................................19

*La Union del Pueblo Entero v. Abbott*,
    29 F.4th 299 (5th Cir. 2022) ...................................................................14, 18, 20

*Louisiana v. Haaland*,
    No. 23-cv-01157, 2023 WL 5989052 (W.D. La. Sept. 14, 2023) ..............15, 21, 22

*Nat. Res. Def. Council v. Costle*,
    561 F.2d 904 (D.C. Cir. 1977)............................................................................24

*NextEra Energy Capital Holdings, Inc. v. D'Andrea*,
    No. 20-50168, 2022 WL 17492273 (5th Cir. Dec. 7, 2022)...................................13

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*,
    21 F. Supp. 3d 657 (E.D. La. 2014) .....................................................................8

*Sierra Club v. Espy*,
    18 F.3d 1202 (5th Cir. 1994) ...................................................................13, 18, 22

*Sierra Club v. Glickman*,
    82 F.3d 106 (5th Cir. 1996) .........................................................................17, 23

*Stone v. First Union Corp.*,
    371 F.3d 1305 (11th Cir. 2004) ..........................................................................17

*Texas v. United States*,
    805 F.3d 653 (5th Cir. 2015) ..............................................................................12

*Trans Chem. Ltd. v. China Nat. Mach. Imp. & Exp. Corp.*,
    332 F.3d 815 (5th Cir. 2003) ..............................................................................23

*W. Energy All. v. Zinke*,
    877 F.3d 1157 (10th Cir. 2017) ..........................................................................19

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
    834 F.3d 562 (5th Cir. 2016) ................................................................. *passim*

**Statutes**

43 U.S.C. § 1301 ................................................................................................................2

43 U.S.C. § 1331 ................................................................................................................2

43 U.S.C. § 1332 ..........................................................................................................2, 22

43 U.S.C. § 1334 ................................................................................................................2

43 U.S.C. § 1341 ................................................................................................................2

43 U.S.C. § 1344 ..........................................................................................................2, 22

Gulf of Mexico Energy Security Act of 2006,
      Pub. L. No. 109-432, 120 Stat. 2922 .......................................................................5

**Federal Register**

25 Fed. Reg. 2352 (Mar. 19, 1960) ...................................................................................2

34 Fed. Reg. 5655 (Mar. 26, 1969) ...................................................................................3

48 Fed. Reg. 10605 (Mar. 14, 1983) .................................................................................2

89 Fed. Reg. 95101 (Dec. 2, 2024) ...................................................................................5

**Rules**

Fed. R. Civ. P. 24 ...........................................................................................12, 14, 16, 24

## INTRODUCTION

Friends of the Earth, Oceana, Surfrider Foundation, and Healthy Gulf (collectively "Applicants"), move under Federal Rule of Civil Procedure 24 to intervene as defendants in this action to protect their and their members' interests in preventing harm to the coastal environment from oil and gas leasing in federal waters.

Applicants meet all four requirements for intervention as of right. This motion is timely, coming just over six weeks after Plaintiffs filed their case and nearly two months before Federal Defendants' answer is due. Applicants have legally protectable interests at stake in the permanent protections of the areas at issue in this matter and those interests may be impaired by the relief Plaintiffs seek, which would allow oil and gas exploration, leasing, and development in these areas. Finally, none of the parties adequately represent Applicants' interests as none share their ultimate objective of stopping the expansion of oil and gas exploration, leasing, and development in the areas protected by the challenged actions in this case. Alternatively, Applicants move for permissive intervention pursuant to Federal Rule of Civil Procedure 24(b) as their defense and the main action have a question of law or fact in common, participation will assist the Court's understanding of the issues, and intervention will not unduly delay adjudication.

## BACKGROUND

### A.     Legal Background

Plaintiffs challenge the legality of President Biden's memoranda withdrawing from oil and gas leasing on the U.S. East coast; the eastern Gulf of Mexico; the Pacific off the coasts of Washington, Oregon, and California; and part of the Northern Bering Sea Climate Resilience Area, off the coast of Alaska. ECF Nos. 1, 1-1, 1-2. President Biden's withdrawals protect areas of exceptional environmental and cultural significance by preventing fossil fuel development in

areas that are unnecessary to meet the nation's energy needs. Plaintiffs seek relief declaring the memos unconstitutional and *ultra vires* and enjoining Defendants from enforcing the memos.

The Outer Continental Shelf Lands Act ("OCSLA") governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf. 43 U.S.C. § 1331 *et seq.*  The Outer Continental Shelf extends from the outer boundary of state waters, typically three geographical miles from shore, to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. 43 U.S.C. §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605 (Mar. 14, 1983). The Outer Continental Shelf in total consists of approximately 2.5 billion acres.

OCSLA charges the Secretary of the Interior with managing oil and gas activities on the Outer Continental Shelf. 43 U.S.C. §§ 1334(a), 1344(a). Management of the Outer Continental Shelf "shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf," as well as "the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments." *Id*. § 1344(a)(1). OCSLA further directs that offshore development shall be "subject to environmental safeguards," consistent with "national needs," and operations should be conducted so as to "prevent or minimize . . . damage to the environment." *Id*. § 1332(3), (6).

Under this framework, OCSLA Section 12(a), provides that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf." 43 U.S.C. § 1341(a). There is a long history of presidential withdrawals from oil and gas leasing under OCSLA, both permanent and time-limited, dating back to 1960, when President Eisenhower withdrew areas of the Key Largo Coral Reef Preserve, now part of Florida Keys National Marine Sanctuary. *See* 25 Fed. Reg. 2352 (Mar. 19, 1960). Since then, Presidents

Nixon, George H.W. Bush, Clinton, George W. Bush, Obama, Trump, and Biden have all issued withdrawals. *E.g.*, 34 Fed. Reg. 5655 (Mar. 26, 1969) (President Nixon made this withdrawal through his Interior Secretary); Decl. Brettny Hardy Supp. Mot. Intervene ("Hardy Decl." filed herewith), Ex. 1. Some of these covered large areas: President Clinton's withdrawals covered 300 million acres. *See* Hardy Decl. Ex. 1, at 4. Existing withdrawals cover areas included in the withdrawal memos at issue here. For example, in September 2020, President Trump issued two memoranda to withdraw, for a ten-year period, areas in the Eastern and Central Gulf of Mexico, the South Atlantic and Straits of Florida Planning Areas, as well as the North Carolina portion of the Mid-Atlantic Planning Area. Hardy Decl. Exs. 2, 3.

