## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WESTERN LOUISIANA
## LAKE CHARLES DIVISION

STATE OF LOUISIANA, *et al.*,

      Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

      Defendants,

      and

FRIENDS OF THE EARTH, *et al.*,

      Intervenor-Defendants.

Hon. Judge James D. Cain, Jr.

Hon. Magistrate Judge Thomas P. LeBlanc

Case No. 2:25-cv-71

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    I.     The Outer Continental Shelf Lands Act................................................ 2

    II.    Prior Withdrawals of Areas of the OCS from Oil and Gas Leasing ...................... 4

    III.   President Trump's Reversal of President Obama's Withdrawals ......................... 7

    IV.   President Biden's Withdrawal of Areas of the OCS from Oil and Gas
           Leasing and President Trump's Rescission of Those Withdrawals ...................... 8

LEGAL STANDARD ............................................................................................. 10

ARGUMENT .......................................................................................................... 10

    I.     The Court Lacks Jurisdiction Over Plaintiffs' Claims.......................... 10

          A.    Plaintiffs' Statutory Claim Is Barred by Sovereign Immunity ................ 10

          B.    Plaintiffs' Statutory and Constitutional Claims Fail for Lack of a
                Private Right of Action ................................................................... 14

    II.    If the Court Reaches the Merits, It Should Find That, to the Extent President
           Biden's Withdrawals Were Permanent, the Withdrawals Exceeded the
           President's Authority Under Section 12(a) of OCSLA ......................... 16

          A.    President Biden's Withdrawals Were Not Permanent and Were
                Lawfully Revoked by President Trump .............................................. 17

          B.    If President Biden's Withdrawals Are Deemed to be Permanent,
                They Are Unlawful ....................................................................... 18

                1.    Under the Plain Text of Section 12(a) of OCSLA,
                    Withdrawals Are Subject to Modification or Revocation ............ 18

                2.    The Purpose, Structure, and Context of OCSLA Demonstrate
                    that Withdrawals May Be Modified or Revoked ........................ 20

                3.    Historical Practice Confirms that Withdrawals May Be
                    Modified or Revoked .............................................................. 22

                 4.    The Legislative History Supports the View that Withdrawals
                    Under OCSLA Are Not Permanent ........................................... 24

III.    Section 12(a) Can (and Should) be Construed to Avoid Constitutional Concerns ........................................................................................... 26

IV.    If the Court Reaches the Constitutional Claims, It Should Reject Them ............. 27

    A.    The Withdrawals Did Not Violate the Property Clause or the Take Care Clause ............................................................................. 27

    B.    Section 12(a) of OCSLA Does not Violate the Non-Delegation Doctrine .................................................................................. 28

CONCLUSION ................................................................................... 34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.L.A. Shechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ................................................................................................ 28, 31

*AFL-CIO v. Khan,*
618 F.2d 784 (D.C. Cir. 1979) ...................................................................................... 24

*Al- Bihani v. Obama,*
619 F.3d 1 (D.C. Cir. 2010) .................................................................................... 24, 25

*Alabama-Coushatta Tribe of Texas v. United States,*
757 F.3d 484 (5th Cir. 2014) ........................................................................................ 14

*Albertson v. FCC,*
182 F.2d 397 (D.C. Cir. 1950) ...................................................................................... 20

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ................................................................................................ 14, 15

*Alexander v. Trump,*
139 S. Ct. 1200 (2019) ................................................................................................. 15

*Alexander v. Trump,*
753 F. App'x. 201 (5th Cir. 2018) ........................................................................... 12, 15

*Allen v. Vertafore, Inc.,*
28 F.4th 613 (5th Cir. 2022) ......................................................................................... 18

*American Power & Light Co. v. SEC,*
329 U.S. 90 (1946) ....................................................................................................... 28

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ................................................................................................ 15, 16

*Big Time Vapes, Inc. v. FDA,*
963 F.3d 436 (5th Cir. 2020) .................................................................................. 28, 29

*Boire v. Greyhound Corp.,*
376 U.S. 473 (1964) ..................................................................................................... 13

*Cal. Coastal Comm'n v. Granite Rock Co.,*
480 U.S. 572 (1987) ..................................................................................................... 32

*Crowell v. Benson,*
285 U.S. 22 (1932) ....................................................................................................... 26

*Ctr. for Sustainable Econ. v. Jewell,*
779 F.3d 588 (D.C. Cir. 2015) ................................................................................... 2, 3

*Dalton v. Specter*,
   511 U.S. 462 (1994) ............................................................................................ 12

*Danos v. Jones*,
   652 F.3d 577 (5th Cir. 2011) ..................................................................... 10, 13

*Davis v. Michigan Dep't of Treasury*,
   489 U.S. 803 (1989) ............................................................................................ 22

*Davis v. Passman*,
   442 U.S. 228 (1979) ............................................................................................ 15

*Def. Distributed v. U.S. Dept. of State*,
   121 F. Supp. 3d 680 (W.D. Tex. 2015) ........................................................... 13

*Dept. of the Navy v. Egan*,
   484 U.S. 518 (1988) ............................................................................................ 33

*Douglas v. Independent Living Center of Southern California, Inc.*,
   565 U.S. 606 (2012) ............................................................................................ 16

*FDIC v. Meyer*,
   510 U.S. 471 (1994) ............................................................................................ 10

*Fed. Trade Comm'n v. ZAAPPAAZ, L.L.C.*,
   140 F.4th 675 (5th Cir. 2025) ........................................................................... 10

*Fischer v. United States*,
   603 U.S. 480 (2024) ............................................................................................ 22

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ..................................................................................... 11, 14

*Free Enter. Fund v. Public Company Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ..................................................................................... 15, 27

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002) ............................................................................................ 14

*GTNX, Inc. v. INTTRA, Inc.*,
   789 F.3d 1309 (Fed. Cir. 2015) ........................................................................ 20

*Gundy v. United States*,
   588 U.S. 128 (2019) ............................................................................................ 30

*J. W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928) ............................................................................................ 28

*Jarkesy v. Sec. & Exchange Comm'n*,
   34 F.4th 446 (5th Cir. 2022) ............................................................................. 32

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ............................................................................................ 26

iv

*King v. Burwell*,
    576 U.S. 473 (2015)...................................................................................... 20

*Kleppe v. New Mexico*,
    426 U.S. 529 (1976)...................................................................................... 32

*Lane v. Pena*,
    518 U.S. 187 (1996)...................................................................................... 10

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949)........................................................................... 12, 13, 15

*League of Conservation Voters v. Biden*,
    843 Fed. Appx. 937 (9th Cir. 2021)............................................................ 17

*League of Conservation Voters v. Trump*,
    363 F. Supp. 3d 1013 (D. Alaska 2019) .................................................. 7, 17

*Leedom v. Kyne*,
    358 U.S. 184 (1958)...................................................................................... 13

*Loving v. United States*,
    517 U.S. 748 (1996)...................................................................................... 33

*Macktal v. Chao*,
    286 F.3d 822 (5th Cir. 2002) ...................................................................... 20

*Medellin v. Texas*,
    552 U.S. 491 (2008)...................................................................................... 24

*Mich. Gambling Opposition v. Kempthorne*,
    525 F.3d 23 (D.C. Cir. 2008) ................................................................ 29, 30

*Mistretta v. United States*,
    488 U.S. 361 (1989)................................................................................ 28, 29

*Nat'l Broadcasting Co. v. United States*,
    319 U.S. 190 (1943)...................................................................................... 30

*Native Vill. of Point Hope v. Jewell*,
    740 F.3d 489 (9th Cir. 2014) ........................................................................ 3

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014)...................................................................................... 22

*Nuclear Reg. Comm'n v. Texas*,
    145 S. Ct. 1 (2025)................................................... 13, 26, 28, 29, 31, 32

*Pacific Operators Offshore, LLP v. Valladolid*,
    132 S. Ct. 680 (2012).................................................................................... 2

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935)................................................................................ 28, 31

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
    587 U.S. 601 (2019) ........................................................................ 20, 21

*Pennhurst State School & Hospital v. Halderman*,
    465 U.S. 89 (1984) .......................................................................... 12, 13

*Reynolds v. United States*,
    565 U.S. 432 (2012) ................................................................................ 30

*Ry. Clerks v. Ass'n for Benefit of Non-contract Emps.*,
    380 U.S. 650 (1965) ................................................................................ 13

*S. Utah Wilderness Alliance v. BLM*,
    425 F.3d 735 (10th Cir. 2005) ................................................................ 19

*Stokes v. Sw. Airlines*,
    887 F.3d 199 (5th Cir. 2018) .................................................................. 14

*Texas v. U.S. Dept. of Homeland Sec.*,
    123 F.4th 186 (5th Cir. 2024) ................................................................ 11

*Touby v. United States*,
    500 U.S. 160 (1991) ................................................................................ 33

*Tribal Vill. of Akutan v. Hodel*,
    869 F.2d 1 (9th Cir. 1988) ...................................................................... 21

*Trujillo v. General Elec. Co.*,
    621 F.2d 1084 (10th Cir. 1980) .............................................................. 19

*Tulare Cnty. v. Bush*,
    185 F. Supp. 2d 18 (D.D.C. 2001) ......................................................... 33