**B.    Factual Background**

On January 6, 2025, President Biden issued two memoranda exercising his authority under Section 12(a) of OCSLA to withdraw areas in the Pacific Ocean, the Atlantic Ocean, the Eastern Gulf of Mexico and a small section of the Central Gulf of Mexico, as well as part of the Northern Bering Sea Climate Resilience Area from oil and gas leasing. ECF Nos. 1-1, 1-2. The memos state that these withdrawals were made "[c]onsistent with principles of responsible public stewardship, and with due consideration of the irreplaceable marine and coastal environments, including wildlife and wildlife habitat, of" the withdrawn areas. *Id*. The memos also describe "the vulnerability of these ecosystems and coastal communities, where limited or no oil and natural gas development has yet occurred." *Id*. An accompanying fact sheet notes that President Biden "determined that the environmental and economic risks and harms that would result from drilling in these areas outweigh their limited fossil fuel resource potential," and "that these regions can remain healthy and safe from the risk of oil spills resulting from development that would do little, if anything, to meet the nation's energy needs." Hardy Decl. Ex. 4.

Protection of these areas will not impact current energy production. There is currently

"no active oil and gas exploration and development along the eastern U.S. Atlantic or in the

Northern Bering Sea Climate Resilience Area." Hardy Decl. Ex. 5. There are about "30 decades-

old existing leases" in the Pacific and only about a dozen in the Eastern Gulf of Mexico—the

withdrawal memos do not affect any of the rights under those existing leases. *Id*. In stark

contrast, the Central and Western Gulf of Mexico, two areas that President Biden did *not*

withdraw from leasing, are home to "more than 99%" of current U.S. offshore oil and gas

production. Hardy Decl. Ex. 6, at 3. Leasing, exploration, development, and production will

continue unaffected in those areas. Even in those areas, more than 80% of the nearly 12 million

acres under lease are sitting idle as of January 1, 2025, leaving nearly 10 million acres available

for future production. Hardy Decl. Ex. 7.

### 1.    *Eastern Gulf of Mexico*

As the only part of the Gulf largely free from drilling infrastructure and the noise and

pollution of drilling, the eastern Gulf of Mexico serves as highly important habitat for marine

wildlife, including whales, dolphins, and sea turtles, and as an important military testing area.

Hardy Decl. Ex. 8, at 110–11. The Gulf of Mexico is the exclusive home of the critically

endangered Rice's whale, a species that scientists estimate may have less than 50 individuals

remaining. *Id*. at 111. Although the Rice's whale is known to inhabit areas throughout the entire

Gulf of Mexico, the most undeveloped portion of the whale's habitat lies in the Eastern Gulf and

protection of that habitat is critical to ensuring the whale's survival. *Id*. at 111, 203–04, 277.

Millions of people who live in Gulf Coast states depend on this productive marine environment

to support coastal fisheries, tourism, and recreational opportunities. *Id*. at 118 ("Communities in

the GOM Region depend on the ocean economy for employment and income."). Fishing and

shrimping are also part of the traditional livelihoods and culture of many Gulf communities. *Id*.

at 119–20.

Florida's citizens and government representatives have long opposed drilling in the Eastern Gulf. Hardy Decl. Exs. 9, 10. The Department of Defense has likewise supported a leasing moratorium in the eastern Gulf because it is an "irreplaceable national asset used . . . to develop and maintain the readiness of our combat forces." Hardy Decl. Ex. 11. *See also* Hardy Decl. Ex. 12. Based on widespread opposition to oil and gas activities in this region, the majority of BOEM's Eastern Gulf of Mexico Planning Area has been protected from leasing for decades, first by Congress through 2022, Gulf of Mexico Energy Security Act of 2006, Pub. L. No. 109-432, § 104(a), 120 Stat. 2922, 2934, and then by President Trump's withdrawal, which expires in 2032. Hardy Decl. Ex. 2.

      2.    *Pacific*

Federal Outer Continental Shelf waters in the Pacific house globally significant marine environments that provide enormous ecological, scientific, and economic benefits. Hardy Decl. Ex. 8, at 94–101. California alone has five National Marine Sanctuaries that are rich in natural and scenic resources and are some of the State's largest economic drivers. *Id.* at 90–91, 100, 253; 89 Fed. Reg. 95101 (Dec. 2, 2024); *see also* Hardy Decl. Ex. 13. These areas contain a diverse array of marine species, making them ideal places for viewing whales, sea otters, seals, sea lions, sea turtles, seabirds, and other wildlife. Hardy Decl. Ex. 8, at 90–91, 100, 253. The gray whale, for example, spans the entire Pacific coast, making annual migrations of more than 10,000 miles between their wintering and calving areas in Baja California, Mexico and their summer feeding grounds in the northern Bering and Chukchi seas in Alaska.

The economies of these regions are vital. For example, California's direct ocean-based economy is nationally significant for tourism, marine transport, recreation, and commercial and recreational fisheries. *Id.* at 101–02.

The region has already experienced significant oil spills: the 1969 Santa Barbara spill remains one of the largest and most devastating in U.S. history, and in 2021, the Amplify Energy pipeline spilled 25,000 gallons of crude into the San Pedro Bay. Hardy Decl. Exs. 14, 15, 16. The State of California has in place a moratorium on leasing in state waters that was first passed in 1969. Hardy Decl. Ex. 4. No new leasing has taken place since 1984. Hardy Decl. Ex. 6, at 4-3.