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc. Ltd.*,
    484 U.S. 365 (1988) ................................................................................ 20

*United States v. Grimaud*,
    220 U.S. 506 (1911) ................................................................................ 32

*United States v. Hansen*,
    599 U.S. 762 (2023) ................................................................................ 26

*United States v. Louisiana*,
    363 U.S. 1 (1960) ...................................................................................... 2

*United States v. Mazurie*,
    419 U.S. 544 (1975) ................................................................................ 33

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ...................................................................... 19, 23, 27

*United States v. Moore*,
    71 F.4th 392 (5th Cir. 2023) .................................................................. 18

*United States v. Pheasant,*
    129 F.4th 576 (9th Cir. 2025) ........................................................ 32

*United States v. Richards,*
    755 F.3d 269 (5th Cir. 2014) ......................................................... 31

*United States v. Williams,*
    553 U.S. 285 (2008) ...................................................................... 22

*Utah Ass'n of Counties v. Bush,*
    316 F. Supp. 2d 1 (D. Utah 2004) ............................................ 32, 33

*Utah Power & Light Co. v. United States,*
    243 U.S. 389 (1917) ...................................................................... 32

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,*
    535 U.S. 635 (2002) ...................................................................... 16

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................... 21, 28, 29, 30

*Yakus v. United States,*
    321 U.S. 414 (1944) ...................................................................... 31

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ................................................................ 24, 33

*Ziglar v. Abbasi,*
    582 U.S. 120 (2017) ...................................................................... 14

**Statutes**

43 U.S.C. § 1312 ..................................................................................... 2

43 U.S.C. § 1331(a) ................................................................................ 2

43 U.S.C. § 1332(3) ................................................................. 21, 29, 31

43 U.S.C. § 1340(a) ................................................................................ 7

43 U.S.C. § 1341(a) ................................................... 4, 13, 14, 18, 30

43 U.S.C. § 1341(b) ......................................................................... 22, 30

43 U.S.C. § 1341(b)-(d) ........................................................................ 33

43 U.S.C. § 1344 ................................................................................ 3, 4

43 U.S.C. § 1349 .............................................................................. 12, 14

43 U.S.C. § 1349(a) .............................................................................. 11

43 U.S.C. § 141 ..................................................................................... 25

43 U.S.C. §§ 1301(b) .............................................................................. 2

43 U.S.C. §§ 1331-1356(c) ............................................................................................. 3

5 U.S.C. § 702 ....................................................................................................... 11, 14

5 U.S.C. § 704 ............................................................................................................. 14

Pub. L. No. 104-185, 110 Stat. 1700 (1996) ............................................................... 24

Pub. L. No. 105-362, 112 Stat. 3280 (1998) ............................................................... 24

Pub. L. No. 109-432, 120 Stat. 2922 (2006) ................................................................. 7

Pub. L. No. 109-58, 119 Stat. 594, 694, 704, 739-47 (2005) ...................................... 24

Pub. L. No. 111-212, 124 Stat. 2341 (2010) ............................................................... 24

Pub. L. No. 113-67, 127 Stat. 1165 (2013) ................................................................. 23

Pub. L. No. 117-169, 136 Stat., 1818, (2022) ............................................................. 23

Pub. L. No. 119-21, 139 Stat. 72 (2025) ............................................................... 3, 23

Pub. L. No. 212, 67 Stat. 462 (Aug. 7, 1953) ............................................................. 11

Pub. L. No. 94-579, 90 Stat. 2743 (1976) ................................................................... 25

Pub. L. No. 95-372, 92 Stat. 629 (1978) ..................................................................... 11

**Regulations**

10 Fed. Reg. 12,303 (Sept. 28, 1945) ............................................................... 2, 3, 33

25 Fed. Reg. 2352 (Mar. 15, 1960) ............................................................................... 4

30 C.F.R. pt. 551 ........................................................................................................... 4

34 Fed. Reg. 5655 (Mar. 26, 1969) ............................................................................... 5

81 Fed. Reg. 90,669 (Dec. 9, 2016) .............................................................................. 6

82 Fed. Reg. 20,815 (Apr. 28, 2017) ............................................................................ 7

86 Fed. Reg. 7,037 (Jan. 20, 2021) ........................................................................... 7, 9

90 Fed. Reg. 6,739 (Jan. 6, 2025) ................................................................................ 8

90 Fed. Reg. 6,743 (Jan. 6, 2025) ................................................................................ 8

90 Fed. Reg. 8,237 (Jan. 20, 2025) ............................................................... 8, 9, 16, 17

90 Fed. Reg. 8,237, 8,240 (Jan. 20, 2025) .................................................................... 9

**Other Authorities**

1953 U.S.C.C.A.N. 2177 ......................................................................................... 3, 21

*Transfer to Treasury Department Jurisdiction Over Portion of Naval Reservation*,
   37 Op. Att'y Gen. 431 (1934) .............................................................................. 19

*Withdrawal of Public Lands*,
  40 Opp. Att'y Gen. 73 (1941) .................................................................................................. 33

## INTRODUCTION

Plaintiffs Louisiana, Gulf Energy Alliance, Alabama, Alaska, Georgia, and Mississippi's ("Louisiana") and American Petroleum Institute's ("API") motions for summary judgment fail because there is neither jurisdiction nor a viable merits defense.

As a threshold matter, Plaintiffs' OCSLA claim against the President must be dismissed because it is barred by sovereign immunity.[1]  The waiver of sovereign immunity in the Administrative Procedure Act ("APA") is not available in a suit against the President, and Plaintiffs cannot evade that precedent by recasting their claims as so-called *ultra vires* claims.  And they lack a right of action to sue the President for both their statutory and constitutional claims.  The APA right of action is unavailable, and the OCSLA right of action is limited to other types of claims.  The Supreme Court has made clear that a plaintiff must possess a right of action, even for constitutional claims, and Plaintiffs do not have one here.

But even if the Court reaches the merits, Plaintiffs' claims fail as a threshold matter.  President Biden's withdrawals were not permanent and were, in fact, lawfully revoked by President Trump.  Yet if the Court finds that the withdrawals were permanent, those withdrawals would exceed the President's authority under Section 12(a) of OCSLA.  Under the statute, withdrawals must be temporary and revocable, consistent with the statutory text and historical practice.  The Court should not reach the constitutional issues, but if it does, it should find that the President's temporary withdrawals were constitutional.

---

[1] Plaintiffs have filed two summary judgment motions.  Louisiana filed a Motion for Summary Judgment, arguing that Section 12(a) of the Outer Continental Shelf Lands Act ("OCSLA") violates the non-delegation doctrine.  *See* Louisiana's Mem. in Supp. of Summ. J. ("La. Mem."), ECF No. 47-1.  The American Petroleum Institute ("API") filed its own summary judgment motion, arguing primarily that President Biden's January 6, 2025 withdrawals of areas on the outer continental shelf ("OCS") exceeded his authority under Section 12(a) of OCSLA.  *See* API's Summ. J. Mem. ("API Mem."), ECF No. 48-1.  This memorandum responds to both sets of arguments.

# BACKGROUND

## I.    The Outer Continental Shelf Lands Act

The OCS of the United States "is a vast underwater expanse nearly equal in size to the Australian continent." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 592 (D.C. Cir. 2015). The OCS includes "all submerged lands lying seaward" of coastal state jurisdiction.  43 U.S.C. § 1331(a); *see also Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 685 (2012). For OCS lands adjacent to most coastal states (except Texas, the Gulf coast of Florida,[2] and certain states where the line has become fixed and no longer adjusts with the coastline), the federal jurisdiction of the OCS begins three nautical miles from the coastline.  43 U.S.C. §§ 1301(b), 1312; *United States v. Louisiana*, 363 U.S. 1, 66 (1960); *United States v. Florida*, 363 U.S. 121, 129 (1960).  The outer boundary of the OCS shelf extends roughly two hundred nautical miles to the seaward limit of the international-law jurisdiction of the United States. 43 U.S.C. § 1312; *Ctr. for Sustainable Econ.*, 779 F.3d at 592.

In 1945, President Truman, recognizing the "long range world-wide need for new sources of petroleum and other minerals," exercised the United States' control over the natural resources of the OCS by issuing the "Truman Proclamation."  Proclamation No. 2667, 10 Fed. Reg. 12,303 (Sept. 28, 1945).  The Proclamation informed other nations that:

> the Government of the United States regards the natural resources of the subsoil and sea bed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control.

*Id.*  Shortly thereafter, President Truman issued another Executive Order to reserve and set aside the OCS's natural resources under the jurisdiction and control of the Secretary of the Interior.

---

[2] The submerged lands off Texas and the west coast of Florida extend from the coastline to no more than 3 marine leagues (16.2 km) into the Gulf of America.

Exec. Order 9633, 10 Fed. Reg. 12,305 (Oct. 2, 1945).