3.    *Atlantic*

Federal Outer Continental Shelf waters in the Atlantic Ocean contain highly diverse habitats and harbor important fish and shellfish populations as well as five species of endangered and threatened sea turtles. Hardy Decl. Ex. 8, at 126–28, 130–34. The Department of the Interior has characterized the waters of the Atlantic continental shelf as "one of the most productive ecosystems in the world." *Id*. at 266. They furnish nurseries, feeding grounds, and transit routes for marine animals. Among their unique and outstanding geological features are dozens of undersea canyons, some of them 100 miles long and deeper than the Grand Canyon, rich in marine life. Hardy Decl. Ex. 17. The surrounding seafloor and continental slope break comprise a vast biodiversity hotspot, a mixing zone of currents and sharp temperature gradients. These features support an internationally known whale migration corridor, including for the endangered North Atlantic Right whale, that connects feeding grounds in the Gulf of Maine to calving areas offshore Florida. Hardy Decl. Ex. 8, at 128–30. Importantly, this area remains largely unmarked by industrial development. *Id*. at 124–34. These waters also have other important uses. Businesses along the U.S. Atlantic coast—including fishing, tourism, and recreation industries are heavily dependent on the health of this ocean ecosystem and are major contributors to the region's economy. *Id*. at 134–35. It is also an important area for military training. *Id*. at 124–34. For example, the U.S. Navy carries out training and testing along the coast from Maine to Florida. Hardy Decl. Ex. 18.

6

4.    *Climate Resilience Area in the Northern Bering Sea*

In Alaska, the Northern Bering Sea Climate Resilience Area is of tremendous ecological, economic, and cultural importance. It supports numerous fish, sea birds, and other wildlife. Hardy Decl. Exs. 4 and 8, at 75–76. It also hosts one of the largest marine mammal migrations in the world, including the migrations of beluga and bowhead whales, walruses, and seals that travel through the Bering Strait every year to feeding and breeding grounds in the Arctic. Hardy Decl. Ex. 8 at 76–77, 82, 228.

More than 70 coastal Tribes have long-requested protections for the Northern Bering Sea to "help sustain a vital and threatened ocean area, and the natural resources it contains that Indigenous communities have stewarded and relied on for subsistence since time immemorial." Hardy Decl. Ex. 4. The Bering Sea has been home to Tribal ancestors for thousands of years and Tribes in the region depend on the wildlife for food and culture. *Id*. Tribes have opposed offshore oil and gas drilling in the region since the early 1980s. *Id*. Moreover, the Alaskan Congressional delegation has consistently opposed proposals for oil and gas drilling in the area. *Id*.

**C.    Impacts of Oil and Gas Activity, Including Oil Spills.**

Oil and gas activity harms the coastal environment and communities in multiple ways. First and foremost, offshore oil and gas operations cause oil spills. *See*, *e.g*., Hardy Decl. Ex. 8, at 52–55. Oil spills already have caused lasting environmental, public health, and economic damage. Exposure to spilled crude oil causes severe harm to coral reefs, marine plants, marine mammals, sea turtles, oysters, and fish. *Id*. at 275–77. Oil spills also damage shorelines, subsistence activities, commercial and recreational fishing, tourism, and the health of onshore communities. *Id*. at 275, 277–78. Racial and ethnic minority groups living and working on the coast are often disproportionately exposed to oil- and gas-related hazards, including oil spills. *E.g.*, Hardy Decl. Ex. 19.

Larger spills are particularly damaging, causing catastrophic damage to communities and ecosystems. In addition to the myriad smaller spills that happen regularly, the Gulf has endured multiple spills greater than 10,000 barrels, which continue to cause devastating impacts. *See* Hardy Decl. Ex. 20, at 46, 48. For instance, the Gulf has yet to recover from the effects of its worst ecological disaster—the April 2010 *Deepwater Horizon* explosion, which killed eleven people and leaked over 130 million gallons of oil, devastating countless marine species, and contaminating thousands of miles of ocean and coastal habitat. *See generally In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657 (E.D. La. 2014). Scientists estimate the spill caused death or serious harm to billions, if not trillions, of animals. Many ESA-listed species were profoundly affected—endangered sperm whales suffered a 7% decline in population, and the critically endangered Rice's whale population diminished by about 20%. Hardy Decl. Ex. 21, at 4-599; *id.* at 4-623, 4-624, 4-631. *Deepwater Horizon* also took a severe human toll. Workers involved with cleanup efforts continue to suffer from decreased liver, blood, heart, and respiratory functions. Hardy Decl. Ex. 22, at 6. Spill contamination caused fishery closures that led to an estimated $247 million loss for the Gulf's commercial fishing industry. Hardy Decl. Ex. 23, at 332–336.

The Gulf is not the only place to suffer from the impacts of devastating spills—in fact, catastrophic spills have occurred in every region that has hosted offshore oil and gas development (the Gulf, the Pacific, and Alaska). In January 1969, the nation's first large offshore oil spill occurred in the Santa Barbara Channel after a blow-out. Hardy Decl. Ex. 14. The spill had a significant impact on marine life, killing thousands of sea birds and marine mammals such as dolphins, elephant seals, and sea lions. Hardy Decl. Exs. 15, 24. All commercial fishing was suspended and tourism suffered. Property damage along the shoreline was extensive.

The 1989 Exxon Valdez oil spill in Prince William Sound, Alaska, also caused significant harm to wildlife. Eighty-one percent of harbor seals in Prince William Sound were found to be oiled and unusually disoriented and lethargic, making them easy prey for whales. Hardy Decl. Ex. 25. Killer whale pods, some of which fed on oil-contaminated harbor seals, suffered dramatic population declines. In the year after the spill, one pod lost 33 percent of its population and another pod lost 41 percent, and some whale pods continued to decline nearly two decades later. *Id.* at 269, 273–76. Twenty-five years after the Exxon Valdez oil spill, oil from the spill continued to contaminate beaches in Alaska. Hardy Decl. Exs. 26, 27.