In 1953, Congress enacted OCSLA, which governs the management of energy and mineral resources on the OCS. *See* 43 U.S.C. §§ 1331-1356(c), as amended. In passing OCSLA, Congress declared that the oil and gas reserves beneath the OCS are "a vital national resource . . . which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.* § 1332(3). A congressional report issued upon OCSLA's enactment similarly declared that: "The principal purpose of [OCSLA] is to authorize the leasing by the Federal Government of [] the shelf." H.R. Rep. No. 413, 83rd Congress, 1st Sess. (1953), *reprinted in* 1953 U.S.C.C.A.N. 2177, 2178.

Consistent with this purpose, OCSLA sets forth a four-stage process to allow development of oil or gas: (1) the Department of the Interior prepares a five-year program of proposed lease sales across the entire OCS, *see* 43 U.S.C. § 1344; (2) the Department issues leases in accordance with the program, *see id.* §§ 1337(a), 1344(d); (3) the Department reviews the lessee's exploration plans, *see id.* § 1340; and (4) the Department, in consultation with state and local governments, reviews the lessee's development plans. *See id.* § 1351; *see also Native Vill. of Point Hope v. Jewell,* 740 F.3d 489, 493 (9th Cir. 2014); *Ctr. for Sustainable Econ.*, 779 F.3d at 594.

The five-year leasing program must address the nation's energy needs for a five-year period and "serves as the template for the Government's leasing of drilling rights on the [Shelf] for the five-year period following its preparation." *Ctr. for Sustainable Econ.*, 779 F.3d at 592 n.6; *see also* 43 U.S.C. § 1344.[3] The five-year program establishes a schedule for potential lease sales, but

---

[3] Section 50102 of the One Big Beautiful Bill Act requires BOEM to hold two sales per year in the Gulf of America, on average, and six total sales in Cook Inlet off Alaska through 2040. *See* Pub. L. No. 119-21 § 50102(a)(1)-(2), 139 Stat. 72, 139-40 (July 4, 2025).

it does not authorize any oil and gas activities. *See id.* Under the statute, the leasing program "considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS], and the potential impact of oil and gas exploration on other resource values of the [OCS] . . . ." *Id.* § 1344(a)(1). Similar requirements apply to the remaining three steps. *See, e.g., id.* §§ 1340(g)(3), 1351(h)(1)(D)(i). OCS oil and gas leasing is limited to areas included in the approved five-year program and must be consistent with the provisions of the program. *See, e.g., id.* § 1344(d)(3). Even exploration, including the use of seismic surveys, can occur only after the proponent of a survey obtains the relevant federal permits or plan approvals, which are subject to environmental and other procedural requirements. *See id.* § 1340; 30 C.F.R. pt. 551.

OCSLA also contains a provision allowing the President to reserve areas of the OCS from disposition by leasing, including for oil and gas development. Section 12(a) states, "The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf." 43 U.S.C. § 1341(a). The statute also provides that "[t]he United States reserves and retains the right to designate by and through the Secretary of Defense, with the approval of the President, as areas restricted from exploration and operation that part of the [OCS] needed for national defense." *Id.* § 1341(d).

## II.    Prior Withdrawals of Areas of the OCS from Oil and Gas Leasing

From OCSLA's passage in 1953 through 2008, Section 12(a) was invoked sparingly. But between 2010 and 2016, President Obama invoked it multiple times:

1.    **1960.** President Eisenhower established the Key Largo Coral Reef Preserve. *See* Proclamation No. 3339, Establishing the Key Largo Coral Reef Preserve, 25 Fed. Reg. 2352 (Mar. 15, 1960), ECF No. 48-6.

2.     **1969.** Secretary of the Interior Walter Hickel provided notice that certain areas were "withheld from leasing as an adjunct to the" creation of the Santa Barbara Channel Ecological Preserve. See Public Land Order No. 4587, 34 Fed. Reg. 5655, 5656 (Mar. 26, 1969), ECF No. 48-7.

3.     **1990.** President George H.W. Bush supported the congressional moratorium of off-shore oil and gas leasing and development in much of the OCS in a statement issued June 26, 1990. *See* Statement on Outer Continental Shelf Oil and Gas Development, 26 Weekly Comp. Pres. Doc. 1006 (June 26, 1990), ECF No. 48-8. President Bush clarified that the moratorium was an exercise of Section 12(a) authority. *See* Memorandum for the Secretary of the Interior (Aug. 4, 1992), Ex. 1. In the August 1992 memorandum, President Bush noted that the withdrawal of the areas of OCS was "subject to revocation should the President determine the scheduling of a lease sale to be required in the interest of national security." *Id.*

4.     **1998.** President Clinton withdrew, for a limited time, certain areas of the OCS, and withdrew other areas for "a time period without specific expiration." Like President Bush, President Clinton noted that his withdrawals of areas of the OCS under Section 12(a) of OCSLA were also "subject to revocation by the President in the interest of national security." Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 34 Weekly Comp. Pres. Docs. 1111, 1111 (June 12, 1998), ECF No. 48-9.

5.     **2007.** President George W. Bush modified the 1998 withdrawal of areas from leasing for a limited time to match a Congressional moratorium. See Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 43 Weekly Comp. Pres. Docs. 19, 19 (Jan. 9, 2007), ECF No. 48-10.

6.      **2008.** President George W. Bush modified the withdrawal of areas of the OCS from leasing disposition, limiting the withdrawal to those areas designated as of July 14, 2008, as Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act. *See* Memorandum on Modification of the Withdrawal of Areas of the United States Outer Continental Shelf from Leasing Disposition, 44 Weekly Comp. Pres. Docs. 986 (July 14, 2008), ECF No. 48-12.

7.      **2010.** President Obama withdrew the area of Bristol Bay from leasing for the period through June 30, 2017. Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 2010 Daily Comp. Pres. Docs. 1, 1 (Mar. 31, 2010), Ex. 2.

8.      **2014.** President Obama revoked his 2010 withdrawal and imposed a withdrawal for the same area for "a time period without specific expiration."  Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 2014 Daily Comp. Pres. Docs. 1, 1 (Dec. 16, 2014), ECF No. 48-13.

9.      **2015.** President Obama withdrew the Chukchi and Beaufort Sea planning areas "for a time period without specific expiration." Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska from Leasing Disposition, 2015 Daily Comp. Pres. Docs. 1, 1 (Jan. 27, 2015), ECF No. 48-14.

10.     **2016.** In three separate actions, President Obama withdrew areas of the Atlantic Ocean and several offshore Alaska Areas from leasing, each for "a time period without specific expiration."  Exec. Order No. 13754 - Northern Bering Sea Climate Resilience, 81 Fed. Reg. 90,669, 90,670 (Dec. 9, 2016), ECF No. 48-15; Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 1, 18 (Dec. 20, 2016), ECF No. 48-16; Memorandum on Withdrawal of Certain Portions of

6

the United States Arctic Outer Continental Shelf from Mineral Leasing, 2016 Daily Comp. Pres. Docs. 1, 18 (Dec. 20, 2016), ECF No. 48-17.

### III.    President Trump's Reversal of President Obama's Withdrawals

Soon after taking office during his first administration, President Trump reversed several of President Obama's withdrawals.  *See* Exec. Order No. 13795, Implementing an America-First Offshore Energy Strategy 82 Fed. Reg. 20,815 (Apr. 28, 2017) ("2017 Order").  The executive order modified the withdrawal memoranda issued on December 20, 2016 and January 27, 2015, such that the withdrawals were limited to "those areas of the [OCS] designated as of July 14, 2008, as Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972." *Id.* § 5.  Many of the same environmental groups who later intervened in this case sued challenging the 2017 Order.

On summary judgment, the court in that case concluded that President Trump lacked authority under Section 12(a) of OCSLA, 43 U.S.C. § 1340(a), to reverse President Obama's withdrawal of areas on the OCS, and it vacated the relevant portion of the 2017 Order.  *See League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1030-31 (D. Alaska 2019), *vacated as moot and remanded*, 843 F. App'x. 937 (9th Cir. 2021).  On appeal, the district court's order was vacated as moot following President Biden's issuance of an executive order rescinding the 2017 Order. *See* Exec. Order No. 13990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7,037 (Jan. 20, 2021).  The plaintiffs in *League of Conservation Voters* recently sought to reopen that case, as discussed below.