Oil and gas activity also causes other harms. It results in noise from seismic surveys, construction, and general operations. *See, e.g.*, Hardy Decl. Ex. 8, 52–55. Operating and servicing offshore platforms also produces air, water, and debris pollution. *Id*. at 28, 52–55, 146, 150, 154, 158. Heavy vessel traffic associated with oil and gas operations also strike and kill animals and harm them with noise. *Id*. at 44–45, 53. Offshore platforms, pipelines, and associated water pollution and oil spills can shut down access to fishing grounds through the life of a platform and introduce contaminants that can persist in fish for decades. *See, e.g.*, *id*. at 55, 146, 150, 153–54, 158, 179 ("Exclusion from a highly productive area may decrease landings or cause longer trips [], resulting in decreased revenue."), 208. Facilities and associated vessel traffic can also interfere with "the sustainable harvest, transport, sale, processing or storage of fish," impacting important cultural practices, nutrition, community resilience, and cultural identity. *Id*. at 179–80. Installation of pipelines destroy bottom habitat, cause noise, and can result in additional spills. *Id*. at 53, 54. When production is complete, facilities are decommissioned using explosives and other methods harmful to nearby animals. *Id*. at 53.

\* \* \*

9

On January 17, 2025, Plaintiffs filed a complaint challenging the withdrawal memos. ECF No. 1. Applicants seek intervention as of right to protect their long-standing interest in protecting the marine environment from expanded offshore oil and gas leasing, exploration, and development; interests advanced and protected by President Biden's withdrawals.

## MOVANTS FOR INTERVENTION

FRIENDS OF THE EARTH is a 501(c)(3) nonprofit organization with offices in Washington, D.C. and Oakland, California. Declaration of Hallie Templeton ¶ 2. For more than 50 years, it has championed the causes of a clean and sustainable environment, protection of the nation's public lands and waterways, and the exposure of political malfeasance and corporate greed. Friends of the Earth's Oceans and Vessels Program works to fight industrialization of the ocean in all its forms, and has won regional, national, and international limits on air, water, and oil pollution from cruise ships, cargo ships, oil tankers, ferries, and recreational watercraft. *See id*. ¶¶ 3, 6. Friends of the Earth has more than 4 million activists and over 240,000 members. *Id*. ¶ 2. Friends of the Earth and its members have a strong interest in protecting the environment from fossil fuel development and ensuring that oil and gas operations do not harm protected wildlife. *Id*. ¶¶ 3–6. Friends of the Earth has long been fighting to halt new fossil fuel development, with a particular emphasis on the Gulf of Mexico, where it has been using policy advocacy, litigation, and outreach to stop expanded offshore oil and gas drilling. *Id*. ¶¶ 7–11

OCEANA is a nonprofit organization dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and public education. Declaration of Beth Ann Lowell Niemiec ¶¶ 2–4. Oceana has over one million members and supporters in the United States. *Id*. ¶ 2. Oceana is headquartered in Washington, D.C. with regional staff across the United States. *Id*. Oceana's Climate and Energy Campaign uses science and advocacy to drive policies aimed at reducing threats to communities by preventing new offshore oil drilling and

promoting responsible offshore wind energy. *Id*. ¶ 3. Oceana's staff and members have opposed offshore oil drilling and have put significant resources and effort into advocating for permanent protections from offshore oil and gas drilling, including the withdrawals at issue in this case. *Id*. ¶¶ 5–15.

HEALTHY GULF is a network of community, conservation, environmental, and fishing groups and individuals committed to empowering people to protect and restore the natural resources of the Gulf of Mexico. Healthy Gulf is headquartered in New Orleans, Louisiana. Declaration of Martha Collins ¶ 1. Healthy Gulf's members live in the five Gulf states of Texas, Louisiana, Mississippi, Alabama, and Florida, and nationwide. *Id*. ¶ 4.  Healthy Gulf's purpose is to collaborate with and serve communities who love the Gulf of Mexico by providing research, communications, and coalition-building tools needed to reverse the long pattern of over-exploitation of the Gulf's natural resources. *Id*. ¶¶ 1, 3. On behalf of its members, Healthy Gulf has long been actively involved in efforts to strengthen oversight of the offshore oil and gas industry and end new oil and gas leasing in the Gulf, including through public education, administrative advocacy, and litigation. *Id*. ¶¶ 6–8, 10–13.

SURFRIDER FOUNDATION ("Surfrider") is a nonprofit organization dedicated to the protection and enjoyment of the world's oceans, waves, and beaches. Declaration of Peter Stauffer ¶ 3. Surfrider is headquartered in San Clemente, California and has more than 350,000 supporters and members and 200 chapters and clubs throughout the nation. *Id*. ¶¶ 3, 7. Surfrider's interests encompass a range of environmental issues, including the protection of ocean and coastal resources from pollution and other threats posed by offshore drilling. Surfrider has worked for decades to end new oil and gas leasing in U.S. waters. *Id*. ¶ 7.

## ARGUMENT

**I.    The Applicants Satisfy Rule 24(a)'s Test for Intervention as of Right.**

Applicants satisfy all requirements for intervention as of right. Federal Rule of Civil Procedure 24(a)(2) provides "On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

As the Fifth Circuit has explained, the Rule reflects a "broad policy favoring intervention." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016). In evaluating whether an applicant meets Rule 24(a)(2)'s requirements, courts in the Fifth Circuit are directed that Rule 24 "'is to be liberally construed,' with 'doubts resolved in favor of the proposed intervenor.'" *Entergy Gulf States La., L.L.C. v. EPA*, 817 F.3d 198, 203 (5th Cir. 2016) (citation omitted). Courts in the Fifth Circuit accept the movant's factual allegations as true. *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015).

Fifth Circuit courts apply a four-part test in considering a motion to intervene of right under Rule 24(a)(2):

> (1) the application . . . must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; [and] (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*Wal-Mart Stores*, 834 F.3d at 565 (quoting *Texas*, 805 F.3d at 657). Applicants satisfy all the prongs of the four-part test.