During his presidency, President Trump also issued two withdrawals.  He withdrew for ten years an area in the Eastern Gulf identified in Section 104(a) of the Gulf of Mexico Energy Security Act of 2006 ("GOMESA"), Pub. L. No. 109-432, and the South Atlantic and Straits of Florida Planning Areas.  *See* Memorandum on Withdrawal of Certain Areas of the United States Outer

7

Continental Shelf from Leasing Disposition (September 8, 2020).  *See* https://www.boem.gov/oil-gas-energy/leasing/areas-under-restriction (last visited May 7, 2025).  In a second memorandum, he withdrew for ten years the North Carolina portion of the Mid-Atlantic Planning Area.  *See* Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition (September 25, 2020).  President Trump's withdrawals remain in effect until June 30, 2032.  *See id.*

## IV.    President Biden's Withdrawal of Areas of the OCS from Oil and Gas Leasing and President Trump's Rescission of Those Withdrawals

On January 6, 2025, President Biden issued two memoranda withdrawing certain areas of the OCS from potential oil and gas leasing.  The first withdrew areas of the OCS off the coast of Alaska.  *See* Withdrawal of Certain Areas of the United States OCS from Oil or Natural Gas Leasing, 90 Fed. Reg. 6,739 (Jan. 6, 2025).  And the second withdrew areas off the East Coast, West Coast, and within the Gulf of America.  *See* Withdrawal of Certain Areas of the United States OCS from Oil and Natural Gas Leasing, 90 Fed. Reg. 6,743 (Jan. 6, 2025).  On January 17, 2025, Plaintiffs sued alleging that President Biden's withdrawals exceeded the President's authority under OCSLA, and the withdrawals were invalid because the delegation of the withdrawal authority in Section 12(a) of OCSLA violated the non-delegation doctrine, and the withdrawals exceeded the President's authority under the Property Clause of the U.S. Constitution.  *See generally* Compl. ECF No. 1.[4]

Upon taking office, on January 20, 2025, President Trump issued an executive order rescinding President Biden's withdrawals.  *See* Exec. Order No. 14148 § 2(vvv), (www), Initial Rescissions of Harmful Executive Orders and Actions, 90 Fed. Reg. 8,237, 8,240 (Jan. 20, 2025)

---

[4] A parallel case challenging the second withdrawal was brought by the State of Texas and an oil and gas production company in the Eastern District of Texas.  *See* Compl., *Texas v. Trump*, No. 9:25-cv-10 (E.D. Tex. Jan. 20, 2025), ECF No. 1.

("2025 Order").  A month later, a coalition of environmental groups, including three of the groups

who intervened in this case, sued in the District of Alaska challenging that rescission.  *See* Compl.,

*N. Alaska Envtl. Ctr. v. Trump*, No. 3:25-cv-38 (D. Alaska Feb. 19, 2025), ECF No. 1.  The plain-

tiffs in that case allege that President Trump's rescission of President Biden's withdrawals violates

the Constitution and is *ultra vires* because, in their view, Section 12(a) of OCSLA operates like a

one-way ratchet, allowing a president to withdraw areas of the OCS but not to modify or eliminate

previously withdrawn areas.  *See id.* ¶¶ 77-88.  They ask the court to invalidate the rescission and

to enjoin the Secretary of the Interior and the Secretary of Commerce from enforcing it.  *See id.* at

42-43 (Prayer for Relief).  Defendants moved to dismiss the amended complaint in that case on

June 30, 2025.  *See* Mot. to Dismiss Pls.' First Am. Compl. for Lack of Jurisdiction, *N. Alaska

Envtl. Ctr. v. Trump*, No. 3:25-cv-38 (D. Alaska June 30, 2025), ECF No. 42.  The motion remains

pending.

President Trump's 2025 Order also rescinded other actions by President Biden to enact or

reinstate OCS withdrawals.  *See* Exec. Order No. 14148 §§ 2(f), (ccc).  One was a March 13, 2023

memorandum withdrawing the Beaufort Planning Area off the coast of Alaska.  *See id.* § 2(ccc);

*see also* Memorandum on Withdrawal of Certain Areas off the United States Arctic Coast of the

Outer Continental Shelf from Oil or Gas Leasing (March 13, 2023), Ex. 3.  Another was Executive

Order No. 13990.  *See* 2025 Order § 2(f).  By rescinding Executive Order No. 13990, the 2025

Order again reversed the OCS withdrawals at issue in the *League of Conservation Voters* case.

*See id.* § 2(f).[5]  Plaintiffs in that case have filed a Rule 60(b) motion asking the court to reinstate

---

[5] Some areas of the OCS off Alaska, in the Atlantic Ocean, and in the Gulf of America remain
withdrawn based on a December 16, 2014 memorandum issued by President Obama and two mem-
oranda issued by President Trump in September 2020.  *See* https://www.boem.gov/oil-gas-en-
ergy/leasing/areas-under-restriction (last visited Aug. 4, 2025).  The area of the Gulf of America

its prior summary judgment order.  *See* Pls.' Rule 60(b)(6) Motion, *League of Conservation Voters v. Trump*, No. 3:17-cv-101-SLG, ECF No. 99 (D. Alaska Feb. 19, 2025) ("*LCV* Rule 60(b)(6) Motion").  Federal Defendants and Defendant-Intervenors opposed that motion.  *See League of Conservation Voters*, ECF Nos. 110, 111 & 112.  The court has not yet ruled on the motion.

## LEGAL STANDARD

 Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Defendants and Plaintiffs agree on the factual background of this case, and Defendants do not assert that there are any genuine issues of material fact for the Court to resolve.  Therefore, the Court may resolve the legal issues before it on summary judgment.  *See Fed. Trade Comm'n v. ZAAPPAAZ, L.L.C.*, 140 F.4th 675, 680 (5th Cir. 2025).

## ARGUMENT

I.    **The Court Lacks Jurisdiction Over Plaintiffs' Claims**

Plaintiffs' OCSLA claim is barred by sovereign immunity, and both their OCSLA and constitutional claims fail for lack of a right of action.

A.    **Plaintiffs' Statutory Claim Is Barred by Sovereign Immunity**

Plaintiffs' claim that President Biden's withdrawal exceeded his authority under Section 12(a) of OCSLA is barred for lack of a waiver of sovereign immunity.  The United States is immune from suit except to the extent Congress unequivocally and expressly waives that immunity.  *Lane v. Pena*, 518 U.S. 187, 192 (1996).  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see Danos v.*

---

that remains withdrawn is the same as the area of the Gulf identified in President Biden's January 6, 2025 Memorandum.  *See* 90 Fed. Reg. at 6,743-45.

*Jones*, 652 F.3d 577, 581 (5th Cir. 2011) ("A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity.").

In claims against the federal government, the APA usually supplies the necessary waiver of sovereign immunity. *See Texas v. U.S. Dept. of Homeland Sec.*, 123 F.4th 186, 200 (5th Cir. 2024); 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). But this waiver of sovereign immunity does not apply to challenges to the President's actions. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-801 (1992) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA."). The challenged presidential memoranda were actions by the President, and, therefore, the APA does not supply the necessary waiver of sovereign immunity.

Nor does OCSLA contain the requisite waiver of sovereign immunity. OCSLA contains a citizen suit provision for claims challenging certain actions taken under the statute. 43 U.S.C. § 1349(a). That citizen suit provision, however, does not provide for actions challenging decisions by a President regarding the withdrawal of areas of the OCS from oil and gas leasing. *See id.* § 1349(b)-(c). Moreover, the history of OCSLA further demonstrates that Congress did not intend to waive sovereign immunity for such suits. When Congress enacted OCSLA in 1953, it did not provide that presidential withdrawal decisions would be subject to judicial review. Pub. L. No. 212, Ch. 345 § 4(b), 67 Stat. 462, 463 (Aug. 7, 1953). In 1976, Congress amended Section 702 of the APA to waive sovereign immunity for non-monetary relief, *see* 5 U.S.C. § 702, but that waiver does not apply to the President. *See Franklin*, 505 U.S. at 801. Two years later, Congress amended OCSLA to include the judicial review provisions that remain largely the same today. Pub. L. No.

95-372, § 208, 92 Stat. 629, 657-59 (1978) (adding 43 U.S.C. § 1349).  Yet Congress once again chose not to waive sovereign immunity for the President's withdrawal decisions.

The exception to sovereign immunity for *ultra vires* actions from *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949), does not apply.  To begin, it is questionable that the exception can be applied to the President, rather than a subordinate officer.  In *Dalton v. Specter*, 511 U.S. 462, 474 (1994), the Supreme Court assumed for the sake of argument that a claim that the President exceeded his authority under the Defense Base Closure and Realignment Act of 1990 was reviewable outside the APA framework.  But the Court went on to rule that the claim could not proceed in any event based on "longstanding authority . . . that [judicial] review is not available when the statute in question commits the decision to the discretion of the President."  *Id.*  Thus, the case cannot be interpreted as an affirmation of the principle that the President may be sued for statutory violations.  *See id.*; *see also Alexander v. Trump*, 753 F. App'x. 201, 206 (5th Cir. 2018) (upholding the dismissal of claims against the President on the ground of sovereign immunity).  Therefore, the *Larsen* exception for *ultra vires* action should not be applied to claims directed at the President.

Even if the *ultra vires* exception could apply to the President, it would not apply here.  Under *Larson*, claims may avoid the sovereign immunity bar if: (1) the challenged action violated the Constitution,[6] or (2) the challenged action was *ultra vires* because it exceeded the authority of the officer taking the action.  *Larson*, 337 U.S. at 689-90.  The exception for *ultra vires* actions is a "narrow and questionable exception" to APA review.  *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 116 (1984).  "Because ultra vires review could become an easy end-run

---

[6] Defendants are not arguing that the constitutional claims are barred by sovereign immunity, but as explained below, there is no right of action for those claims.

around the limitations of . . . judicial review statutes, this Court's subsequent cases have strictly limited ultra vires review to the 'painstakingly delineated procedural boundaries of [*Leedom v. Kyne*, 358 U.S. 184 (1958)].'" *Nuclear Reg. Comm'n v. Texas*, 145 S. Ct. 1,762, 1,776 (2025) (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). "The *Kyne* exception is a narrow one," and it does not apply simply because an agency has potentially reached a 'conclusion which does not comport with the law.'" *Id.* The *ultra vires* exception "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition* in a statute.'" *Id.* at 1,776 (quoting *Ry. Clerks v. Ass'n for Benefit of Non-contract Emps.*, 380 U.S. 650, 660 (1965)); *see also Danos v. Jones*, 652 F.3d 577, 583 (2011) (To fall within the *ultra vires* exception, a plaintiff must show that the officer acted "without any authority whatever.") (quoting *Pennhurst*, 465 U.S. at 101 n.11)).