A.    **The Applicants' Motion to Intervene Is Timely.**

The Applicants' Motion is timely. The timeliness analysis is contextual and is to be determined from all the circumstances. *Wal-Mart Stores, Inc.*, 834 F.3d at 565. "Generally, filing a motion to intervene as soon as an intervenor realizes its interests are not adequately protected is sufficient to meet the timeliness requirement." *Field v. Anadarko Petroleum Corp.*, 35 F.4th 1013, 1018 (5th Cir. 2022) (citation omitted).

Applicants move to intervene just over six weeks after Plaintiffs filed their complaint. Hardy Decl. Ex. 28. Federal Defendants were only recently served and no answer is due until April 14, 20205. ECF 19. No record has been produced, no other factual development has taken place, and there have been no hearings or rulings on substantive matters. *See, e.g.*, *Wal-Mart Stores*, 834 F.3d at 565–66 (finding motion timely when it was filed "before discovery progressed and because it did not seek to delay or reconsider phases of the litigation that had already concluded"). The length of time that has elapsed since the Applicants knew or should have known of their interests in this case is minimal. *Cf., e.g.*, *NextEra Energy Capital Holdings, Inc. v. D'Andrea*, No. 20-50168, 2022 WL 17492273, at *3 (5th Cir. Dec. 7, 2022) (finding intervention timely when filed within two months of plaintiffs filing suit and before defendants filed responsive pleadings); *Ass'n of Pro. Flight Attendants v. Gibbs*, 804 F.2d. 318, 321 (5th Cir. 1986) (holding five-month lapse was not unreasonable). At this very early stage of litigation, delay that may prejudice an existing party is not an issue. *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994) ("[P]rejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation."). Applicants' motion is therefore timely.

**B.    The Applicants and Their Members Have Legally Protectable Interests at Stake.**

Applicants each have a protectable interest in this litigation. Rule 24(a)(2) requires an applicant for intervention to possess an interest relating to the property or transaction that is the subject matter of the litigation. Fed. R. Civ. P. 24(a)(2). This requirement is not rigid. Rather, "[t]he 'interest' test is primarily . . . a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Wal-Mart Stores*, 834 F.3d at 566 n.2 (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)). An interest is sufficient for purposes of Rule 24 if it is "legally protectable"—that is, "if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim.*" La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 305 (5th Cir. 2022) (quoting *Texas*, 805 F.3d at 659); *see also Diamond v. Charles*, 476 U.S. 54, 75 (1986). "What is important is 'whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way.'" *DeOtte v. Nevada*, 20 F.4th 1055, 1068 (5th Cir. 2021) (citation omitted). *See also id*. at 1070 (noting that the courts in the Fifth Circuit have a "liberal construction [of interest] in favor of intervention" (citing *Wal-Mart*, 834 F.3d at 565)); *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 167 (5th Cir. 2012).

Applicants have strong, legally protected interests related to the transaction that is the subject matter of this litigation—the withdrawal from oil and gas leasing areas off the Atlantic, Pacific, and eastern Gulf coasts as well as the Northern Bering Sea Climate Resilience Area. Applicants have long opposed oil and gas development in the areas specifically protected in the withdrawals and have advocated (for decades in some cases) for permanent protections. The withdrawal memos arose after more than a decade of Applicants' prior advocacy efforts for the

government to withdraw these areas in order to protect vital coastal communities, wildlife, economies, and cultures from the dangers of oil development. *See* Stauffer Decl. ¶ 7 (summarizing Surfrider's advocacy for withdrawals through organizing and engaging citizens and businesses, outreach to federal and state elected officials, and petitioning the administration); Lowell Niemiec Decl. ¶¶ 5–6, 22 (describing Oceana's work to obtain bipartisan opposition to offshore drilling from more than 380 local governments and 2,300 elected officials and its most recent advocacy with 197 organizations, business leaders, and national defense advocates to encourage President Biden to withdraw areas in the Atlantic, Pacific, and Gulf of Mexico); Templeton Decl. ¶¶ 7–10 (describing extensive efforts to engage millions of citizens to stop expanded offshore drilling, and through litigation and policy and administrative advocacy with decision-makers, including support for President Biden's withdrawals); Collins Decl. ¶¶ 11–14. That suffices to meet this requirement: As this Court has recognized, the interest requirement is "judged by a more lenient standard if the case involves a public interest question or is brought by a public interest group" and met where potential intervenors are defending an action that their advocacy helped cause to happen. *Louisiana v. Haaland*, No. 23-cv-01157, 2023 WL 5989052, at *3 (W.D. La. Sept. 14, 2023) (quoting *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014)).[1]

Even beyond meeting the minimum requirement for interest, applicants and their members also have cognizable recreational, aesthetic, and research interests in protecting the areas that are the subject of the withdrawal memos. Stauffer Decl. ¶¶ 12–13; Lowell Niemiec

---

[1] Other courts apply the same rule. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) ("A public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported."); *see also Coal. of Ariz./N.M Cntys. for Stable Econ. Growth v. Dep't of the Interior*, 100 F.3d 837, 841 (10th Cir. 1996) (holding a party with a "persistent record of advocacy for [the environmental] protection[s]" adopted by an agency that were subsequently challenged in court has a "direct and substantial interest" sufficient "for the purpose of intervention as of right").