No action wholly outside of the President's statutory authority is alleged here. Section 12(a) of OCSLA authorizes the President, in his discretion, to make withdrawal decisions "from time to time." 43 U.S.C. § 1341(a). Exercising Section 12(a) authority, President Biden withdrew areas of the OCS from oil and gas development. *See*, *e.g.*, 90 Fed. Reg. at 6,739. Regardless of whether the President exercised that authority correctly, the President acted pursuant to congressional authorization in a statute and thus not "without any authority whatever." *Danos*, 652 F.3d at 583; *see also Def. Distributed v. U.S. Dept. of State*, 121 F. Supp. 3d 680, 690 (W.D. Tex. 2015) (rejecting the plaintiffs' arguments that the federal defendants had acted "without any 'colorable basis for the exercise of that authority'" because Congress had authorized the agencies to regulate the export of weapons). Because President Biden's withdrawals did not "conflict with the terms of his valid statutory authority," it remains the action of the sovereign and thus "cannot be enjoined." *Larson*, 337 U.S. at 695.

Finally, there are no valid claims against the agency defendants under OCSLA. The agencies must be sued under the APA, and a final agency action is a prerequisite to suit under the APA. *See Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 489 (5th Cir. 2014); *see also* 5 U.S.C. § 704. Since the agencies have taken no such final actions to implement the Biden withdrawals, the claims against the agencies fail for lack of jurisdiction. *See Alabama-Coushatta Tribe*, 757 F.3d at 492.

### B.    Plaintiffs' Statutory and Constitutional Claims Fail for Lack of a Private Right of Action

In addition to an applicable waiver of sovereign immunity, a plaintiff may only bring suit to enforce federal law if Congress has provided a private right of action. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Such a right is created only when Congress does so in "clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate." *Stokes v. Sw. Airlines*, 887 F.3d 199, 201 (5th Cir. 2018) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017)).

No statute provides the requisite right of action for Plaintiffs' claim that the President exceeded his authority under OCSLA. Such a right of action cannot be found in OCSLA because, although OCSLA contains a citizen's suit provision allowing litigants to challenge certain actions taken under the statute, *see* 43 U.S.C. § 1349, those do not include withdrawal decisions by the President under 43 U.S.C. § 1341(a). Nor is any relevant right of action conferred by the APA. Although the APA generally provides a right of action against federal officials for statutory violations, *see* 5 U.S.C. § 702, the APA does not apply to the President. *See Franklin*, 505 U.S. 800-01. Thus, no statute provides the requisite right of action.

Nor does *Larson* provide a right of action.  *Larson* itself recognized the distinction between the separate requirements for a waiver of sovereign immunity and private right of action.  The Supreme Court emphasized that, even if sovereign immunity posed no barrier to specific relief against an officer, the plaintiff still must have a cause of action to pursue this relief.  *Larson*, 337 U.S. at 692–93 (it is a "prerequisite to the maintenance of any action for specific relief that the plaintiff claim an invasion of his legal rights, either past or threatened").  Without a cause of action, the plaintiff's suit "must fail even if he alleges that the agent acted beyond statutory authority or unconstitutionally."  *Id*. at 693.  Thus, even if sovereign immunity is waived for Plaintiffs' *ultra vires* challenge under Section 12(a) of OCSLA—which Defendants dispute—Plaintiffs still have no right of action, and therefore the claim is not justiciable.  *See Sandoval*, 532 U.S. at 286-87.

Plaintiffs also lack a private right of action for their constitutional claims.  A right of action does not exist for every alleged violation of the Constitution.  *See*, *e.g.*, *Alexander v. Trump*, 753 F. App'x at 206 ("Although there have been a few notable exceptions, the federal courts . . . have been hesitant to find causes of action arising directly from the Constitution."), *cert. denied*, 139 S. Ct. 1200 (2019).  Instead, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).  Such a right of action is "a judge-made remedy" and does not exist for every alleged constitutional violation.  *See id.* (Supremacy Clause contains no implied right of action).

For certain constitutional violations, the Supreme Court has inferred an implied right of action, but only when individual rights were being infringed.  The Court has, for example, found an implied right of action to protect a fired employee's Fifth Amendment right to due process.  *See Davis v. Passman*, 442 U.S. 228, 243-44 (1979); *see also Free Enter. Fund v. Public Company Acct. Oversight Bd.*, 561 U.S. 477, 489-91 (2010) (an accounting firm that was investigated by an

oversight board under Sarbanes-Oxley was entitled to challenge the constitutionality of the creation of the board); *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 642-43 (2002) (a telecommunications company had a right to challenge a state commission's order on the basis that it was preempted by federal law).  A court, however, should not infer an implied equitable cause of action where the plaintiffs "are not subject to or threatened with any enforcement proceeding."  *See Douglas v. Independent Living Center of Southern California, Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting).

There is no implied equitable cause of action for Plaintiffs' constitutional claims.  This is not an instance where the government has directly infringed on a plaintiff's personal property or liberty interests.  *See Armstrong*, 575 U.S. at 327 ("What our cases demonstrate is that, in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer.") (quotation marks and citation omitted).  Instead, Plaintiffs would ask the Court to create a new implied right of action for the alleged constitutional violations—an implied right that would presumably allow them to challenge any action by the President.  There is no precedent for such an implied right, and the Court should not find one.

## II.    If the Court Reaches the Merits, It Should Find That, to the Extent President Biden's Withdrawals Were Permanent, the Withdrawals Exceeded the President's Authority Under Section 12(a) of OCSLA

If Court reaches the merits, it should find that, to the extent that President Biden's withdrawals were permanent, they violated Section 12(a) of OCSLA.  To be clear, Defendants do not believe that President Biden's withdrawals were permanent such that they could not be revoked; rather, the withdrawals were reversible, and President Trump lawfully revoked them when he issued Executive Order 14148.  But if this Court concludes that President Biden's withdrawals *were* permanent, then those permanent withdrawals violate Section 12(a) of OCSLA.

16

**A.    President Biden's Withdrawals Were Not Permanent and Were Lawfully Revoked by President Trump**

President Biden's withdrawals were not permanent.  In relevant part, each memorandum supporting the respective withdrawals states that the withdrawal shall be "for a time period without specific expiration."  *E.g.*, 90 Fed. Reg. at 6,739.  In other words, the withdrawals will be in effect until a President decides to end or modify them.  There is nothing in the withdrawal memoranda themselves to indicate that the withdrawals could not be revoked or modified by a President in the future.  And as demonstrated below, it is common for Presidents to reverse or modify prior withdrawals.  *See* section II.B.3., *infra*.  President Trump did so here when he lawfully reversed President Biden's withdrawals.  *See* Exec. Order 14148 § 2(ccc), (vvv), (www).

Defendants recognize that President Trump's rescission of President Biden's withdrawals is being challenged in another case, *Northern Alaska Environmental Center v. Trump*, No. 3:25-cv-38-SLG (D. Alaska).  It is possible that the Alaska court will rule, as it did in 2019 with respect to different withdrawals, that President Trump was not permitted to reverse or modify a prior withdrawal.  *See League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1030 (D. Alaska 2019) (holding that President Trump's revocation of prior presidential withdrawals of OCS lands exceeded his authority under Section 12(a) of OCSLA), *vacated as moot sub nom. League of Conservation Voters v. Biden*, 843 Fed. Appx. 937, 939 (9th Cir. 2021)  Yet Defendants submit that *League of Conservation Voters* was wrongly decided and that Presidents can legally modify or reverse prior withdrawals.  The ruling in *League of Conservation Voters* that a President may not do so and that withdrawals may only be reversed by Congress is contrary to the statutory text of OCSLA, the statute's purpose, and a long history of practice by prior Presidents, as discussed directly below.

17

### B.    If President Biden's Withdrawals Are Deemed to be Permanent, They Are Unlawful

Section 12(a) of OCSLA does not authorize Presidents to make permanent, irrevocable withdrawals of areas of the OCS from oil and gas leasing.  In interpreting statutes, courts should begin with the plain meaning of the statutory language.  *Allen v. Vertafore, Inc.*, 28 F.4th 613, 617 (5th Cir. 2022).  Courts should also consider the context of the statute as a whole, relevant canons of construction, and where appropriate, legislative history.  *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023).  Applying these factors, the Court should find that Section 12(a) of OCSLA does not authorize permanent withdrawals of areas of the OCS.