Decl. ¶¶ 16–21; Templeton Decl. ¶¶ 4, 5, 11. For instance, members "regularly visit beaches and waters along the Atlantic, Pacific, and Gulf coasts, mostly to surf, but also to fish, swim, boat, or simply to enjoy time at the beach alone or together with friends and family," Stauffer Decl. ¶ 12, or to snorkel, scuba dive, view and photograph wildlife, or harvest clams and other shellfish. Templeton Decl. ¶ 4; Lowell Niemiec Decl. ¶ 16; Collins Decl. ¶¶ 3, 15. Applicants have acted to advance those interests through years of advocacy. Stauffer Decl. ¶¶ 8–11 (summarizing years of engagement with citizens and local governments to oppose expanded offshore drilling in the Atlantic, Pacific, and Gulf of Mexico, and participation in federal administrative and congressional decision-making); Lowell Niemiec Decl. ¶¶ 7–15 (detailing Oceana's nearly twenty-year efforts, including litigation and administrative advocacy, to oppose expansion of offshore oil and gas exploration and development in the Atlantic and Gulf of Mexico); Templeton Decl. ¶¶ 7–11; Collins Decl. ¶¶ 6–11.

In sum, Applicants' overriding interests in the areas protected by the withdrawal memos are protectable interests sufficient to support intervention as of right in this case. Applicants have invested years of effort and substantial financial resources advocating for these protections and have demonstrated protectable recreational, aesthetic, and research interests sufficient to support their intervention of right in this case.

### C.    Disposition of this Case May Impair or Impede the Applicants' Interests.

Disposition of this case threatens to impair or impede Applicants' demonstrated protectable interests. An applicant need only show that "the action *may* as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. P. 24(a)(2) (emphasis added). "[A] would-be intervenor must show only that impairment of its substantial legal interest is *possible* if intervention is denied. This burden is *minimal*." *Brumfield*, 749 F.3d at 345 n.2 (quoting *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999)).

Plaintiffs in this case challenge President Biden's withdrawal memos protecting areas off the Atlantic, Pacific, and eastern Gulf coasts, as well as along with the Northern Bering Sea Climate Resilience Area from new oil and gas leasing. This case may not reach the merits given that the Trump Administration has treated these withdrawals as a nullity. *See infra* at 19. But if it does, a decision favorable to Plaintiffs in this case would directly impair Applicants' long-standing interests in protecting these areas by effectively nullifying their many years of effort and investment. The benefits of the withdrawals will be lost if Plaintiffs prevail in this case.

Plaintiffs' requested relief, if granted, would also harm the recreational, aesthetic, and other interests of the Applicants and their members in protecting these areas from oil and gas development. Stauffer Decl. ¶¶ 13–14; Lowell Niemiec Decl. ¶ 22; Templeton Decl. ¶¶ 11–12; Collins Decl. ¶ 16. If the requested relief is granted, these areas would be open to future oil and gas leases and available for development. Such development would harm the coastal communities, Tribal cultures, and vital marine species and ecosystems along the shores.

A ruling in Plaintiffs' favor would also impair the Applicants' interests as a practical matter by having a potential chilling effect on the adoption of future protections. *See, e.g.*, *Sierra Club v. Glickman*, 82 F.3d 106, 109–10 (5th Cir. 1996) ("[T]he *stare decisis* effect of an adverse judgment constitutes a sufficient impairment to compel intervention." (citing *Espy*, 18 F.3d at 1207)); *see also Stone v. First Union Corp.*, 371 F.3d 1305, 1310 (11th Cir. 2004) (recognizing that "one court's ruling . . . could influence later suits," even though "a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects"). All in all, disposition of this case may impede or impair Applicants' demonstrated interests in protecting these areas.

### D.    None of the Existing Parties Adequately Represent Applicants' Interests.

Establishing the fourth and final factor for intervention of right—a potential for

inadequate representation—"present[s] proposed intervenors with only a minimal challenge," *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 195 (2022). To that end, the burden of establishing inadequate representation is "minimal," where potential intervenors "need not show that the representation by existing parties will be, for certain, inadequate," only that it "may be." *La Union*, 29 F.4th at 308–09 (quoting *Texas*, 805 F.3d at 661); *see also Espy*, 18 F.3d at 1207 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)).[2] Applicants' interests do not align with the interests of either existing party. That is of course true of Plaintiffs, who attempt to undermine the very protections Applicants have long sought. And it is also true of the government—President Trump purported to undo the withdrawals at issue the day he took office.

In this Circuit, the adequate representation requirement has "teeth"—and thus can be a basis to deny intervention—only where one of "two presumptions of adequate representation" apply. *Brumfield*, 749 F.3d at 345.[3] The first presumption, which does not apply here, arises "where one party is a representative" of the prospective intervenor by law. *Id*. In this case, no "existing party is a governmental body or officer charged by law with representing" Applicants' interests. *La Union*, 29 F.4th at 308 (quoting *Texas*, 805 F.3d at 661–62); *see Brumfield*, 749 F.3d at 345.

The second presumption applies if a party maintains the "same ultimate objective" as Applicants. *See La Union*, 29 F.4th at 308 (citation omitted). Here, no party shares an objective

---

[2] This is the standard "[b]ecause intervention necessarily occurs before the litigation has been resolved" and actual adequacy of representation will be apparent. *Wal-Mart Stores*, 834 F.3d at 569 (quoting *Texas*, 805 F.3d at 662).

[3] The Supreme Court never has blessed these presumptions as an appropriate interpretation of Rule 24. To the contrary, the Court has left open whether "a presumption of adequate representation might sometimes be appropriate when a private litigant seeks to defend a law alongside the government or in any other circumstance." *Berger*, 597 U.S. at 197.