### 1.    Under the Plain Text of Section 12(a) of OCSLA, Withdrawals Are Subject to Modification or Revocation

Section 12(c) of OCSLA grants the President substantial discretion to withdraw areas from leasing.  It provides: "The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf."  43 U.S.C. § 1341(a).  Aside from the limitation to unleased lands, Section 12(a) allows the President considerable discretion to determine what areas of the OCS to withdraw and for how long.  But the statute says nothing about the President's ability to withdraw areas of the OCS permanently and to make such permanent withdrawals irrevocable by a President in the future.  Inferring such a sweeping ability would be contrary to the statutory language.

Congress's inclusion of the phrase "from time to time" confirms the President's wide latitude over the timing and duration of withdrawals.  But this phrase also shows that Congress contemplated withdrawals for *limited*, not permanent, periods of time.  Contemporaneous dictionary definitions confirm that when Congress enacted OCSLA in 1953, it understood "from time to time" to mean "occasionally," "once in a while," "now and again," "at more or less regular intervals," and "sometimes."  *Webster's New International Dictionary of the English Language* 2649 (2d ed.

18

1947); *The Oxford English Dictionary* 2940 (1933); *Funk & Wagnalls New Standard Dictionary of the English Language* 2520 (1945). By authorizing Presidents to withdraw areas of the OCS "once in a while," Congress must have expected that the withdrawals would be for discrete intervals of time. Put differently, if withdrawal decisions could be permanent, one would not expect them also to be made "now and again."

This interpretation comports with the common understanding in public lands law that a withdrawal temporarily suspends operation of the laws governing the use or disposition of the public land—similar to a Section 12(a) withdrawal "from disposition" under OCSLA's leasing procedures. *See, e.g.*, *S. Utah Wilderness Alliance v. BLM*, 425 F.3d 735, 784 (10th Cir. 2005) (A withdrawal "temporarily suspends the operation of some or all of the public land laws, preserving the status quo while Congress or the executive decides on the ultimate disposition of the subject lands."); *Transfer to Treasury Department Jurisdiction Over Portion of Naval Reservation*, 37 Op. Att'y Gen. 431, 432 (1934) (The President's implied withdrawal power under *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915), "necessarily implies the power to restore the land to the public domain when it has served the purpose for which it was withdrawn, and again withdraw the same land for new uses.").

Moreover, a sound interpretation of "withdraw" should account for one of the foundational principles of administrative law: inherent in the power to decide is the power to reconsider. *See Trujillo v. General Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980) ("Administrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider."). Agencies often reconsider their decisions, and without this authority, the modern administrative state would struggle to function. To this end, courts recognize that agencies possess inherent reconsideration authority unless Congress

19

expressly limits it. *See Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002) (recognizing that "it is generally accepted that *in the absence of a specific statutory limitation*, an administrative agency has the inherent authority to reconsider its decisions" (emphasis added)); *accord GTNX, Inc. v. INTTRA, Inc.*, 789 F.3d 1309, 1313 (Fed. Cir. 2015).

When it enacted Section 12(a) to grant the President authority to withdraw areas of the OCS, Congress necessarily understood the implied authority that agencies may reconsider decisions. *See, e.g.*, *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950) (recognizing, several years before OCSLA, that the "power to reconsider is inherent in the power to decide" and accepting that authority "in the absence of statutory prohibition"). The interpretive principle that applies to the whole of the Executive Branch should apply with especial force to its Chief Executive. Because Section 12(a) does not explicitly limit the President's inherent authority to reconsider withdrawals, Congress should be presumed to have preserved that inherent authority in its delegation. *See also* Office of Legal Counsel, *Revocation of Prior Monument Designations*, at 17-20 (recognizing the President's ability to reverse a prior monument designation decision under the Antiquities Act), ECF No. 48-21.

### 2. The Purpose, Structure, and Context of OCSLA Demonstrate that Withdrawals May Be Modified or Revoked

An interpretation that OCSLA allows only temporary withdrawals is consistent with the purpose, structure, and context of the statute. As the Supreme Court instructed, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 608 (2019) (citation and internal quotation marks omitted); *see also King v. Burwell*, 576 U.S. 473, 492 (2015) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . .") (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc. Ltd.*, 484 U.S. 365, 371

(1988)).  Here, OCSLA's purpose and structure confirm that the President's authority in Section 12(a) includes power to modify and undo withdrawal decisions.

Starting with OCSLA's purpose, in passing OCSLA in 1953, Congress declared that the oil and gas reserves beneath the OCS are "a vital national resource . . . which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs."  43 U.S.C. § 1332(3).  A congressional report issued after OCSLA's enactment declared that: "The principal purpose of [OCSLA] is to authorize the leasing by the Federal Government of [] the shelf."  H.R. Rep. No. 413, 83rd Cong., 1st Sess. (1953), *reprinted in* 1953 U.S.C.C.A.N. 2177, 2178; *see also Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1,185, 1,187 (9th Cir. 1988) (primary purpose of OCSLA is the "expeditious and orderly development" of the OCS) (quoting 43 U.S.C. § 1332(3)).

Interpreting Section 12(a) of OCSLA to allow a President to permanently withdraw all unleased areas of the OCS would contradict that statutory purpose.  It is "implausible that Congress would give" to a single President "through these modest words the power to determine" whether any leasing could ever happen again on these areas of the OCS, absent further action by Congress. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  A contrary interpretation would be counter to OCSLA's fundamental purpose because it would allow a President to place all unleased areas of the OCS off limits to future development.  The Court should not interpret the statutory language in a way that would lead to such an absurd result.  *See Parker Drilling*, 587 U.S. at 610 (concluding from the "place in the overall statutory scheme" of a single OCSLA provision that defendant's interpretation of that provision "would make little sense").

The statute's structure and surrounding context also confirms that withdrawals under Section 12(a) were not intended to be permanent.  "It is a fundamental canon of statutory construction

that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989).  In context, Section 12(a) cannot be construed as a provision allowing permanent withdrawals for environmental protection.  The remaining sub-sections in Section 12 relate generally to national defense.  *See*, *e.g.*, 43 U.S.C. § 1341(b) (the President has the right, during war time, to purchase minerals produced on the OCS), *id.* § 1341(c) ("during a state of war or national emergency," the President may "suspend operations under any lease"), *id.* § 1341(d) (the United States may restrict areas of the OCS from oil and gas exploration as necessary for the national defense).  Thus, the surrounding context suggests that the purpose of withdrawals may be for national security reasons, among others, and would be temporary.  *See Davis*, 489 U.S. at 809; *see also Fischer v. United States*, 603 U.S. 480, 487 (2024) ("[T]he canon of *noscitur a sociis* teaches that a word is 'given more precise content by the neighboring words with which it is associated.'") (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)).  The context does not suggest that withdrawals are intended to preserve areas permanently for conservation purposes.

### 3.    Historical Practice Confirms that Withdrawals May Be Modified or Revoked

"The longstanding practice of the government can inform a court's determination of what the law is." *NLRB v. Noel Canning*, 573 U.S. 513, 514 (2014) (cleaned up) (citation omitted).  Consistent past presidential practice over the course of several decades and multiple administrations confirms that withdrawals under Section 12(a) of OCSLA are not permanent and are revocable by a President.

In the seven decades since Section 12(a) became law, Presidents besides President Trump have modified or revoked multiple withdrawals.  In 2007, for example, President George W. Bush modified a prior withdrawal made by President Clinton.  *See* Jan. 9, 2007 Memo., ECF No. 48-10.

And the 1998 Clinton withdrawal that President Bush modified stated that the withdrawal would be in place "for a time period without specification," June 12, 1998 Memo., ECF No. 48-9, which is the same language used in President Biden's withdrawal. *See*, *e.g.*, 90 Fed. Reg. at 6,739.  President Bush also modified other withdrawals in 2008, *see* July 14, 2008 Memo., ECF No. 48-12, and President Obama revoked his own prior withdrawal and issued a new one in its place in 2014. *See* December 16, 2014 Memo., ECF No. 48-13.

In addition, Presidents George H.W. Bush and Clinton stated in withdrawal memoranda that their withdrawals were subject to revocation by "the President . . . in the interest of national security." *See* June 12, 1998 Memo., ECF No. 48-9; August 4, 1992 Memo., ECF No. 48-11.  And like President Biden, Presidents Clinton, George W. Bush and Obama each made withdrawals "for a time period without specific expiration." *See* June 12, 1998 Mem., ECF No. 48-9; July 14, 2008 Memo., ECF No. 48-12; Jan. 27, 2015 Memo. ECF No. 48-14.  There is no suggestion in those withdrawals that they were intended to be irrevocable.  Thus, Presidents have consistently used their authority to temporarily withdraw areas of the OCS, subject to later revocation by themselves or a subsequent President.  There is nothing in the history of the exercise of the withdrawal authority to indicate that Presidents viewed withdrawals as permanent and irrevocable.