with Applicants. Applicants' ultimate objective is to stop the expansion of new oil and gas leasing and development throughout the Outer Continental Shelf, including in the areas protected by President Biden's withdrawals in the Pacific Ocean, the Atlantic Ocean, the Eastern Gulf of Mexico and small section of Central Gulf of Mexico, and the Northern Bering Sea and to defend those withdrawals as a lawful exercise of power under Section 12(a) of OSCLA and the Constitution. Plaintiffs, of course, do not share that objective—they aim to enjoin the withdrawals. ECF No. 1 at 23 (Prayer for Relief). The Federal Defendants may have once shared that objective, but they do not anymore. Shortly after Plaintiffs filed suit, President Trump took office and issued an executive order that "revoked" both withdrawal memoranda. Hardy Decl. Ex. 28, at Sec. 2. The Secretary of the Interior more recently signed Secretarial Order 3420, announcing that "President Trump has revoked the withdrawals of the Outer Continental Shelf from oil and gas leasing that the Biden administration issued" and directing that all "Bureaus and Offices are to take all actions available to expedite the leasing of the [Outer Continental Shelf] for oil and gas exploration and production." Hardy Decl. Ex. 30. Given these clear statements that the new administration is not abiding by the withdrawals, Federal Defendants may ultimately agree with the Plaintiffs in this litigation, accepting that President Biden's withdrawals should be set aside. The Applicants and Federal Defendants thus do not share the same ultimate objective. *See Am. Great Lakes Ports Ass'n v. Zukunft*, No. 16-cv-1019, 2016 WL 8608457, at *4 (D.D.C. Aug. 26, 2016) (finding prospective-intervenor's interests may not be adequately represented because government might decide to settle with plaintiff).[4]

---

[4] The mere possibility that the government's position will change based on "unanticipated policy shifts" counsels in favor of concluding that the government does not adequately represent an intervenor's interest. *W. Energy All. v. Zinke*, 877 F.3d 1157, 1168 (10th Cir. 2017); *Kleissler v. United States Forest Serv.*, 157 F.3d 964, 974 (3d Cir. 1998). Here, the case for intervention is stronger still because that policy shift already has occurred.

To be sure, it remains possible that Federal Defendants will oppose Plaintiffs' complaint or seek to dismiss it on jurisdictional grounds given the new administration's orders and directives. Even if the Federal Defendants "vigorously oppose" Plaintiffs' complaint, the "ultimate-objective presumption" still does not apply because the Federal Defendants have "more extensive interests to balance than do" Applicants. *Brumfield*, 749 F.3d at 345–46. Federal Defendants may defend President Biden's withdrawals in this litigation, but they also will pursue a course that would allow them to defend President Trump's revocation of those withdrawals. Hardy Decl. Ex. 28, at Sec. 2. Applicants "do not have th[at] latter . . . interest[]," *Brumfield*, 749 F.3d at 346—Applicants seek only to defend President Biden's withdrawals. This "lack of unity in all objectives . . . is sufficient to demonstrate that the representation may be inadequate." *Id.*

In any event, even if the same-objective presumption applied, Applicants "overcome" that presumption because there is an "adversity of interest" between Applicants and the Federal Defendants. *La Union*, 29 F.4th at 308 (citation omitted). Adversity is present where the parties share the objective of prevailing in the litigation, but "interests diverge" with "how to carry out the ultimate objective." *Id.* Thus, the presumption is rebutted where, in response to a complaint challenging a policy, a defendant accepts that some change is "needed," while a potential intervenor would "urge[] that those policies need[] no adjustment." *Brumfield*, 749 F.3d at 346 (describing *Edwards v. City of Houston*, 78 F.3d 983, 1005 (5th Cir. 1996)). So too where a defendant may "prefer to not resolve [a] case on the merits at all," instead opting to defend against the complaint on threshold grounds and not "substantively defend[ing] the constitutionality of the law in th[e] lawsuit." *La Union*, 29 F.4th at 308. Where a potential intervenor seeks to argue a "regulatory scheme is constitutionally valid," but the defendant "merely seeks to defend the present suit and would accept a procedural victory," the defendant

20

does not adequately represent the intervenor's interest. *Wal-Mart*, 834 F.3d at 569; *see also Louisiana*, 2023 WL 5989052, at *3 (intervention appropriate where intervenors would defend "the ultimate merits" of an agency's decision while the government would make only procedural arguments).

These features favoring intervention are present here. Applicants would defend President Biden's withdrawals both on threshold grounds and on the merits: The withdrawals are consistent with OSCLA's requirements and the Constitution, and no change in policy is needed. It remains to be seen whether Federal Defendants will defend the lawfulness of those withdrawals on the merits, but Federal Defendants already have admitted that a change in policy has occurred. Having abandoned President Biden's withdrawals of oil and gas leasing, Federal Defendants will be "limit[ed] in the range of arguments [they] can advance" to defend those withdrawals, and there no doubt will be some "arguments" Applicants would advance that the Federal Defendants "cannot make given the differences in objectives." *Wal-Mart Stores*, 834 F.3d at 569. Rather, Federal Defendants may stick to procedural arguments to avoid having to opine on the lawfulness of President Biden's withdrawals. At the same time, to the extent Federal Defendants opine on the merits, they may make arguments to defend President Trump's asserted authority to revoke President Biden's withdrawals. In short, while it may not yet be possible to "say for sure" that the Federal Defendants' "more extensive interests will in fact result in inadequate representation," "they might, which is all that . . . rule [24(a)] requires." *Brumfield*, 749 F.3d at 346. It is enough to highlight "arguments" that Federal Defendants "cannot make given the differences in . . . objectives." *Wal-Mart*, 834 F.3d at 569.

Should this case proceed to judgment, divergent interests may also cause Federal Defendants and Applicants to disagree over how to proceed. *See Crossroads Grassroots Pol'y*

*Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 321 (D.C. Cir. 2015) ("It is apparent the Commission and Crossroads hold different interests, for they disagree about . . . post-judgment strategy."). In this case, Federal Defendants' broader interests—such as considerations of the federal government's litigation positions across all its cases—may cause it to make strategic or argumentative choices that do not protect Applicants' interests. They may decline to seek a stay or appeal. *See Berger*, 597 U.S. at 198–99 (inadequate representation where an existing party "declined to seek a stay" of a preliminary injunction that barred enforcement of that law).