By its silence, Congress has acquiesced in the presidential interpretations of Section 12(a) authority described above. *See United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915) (courts presume congressional consent to presidential action that is "known to and acquiesced in by Congress" over an extended period of time).  Although OCSLA was last substantially amended in 1978, Congress periodically has amended the statute over the last several decades, including in the One Big Beautiful Bill in 2025.  *See* Pub. L. No. 119-21, § 50102, 139 Stat. at 139-40; Pub. L. No. 117-169, § 50264, 136 Stat., 1,818, 2,059-60 (2022); Pub. L. No. 113-67, § 304, 127 Stat. 1,165,

1,182-83 (2013); Pub. L. No. 111-212, § 3013, 124 Stat. 2341-42 (2010).[7]  But Congress has not reversed the presidential interpretations of Section 12(a), including President Bush's modifications of withdrawals in 2007 and 2008 or President Trump's revocation of President Obama's withdrawals.  *See AFL-CIO v. Khan*, 618 F.2d 784, 790 (D.C. Cir. 1979) (en banc) (holding that the "President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting congressional reversal, it is 'entitled to great respect'"); *see also Medellin v. Texas*, 552 U.S. 491, 524 (2008) ("Presidential authority can derive support from 'congressional inertia, indifference or quiescence.'") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952)); *Al- Bihani v. Obama*, 619 F.3d 1, 26 (D.C. Cir. 2010) (en banc) ("[C]ourts presume that Congress authorized the President, except to the extent otherwise prohibited by the  Constitution or statutes, to take at least those actions that U.S. Presidents have historically taken . . . .").

### 4.  The Legislative History Supports the View that Withdrawals Under OCSLA Are Not Permanent

Section 12(a)'s legislative history also supports the interpretation that withdrawals were intended to be temporary and revocable.  The provision that became Section 12(a) appears to have originated from the Truman Administration's desire to ensure that the President could respond to national security concerns by establishing oil reserves "for future military use."  Joint Hearings on S. 1988 and Similar House Bills Before the Committees on the Judiciary, 80th Cong., 2d Sess. No. 737 (1948) (statement of Interior Secretary Julius Krug, describing the Truman Administration's draft bill).  Accordingly, an early version of Section 12(a) provided that the "President may, from

---

[7] *See also* Pub. L. No. 109-58, Title III, §§ 321(a), 346, 384, 388, 119 Stat. 594, 694, 704, 739-47 (2005); Pub. L. No. 105-362, § 901(*l*)(1), 112 Stat. 3280, 3290 (1998); Pub. L. No. 104-185, § 8(b), 110 Stat. 1700, 1717 (1996).

time to time and after consultation with the National Security Resources Board, withdraw from disposition any of the submerged coastal lands and reserve them for the use of the United States in the interest of national security." S. No. 2165, § 3(d), 80th Cong. 2d Sess. (Feb. 17, 1948).

Later, the Eisenhower Administration objected to the proposed provision as unnecessary and suggested striking the limitation that the President could withdraw unleased lands "and reserve them for the use of the United States in the interest of national security." S. Rep. No. 83-411, at 39 (1953) (comments from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel). The Senate Committee on Interior and Insular Affairs agreed that the President's withdrawal authority "should not be limited to security requirements" and struck the clause. *Id.* at 26. The Committee also stated that the President's withdrawal authority was "comparable to that which is vested in him with respect to federally owned lands on the uplands." *Id.* Most likely this refers to the General Withdrawal Statute (Pickett Act), ch. 420 § 1, 36 Stat. 847, 847 (1910), which granted the President express authority to revoke prior presidential withdrawals. *See* 43 U.S.C. § 141 ("[T]he President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States . . . and reserve the same for [various purposes], and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress."), *repealed by* Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792 (1976). Therefore, the legislative history supports the view that a President may modify or revoke a prior withdrawal.

In sum, the statute's language, context and structure, historical practice, and legislative history support interpreting Section 12(a) as authorizing temporary, not permanent, withdrawals of areas of the OCS. Therefore, to the extent that President Biden's withdrawals are deemed to be permanent, they violate OCSLA.

### III.  Section 12(a) Can (and Should) be Construed to Avoid Constitutional Concerns.

Based on the doctrine of constitutional avoidance, the Court should construe Section 12(a) to avoid the constitutional concerns that API and Louisiana identify.  *See United States v. Hansen*, 599 U.S. 762, 781 (2023); API Mem. at 19-22 (arguing that, without a narrowing construction, Section 12(a) violates the non-delegation doctrine, the Property Clause, and the Take Care Clause); *see also* La. Mem. at 8-10 (arguing that Section 12(a) violates the non-delegation doctrine).  "When 'a serious doubt' is raised about the constitutionality of an Act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'"  *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (quoting *Crowell v. Benson,* 285 U.S. 22, 62 (1932)).  "Statutes . . . should be read, if possible, to comport with the Constitution, not contradict it."  *Fed. Comm. Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2,482, 2,507 (2025).  As demonstrated above, Section 12(a) of OCSLA can, and should, be interpreted in a way that allows a President to withdraw areas of the OCS only temporarily.  *See supra* Section II.B.  With that understanding, to the extent that President Biden's withdrawals are interpreted to be permanent, they violate Section 12(a) of OCSLA.  There is therefore no need for the Court to reach the constitutional issues.

In addition, the Court should not reach the Property Clause and Take Care Clause claims because they were not separately argued.  Defendants understand that API only raised those issues to make the point that Section 12(a) of OCSLA should not be interpreted in a way that would raise potential constitutional issues.  *See* API Mem. at 19-22.  But API did not raise them as separate claims.[8]

---

[8] The Complaint does not contain a Take Care clause claim.  *See* Compl. ¶¶ 82-95, ECF No. 1. Louisiana does not argue either claim.

## IV.    If the Court Reaches the Constitutional Claims, It Should Reject Them

Yet if the Court reaches Plaintiffs' constitutional claims, it should reject them and find that Section 12(a) of OCSLA did not impermissibly delegate Congress's legislative authority to the President.

### A.    The Withdrawals Did Not Violate the Property Clause or the Take Care Clause

President Biden's withdrawals did not violate the Property Clause.  President Biden withdrew areas of the OCS "[u]nder the authority granted to [him] in [S]ection 12(a) of [OCSLA]." *See* Jan. 6, 2025 Memo., 90 Fed. Reg. at 6,739.  As discussed above, the withdrawals were subject to modification or reversal by a President and were, in fact, reversed by President Trump.  *See supra* Section II.A.  A permanent and irreversible withdrawal would violate section 12(a) of OCSLA.  *See supra* Section II.B.  Properly interpreted, the withdrawals did not usurp Congress's authority "to dispose of and make all needful Rule and Regulations respecting the Territory . . . belonging to the United States."  U.S. Const. art. IV, § 3, cl. 2.  Further, Defendants do not concede that any action by the President regarding the OCS without express congressional authorization would exceed the President's inherent authority.  Historically, there is long established practice of Presidents withdrawing lands for public purposes absent an act of Congress.  *See Withdrawal of Public Lands*, 40 U.S. Op. Atty. Gen. at 83; *see also United States v. Midwest Oil Co.*, 236 U.S. 459, 469-83 (1915).

In addition, President Biden's withdrawals did not violate the Take Care Clause.  API argues that a permanent withdrawal would violate the Take Care Clause because it would bind the hands of future Presidents.  *See* API Mem. at 22 (citing *Free Enters. Fund. v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010)).  President Biden's withdrawals, however, did not bind President Trump, who lawfully reversed the withdrawals.  *See supra* Section II.A.

27

**B.    Section 12(a) of OCSLA Does not Violate the Non-Delegation Doctrine**

The non-delegation argument is rooted in Article I of the Constitution, which provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art, I, § 1.  The legislative power belongs solely to Congress, but Congress may "seek assistance from its coordinate branches to secure the effect intended by its acts of legislation." *Fed. Comm. Comm'n*, 145 S. Ct. at 2,496 (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (internal brackets and quotation marks omitted).  Delegations are constitutional so long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform."  *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J. W. Hampton, Jr.*, 276 U.S. at 409).  It is "constitu-tionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority."  *Id.* at 372-73 (quoting *American Power & Light Co. v. SEC*, 329 U.S. 980, 105 (1946)).  In conducting this inquiry, statutory terms must not be considered in "isolation," *Fed. Comm. Comm'n*, 145 S. Ct. at 2503, but rather must be understood in light of "the purpose of the Act, its factual background and the statutory context in which they appear," *Am. Power & Light Co.*, 329 U.S. at 104.

This standard is "not demanding."  *See Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 442 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2746 (2021).  In its long history, the Supreme Court has "found the requisite 'intelligible principle' lacking in only two statutes," both in 1935.  *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 474 (2001) (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).  By contrast, in the 90 years since those decisions issued, the Supreme Court has "found intelligible principles in a host of statutes giving agencies significant discretion," *Fed. Comm'n Comm.*, 145 S. Ct. at 2503, and  has "almost never felt qualified to second-guess Congress regarding the permissible degree

of policy judgment that can be left to those executing or applying the laws," *Whitman*, 531 U.S. at 474-75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

Congress has provided an intelligible principle for the President to follow in exercising his withdrawal authority under Section 12(a) of OCSLA. *See Mistretta*, 488 U.S. at 372. First, in OCSLA, Congress clearly set forth the general policy of the statute. Congress declared that the oil and gas reserves beneath the OCS are "a vital national resource . . . which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3); *see also supra* Section II.B.2. Thus, the overall purpose of OCSLA is the development of resources on the OCS. And as described above, the purpose of Section 12(a) is to allow the President to make temporary withdrawals of unleased areas of the OCS, primarily for national security purposes. *See supra* Sections II.B.1.-2. The expression of congressional purpose is sufficiently clear to avoid a constitutional issue. *See Mistretta*, 488 U.S. at 375 (finding that Congress's delegation of authority to a commission to establish sentencing guidelines sufficiently established the goals and purposes of the statute); *Big Time Vapes*, 963 F.3d at 444-45 (finding that Congress had sufficiently described the purpose of the Tobacco Control Act); *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 30-31 (D.C. Cir. 2008) (finding that the purpose and structure of the Indian Reorganization Act provided adequate guidance for Secretary of the Interior to follow in acquiring lands for use by Indians). Thus, the statutory purpose of energy development offers an intelligible principle for the President to follow in exercising his authority to withdraw OCS lands and to rescind or modify those withdrawals. *See Big Time Vapes*, 963 F.3d at 444.