It is enough to highlight arguments that Federal Defendants "cannot make given the difference in . . . objectives." *Wal-Mart*, 834 F.3d at 569. But the adversity of interests runs deeper still. As this Court has recognized, when it comes to applying OSCLA, environmental groups' interests can differ from those of government agencies. Although the federal government is "statutorily required to consider environmental factors," they "must also consider energy needs and other economic concerns." *Louisiana*, 2023 WL 5989052, at *3 (citing 43 U.S.C. §§ 1344(a)(1)–(3)).[5] Applicants, by contrast, each are focused singularly on environmental protection and preservation that only partially align with the numerous and varied statutory obligations placed on Federal Defendants. Stauffer Decl. ¶¶ 3, 6; Lowell Niemiec Decl. ¶¶ 3–4; Templeton Decl. ¶¶ 2–3; Collins Decl. ¶¶ 1, 3, 5. That Federal Defendants must represent these broader interests supports intervention here. *See, e.g.*, *Espy*, 18 F.3d at 1208 (concluding that the

---

[5] *See, e.g.*, 43 U.S.C. § 1332(3) (Outer Continental Shelf Lands Act, stating that these lands are "a vital national resource reserve held . . . for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards . . . consistent with the maintenance of competition and other national needs"); *id*. § 1344(a)(1) ("Management of the outer Continental Shelf shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments.").

agency "represent[s] the broad public interest, not just the economic concerns of the timber industry" and based on "the minimal burden," concluding "that [its] representation of the intervenors' interest is inadequate"); *Sierra Club*, 82 F.3d at 110 (per curiam) (concluding that because the Department of Agriculture must represent the broad public interest, "[f]or this reason alone," its interests and those of farmers seeking to intervene "will not necessarily coincide").

These diverging interests are not academic. Applicants and the government can, and regularly do,[6] diverge on how best to apply OSCLA. Those disputes will spill over into the contours of a president's authority to withdraw lands under section 12(a) of OSCLA. Indeed, those differences have manifested already, as the government has made clear that it will proceed with oil and gas leasing without regard to the withdrawals. *See supra* at 19.

Because they satisfy each element of Rule 24(a), Applicants should be allowed to intervene in this case as of right.

## II.    Alternatively, the Court Should Permit the Applicants to Intervene Permissively.

If the Court denies intervention as of right, Applicants request permissive intervention under Rule 24(b). "[P]ermissive intervention is appropriate where 'an applicant's claim or defense and the main action have a question of law or fact in common.'" *Trans Chem. Ltd. v. China Nat. Mach. Imp. & Exp. Corp.*, 332 F.3d 815, 824 (5th Cir. 2003) (quoting Fed. R. Civ. P. 24(b)(2)). The Fifth Circuit "has accepted that '[t]he "claim or defense" portion of Rule 24(b) ... [is to be] construed liberally.'" *United States ex rel. Hernandez v. Team Finance*, L.L.C., 80 F.4th 571, 577 (5th Cir. 2023) (alterations in original) (quoting *Newby v. Enron Corp.*, 443 F.3d

---

[6] Applicants have litigated repeatedly (and currently are litigating) against Federal Defendants' oil and gas decisions due to the government's failure to protect the Applicants' interests. *See, e.g., Healthy Gulf v. Haaland*, No. 24-1024 (D.C. Cir. filed February 12, 2024); *Healthy Gulf v. Haaland*, No. 23-cv-00604 (D.D.C. filed Mar. 6, 2023); *Healthy Gulf v. Haaland*, No. 23-cv-02487 (D.D.C. filed Aug. 25, 2023).

416, 422 (5th Cir. 2006)). "[D]istrict courts have 'broad discretion' in allowing intervention." *Hanover Ins. Co. v. Superior Lab. Servs., Inc.*, 179 F. Supp. 3d 656, 667 (E.D. La. 2016) (citation omitted). In exercising that discretion, a court considers "whether the intervention will unduly delay or prejudice the adjudication of the original parties' right." Fed. R. Civ. P. 24(b)(3).

Applicants satisfy Rule 24(b)'s requirements. Applicants seek to defend the protections afforded under President Biden's withdrawal memos. Given this overlap, the interests Applicants seek to protect and the defenses they seek to assert share common questions of both law and fact with the claims in this case.

Applicants' participation will aid the Court by bringing to bear their expertise on the reasons protections in these areas are necessary. *See, e.g.*, *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 912–13 (D.C. Cir. 1977) (granting intervention in part because intervenor "may also be likely to serve as a vigorous and helpful supplement to EPA's defense"). Applicants' perspective based on years of advocacy will equip the Court to understand the broad range of support for President Biden's actions and the harm that will occur if those protections are removed.

Allowing permissive intervention will not "unduly delay or prejudice the adjudication of the original parties." Fed. R. Civ. P. 24(b)(3). Applicants seek to intervene early in the lawsuit, prior to any substantive briefing or rulings. Applicants should be permitted to intervene permissively.

<u>**CONCLUSION**</u>

For the above reasons, Applicants respectfully ask this Court to grant them intervention as of right, or, in the alternative, by permission, to protect their and their members' interests in safeguarding valuable coastal communities off the Atlantic, Pacific, and Eastern Gulf coasts as well as the Northern Bering Sea Climate Resilience Area from the dangers associated with oil and gas leasing.

24

Respectfully submitted this 3rd day of March, 2025.

/s/ Lauren E. Godshall
Lauren E. Godshall, La. Bar. No. 31465
Earthjustice
1505 Colony Place
Metairie, LA 70003
T: 773-828-0836
lgodshall@earthjustice.org

/s/ Stephen D. Mashuda
Stephen D. Mashuda (*pro hac vice* forthcoming)
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
T: 206-343-7340
smashuda@earthjustice.org

/s/ Brettny Hardy
Brettny Hardy (*pro hac vice* forthcoming)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
T: 415-217-2000
bhardy@earthjustice.org

/s/ Benjamin P. Chagnon
Benjamin P. Chagnon (*pro hac vice* forthcoming)
Earthjustice
1001 G Street NW, Suite 1000
Washington, D.C. 20001
T: 202-745-5210
bchagnon@earthjustice.org

*Counsel for Applicant-Intervenor-Defendants*
*Friends of the Earth, Healthy Gulf, Oceana,*
*Surfrider Foundation*