Second, Congress "clearly delineate[d]" . . . the boundaries of" the President's withdrawal authority. *Mistretta*, 488 U.S. at 372-73 (citation omitted); *see also Fed. Comm. Comm'n*, 145 S.

Ct. at 2,497. Section 12(a) allows a President to withdraw only unleased lands; thus, the President cannot use Section 12(a) authority to alter the ongoing management of oil and gas exploration and development on leases that have been issued by the Secretary of the Interior. *See* 43 U.S.C. 1341(a). And the President may only do so from "time to time." *Id.* Properly understood, this phrase means that the President may only withdraw areas of the OCS temporarily; a President may not withdraw areas of the OCS permanently and irrevocably. *See supra* Section II.B. Interpreting Section 12(a) of OCSLA to allow only temporary withdrawals reinforces the constitutionality of the delegation. *See Am. Trucking Ass'n*, 531 U.S. at 475 ("[T]he degree of agency discretion that is acceptable varies according to the scope of power congressionally conferred.").

For decades, Presidents have followed Congress's guidance and withdrawn specific areas for limited periods of time, subject to modification or revocation by a President. *See supra* Section II.B.3. This consistent historical understanding, confirmed by Congress's acquiescence, demonstrates that a President's ability to withdraw areas of the OCS is limited to temporary withdrawals. *See id.* With these parameters, the guidance that Congress has provided for the exercise of withdrawal authority in Section 12(a) is more than sufficient to meet the intelligible-principle test. *See Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943) (the delegation of authority to grant broadcasting licenses in the "public interest" was not an improper delegation of Congress's power); *Michigan Gambling*, 525 F.3d at 30-31 (a statute allowing an agency to acquire lands "for Indians" was sufficiently circumscribed to avoid being unconstitutional). This is not an instance where Congress's delegation was wholly "'unguided and unchecked'" and therefore fell "well within permissible bounds." *Gundy v. United States*, 588 U.S. 128, 137 (2019) (quoting *Reynolds v. United States*, 565 U.S. 432, 442-43 (2012)). If there were any doubt about the limits that OCSLA places on Presidential authority, "it is incumbent upon courts to read the statute to

eliminate those doubts so long as such a reading is not plainly contrary to the intent of Congress." *United States v. Richards*, 755 F.3d 269, 274 (5th Cir. 2014).

The two instances in which the Court has found non-delegation violations are readily distinguishable. In *Panama Refining*, 293 U.S. 388, the Supreme Court held that section 9(c) of the National Industrial Recovery Act of June 16, 1933 ("NIRA") violated the non-delegation doctrine. *Id.* at 414-21, 433. Section 9(c) authorized the President to "prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof." *Id.* at 406. But NIRA was unlike Section 12(a) of OCSLA because it authorized the President to "prescribe such rules and regulations as he may deem necessary" to carry out the purposes of NIRA. *Id.* at 407. Section 12(a) of OCSLA does not authorize the President to issue rules and regulations; instead, properly understood it allows the President to make discrete decisions to withdraw areas of the OCS for a limited time. And unlike the statute at issue in *Panama Refining*, Section 12(a) of OCSLA did not empower the President to act "while establishing no criterion and declaring no policy for whether, when, or how he should do so." *Fed. Comm. Comm'n*, 145 S. Ct. at 2,503 (quoting *Panama Refining*, 293 U.S. at 415) (cleaned up). Instead, Congress (and before that the President himself) announced the policy of reserving the OCS for the development of natural resources, subject to appropriate environmental safeguards. *See* 43 U.S.C. § 1332(3).

Nor does this case resemble *Shechter Poultry*, 295 U.S. 495, which authorized private parties to write, and the President to approve or prescribe, "codes of fair competition" in order "to rehabilitate industry." *Id.* at 530-31. But the statute did not prescribe any method of attaining that goal, any limitations on the nature of the codes that could be created, or the standards against which the codes should be adjudged, *see Yakus v. United States*, 321 U.S. 414, 424 (1944) (describing *Schecter*). The statute "thus gave the President 'virtually unfettered' authority to govern the

31

Nation's trades and industries." *Fed. Comm. Comm'n*, 145 S. Ct. at 2503. No such unfettered authority is at issue here because, among other reasons, the President must adhere to the purpose of the OCSLA and may not interfere with the ongoing leasing and development of the OCS. *Jarkesy v. Sec. & Exchange Comm'n*, 34 F.4th 446 (5th Cir. 2022), is likewise distinguishable because, in that case, the court found that Congress had provided "*no guidance* whatsoever." *Id.* at 462.

The unique nature of public land management also weighs against a finding that OCSLA violates the non-delegation doctrine. Congress's authority under the Property Clause is plenary. *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987). "[T]he Property Clause gives Congress the power over the public lands 'to control their occupancy and use, to protect them from trespass and injury, and to prescribe the conditions upon which others may obtain rights in them . . . .'" *Kleppe v. New Mexico*, 426 U.S. 529, 541 (1976) (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917)). Congress's plenary authority over public lands "counsels in favor of more, rather than less, deference to Congress's choice about the degree of responsibility to assign to the Executive Branch." *United States v. Pheasant*, 129 F.4th 576, 582 (9th Cir. 2025); *see also United States v. Grimaud*, 220 U.S. 506, 521 (1911) (the delegation to the Secretary of the Interior to make administrative rules governing the administration of public lands was not unconstitutional).

In analogous circumstances, courts have rejected the notion that the delegation of authority in the Antiquities Act to set aside areas of public land for protection violates the non-delegation doctrine. *See*, *e.g.*, *Utah Ass'n of Counties v. Bush*, 316 F. Supp. 2d 1,172, 1,190-91 (D. Utah 2004). "Although the standards [in the Antiquities Act] are general, 'Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion

to executive or judicial actors.'"  *Id.* at 1,191 (quoting *Touby v. United States*, 500 U.S. 160, 165 (1991)); *see also Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 26 (D.D.C. 2001) ("[T]he Antiquities Act represents a proper delegation of congressional authority to the President under the Property Clause.").  The same principle applies here.

Finally, the delegation of authority to the President here is appropriate given that the withdrawal of areas of the OCS for particular purposes is not solely within Congress's domain.  Prior to the enactment of OCSLA, exercising his inherent authority as the President of the United States, President Truman issued an executive order to reserve and set aside the OCS's natural resources and place them under the jurisdiction and control of the Secretary of the Interior.  Exec. Order 9633, 10 Fed. Reg. 12,305; *see also Withdrawal of Public Lands*, 40 Opp. Att'y Gen. 73, 81-82 (1941) (recognizing the authority to withdraw land for public uses even in the absence of express statutory authority).  In addition, the President has broad authority over national defense, *see*, *e.g.*, *Dept. of the Navy v. Egan*, 484 U.S. 518, 527 (1988), and Section 12 of OCSLA contains multiple references to national security.  *See*, *e.g.*, 43 U.S.C. § 1341(b)-(d).  Therefore, the withdrawal of areas of the OCS falls within "a zone of twilight in which [the President] and Congress may have concurrent authority."  *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).  In this light, Section 12(a) should be viewed, not so much as a delegation of power, but an affirmation of the President's historical role in managing the OCS. *See Loving v. United States*, 517 U.S. 748, 772 (1996) (finding that the usual limits on delegation "do not apply 'where the entity exercising delegated authority itself possesses independent authority over the subject matter'" (quoting *United States v. Mazurie*, 419 U.S. 544, 556-57 (1975)).  During the past several decades, no one has questioned the President's authority under the statute to withdraw areas of the OCS or suggested that Section

12(a) was unconstitutional.  Therefore, the Court should find that Section 12(a) of OCSLA does not violate the non-delegation doctrine.

## CONCLUSION

For the reasons above, the Court should find that it lacks jurisdiction over Plaintiffs' claims. Yet if the Court determines that it has jurisdiction, it should find that, if President Biden's withdrawals were permanent, they exceeded his authority under Section 12(a) of OCSLA.  The Court should not reach the constitutional claims, but if it does, it should reject them.

Respectfully submitted this 4th day of August 2025.

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment and Natural Resources Division

/s/ *Luther L. Hajek*
LUTHER L. HAJEK
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace – Suite 370
Denver, CO 80202
Telephone: (303) 844-1376
Facsimile: (303) 844-1350
Email: luke.hajek@usdoj.gov

*Counsel for Federal Defendants*

34