## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WESTERN LOUISIANA
## LAKE CHARLES DIVISION

| | |
|---|---|
| STATE OF LOUISIANA, *et al.*, | Hon. Judge James D. Cain, Jr. |
| Plaintiffs, | Hon. Magistrate Judge Thomas P. LeBlanc |
| v. | Case No. 2:25-cv-71 |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants, | **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| and | |
| FRIENDS OF THE EARTH, *et al.*, | |
| Intervenor-Defendants. | |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 1

I.     The Court Lacks Jurisdiction Over Plaintiffs' Claims............................... 1

    A.     Plaintiffs' OCSLA Claim Is Barred by Sovereign Immunity.................... 1

    B.     Plaintiffs' Statutory and Constitutional Claims Fail for Lack of a Private Right of Action ................................................................. 4

II.    If the Court Finds that President Biden's Withdrawals Are Permanent, They Exceeded the President's Authority Under Section 12(a) of OCSLA.................. 6

III.   It Is Not Necessary for the Court to Resolve the Constitutional Issues, and Therefore the Court Should Avoid Them ................................................ 9

IV.    If the Court Reaches the Constitutional Claims, It Should Reject Them ............. 10

    A.     Section 12(a) of OCSLA Does not Violate the Non-Delegation Doctrine.......................................................................... 10

    B.     The Withdrawals Did Not Violate the Property Clause or the Take Care Clause ................................................................... 16

CONCLUSION....................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ..................................................................................................... 5

*Am. Power & Light Co. v. Sec. and Exchange Comm'n*,
329 U.S. 90 (1946) ................................................................................................ 11, 12

*Armstrong v. Exceptional Child Center*,
575 U.S. 320 (2015) ..................................................................................................... 5

*Big Time Vapes, Inc. v. Food & Drug Admin.*,
963 F.3d 436 (5th Cir. 2020) ...................................................................................... 13

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964) ..................................................................................................... 2

*Dalton v. Specter*,
511 U.S. 462 (1994) ..................................................................................................... 4

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ..................................................................................................... 9

*Danos v. Jones*,
652 F.3d 577 (2011) ..................................................................................................... 2

*Fed. Comm. Comm'n v. Consumers' Research*,
145 S. Ct. 2482 (2025) ..................................................................................... 11, 12, 13

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .................................................................................................. 2, 3

*Free Enter. Fund v. Public Company Acct. Oversight Bd.*,
561 U.S. 477 (2010) ..................................................................................................... 5

*Harmon v. Brucker*,
355 U.S. 579 (1958) ..................................................................................................... 6

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) ..................................................................................................... 2

*Leedom v. Kyne*,
358 U.S. 184 (1958) ..................................................................................................... 2

*Louisiana v. Biden*,
622 F. Supp. 3d 267 (W.D. La. 2022) .......................................................................... 4

*Loving v. United States*,
517 U.S. 748 (1996) ................................................................................................... 14

ii

*Macktal v. Chao*,
   286 F.3d 822 (5th Cir. 2002) ........................................................................ 7

*Medellin v. Texas*,
   552 U.S. 491 (2008) .................................................................................... 15

*Mich. Gambling Opposition v. Kempthorne*,
   525 F.3d 23 (D.C. Cir. 2008) ...................................................................... 13

*Mountain States Legal Foundation v. Bush*,
   306 F.3d 1132- (D.C. Cir. 2002) .................................................................. 3

*Nuclear Reg. Comm'n v. Texas*,
   605 U.S. 665 (2025) .................................................................................. 2, 3

*Pennhurst State School & Hosp. v. Halderman*,
   465 U.S. 89 (1984) ....................................................................................... 2

*Ry. Clerks v. Ass'n for Benefit of Non-contract Emps.*,
   380 U.S. 650 (1965) ..................................................................................... 2

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ..................................................................................... 6

*United States v. Hansen*,
   599 U.S. 762 (2023) ................................................................................. 9, 10

*United States v. Pheasant*,
   129 F.4th 576 (9th Cir. 2025) ..................................................................... 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................................... 14, 16

**Statutes**

43 U.S.C. § 1332(3) .......................................................................................... 12

43 U.S.C. § 1341(a) ..................................................................................... 4, 11

43 U.S.C. § 1341(b) .......................................................................................... 13

43 U.S.C. § 1341(b)-(d) ................................................................................... 14

43 U.S.C. § 1349(a)-(c) ...................................................................................... 4

43 U.S.C. § 1349(b)-(c) ...................................................................................... 5

43 U.S.C. § 1733(a) .......................................................................................... 15

5 U.S.C. § 702 ..................................................................................................... 2

5 U.S.C. § 706(2)(C) ........................................................................................... 3

**Other Authorities**

Exec. Order No. 14148,
    90 Fed. Reg. 8237 (Jan. 20, 2025) ................................................................................ 6

*Withdrawal of Certain Areas of the United States* Outer *Continental Shelf From Oil or Natural Gas Leasing,*
    90 Fed. Reg. 6739 (Jan. 6, 2025) .................................................................................. 6

*Withdrawal of Public Lands*,
    40 Op. Atty. Gen. 73 (1941) ....................................................................................... 15

## INTRODUCTION

Plaintiffs' motions for summary judgment fail for lack of jurisdiction and on the merits.[1] At the threshold, Plaintiffs fail to show the waiver of sovereign immunity and private right of action necessary to sue the federal government. On the merits, the Plaintiffs are divided as to how to interpret OCSLA. Louisiana argues that because Section 12(a) of OCSLA imposes no limits on a President's authority to permanently withdraw areas of the Outer Continental Shelf ("OCS"), it violates the non-delegation doctrine. API argues the opposite—that Presidents lack the authority under OCSLA to withdraw areas of the OCS permanently—and they ask the Court to interpret OCSLA narrowly and avoid the constitutional question. On the statutory interpretation point, Defendants agree with API—the Court need not reach the constitutional issues. There is nothing in the statutory text, context, or historical practice that suggests that the statute gives Presidents a broad power to withdraw areas of the OCS permanently and irrevocably. If the Court reaches the merits, it should find that President Biden's withdrawals were not permanent and have been revoked. But if the Court concludes that President Biden's withdrawals are permanent, it should find that the withdrawals exceeded the President's authority under OCSLA.

## ARGUMENT

### I.    The Court Lacks Jurisdiction Over Plaintiffs' Claims.

Plaintiffs' OCSLA claim is barred by sovereign immunity, and both their OCSLA and constitutional claims fail for lack of a right of action.

### A.    Plaintiffs' OCSLA Claim Is Barred by Sovereign Immunity.

Plaintiffs' claim, that President Biden's withdrawal exceeded his authority under Section 12(a) of OCSLA, is barred by the United States' sovereign immunity. API implicitly concedes

---

[1] For clarity, this brief refers to Plaintiffs Louisiana, Gulf Energy Alliance, Alabama, Alaska, Georgia, and Mississippi as "Louisiana," and Plaintiff American Petroleum Institute as "API."

that neither the Administrative Procedure Act ("APA") nor OCSLA waive that sovereign immunity. This is significant because claims challenging government action are typically brought under the waiver of sovereign immunity in the APA, *see* 5 U.S.C. § 702, and this waiver does not apply to actions against the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Here, no statute provides a waiver of sovereign immunity for a suit against the President regarding a decision under Section 12(a) of OCSLA. That should end the inquiry.

Recognizing that the typical waiver of sovereign immunity does not apply, API resorts to *ultra vires* review under *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949). But API ignores the Supreme Court's recent decision in *Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 681 (2025), which refutes API's position. Noting that "ultra vires review could [otherwise] become an easy end-run around the limitations of . . . judicial review statutes," the Court clarified that *ultra vires* review is "strictly limited . . . to the 'painstakingly delineated procedural boundaries of [*Leedom v. Kyne*, 358 U.S. 184 (1958)].'" *Id.* (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). The Court further explained that "'[t]he *Kyne* exception is a narrow one,' and does not apply simply because an agency has potentially reached a 'conclusion which does not comport with the law.'" *Id.* Instead, the *ultra vires* exception "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition* in a statute.'" *Id.* (quoting *Ry. Clerks v. Ass'n for Benefit of Non-contract Emps.*, 380 U.S. 650, 660 (1965)); *see also Danos v. Jones*, 652 F.3d 577, 583 (2011) (To fall within the *ultra vires* exception, a plaintiff must show that the officer acted "without any authority whatever.") (quoting *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)).

*Ultra vires* review is not available for Plaintiffs' OCSLA claim because they identify no "specific prohibition" in the statute that President Biden exceeded. *Nuclear Reg. Comm'n*, 605

U.S. at 681.  API argues that whether President Biden exceeded his authority "is precisely the question," at issue here, API Opp. at 6, but that assertion is insufficient to bring its OCSLA claim within the ambit of *ultra vires* review.  Merely asserting that the President exceeded his authority under a statute is no different from review under the APA.  *See* 5 U.S.C. § 706(2)(C) (agency actions may be set aside if they were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").  Thus, the OCSLA claim that API is arguing is no different from one that it would press under the APA.  And such a claim cannot be brought against the President.  *See Franklin*, 505 U.S. at 800-01.

Even if *ultra vires* review were otherwise available, it is questionable whether it would be a proper vehicle for challenging presidential action.  The Supreme Court has not endorsed *ultra vires* review as a means for challenging action by the President, and it has expressly cautioned that "[o]ut of respect for the separation of powers and the unique constitutional position of the President . . . textual silence is not enough to subject the President" to judicial review.  *Franklin*, 505 U.S. at 800-01.  This principle applies no less to *ultra vires* review than it does to APA review, particularly given the Supreme Court's recent clarification of *ultra vires* review as an extremely narrow doctrine—"essentially a Hail Mary pass [that] rarely succeeds."  *Nuclear Reg. Comm'n*, 605 U.S. at 681-82.  Relying on *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132-36 (D.C. Cir. 2002), API argues that *ultra vires* review is available for actions by the President.  API Opp. at 5.  But in that case, the D.C. Circuit never actually applied *ultra vires* review.  *See Mountains States Legal Found.*, 306 F.3d at 1136 ("The instant case, however, presents no occasion for the court to engage in *ultra vires* review of the Proclamation because Mountain States fails to allege any facts to support its *ultra vires* claim.").

Plaintiffs' reliance on *Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022), is misplaced. The court's reasoning is unclear, but its conclusion that a President's action may be reviewed for statutory violations is contrary to *Dalton v. Specter*, 511 U.S. 462 (1994), where the Supreme Court stated that "claims alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to review under the exception recognized in *Franklin*." *Id.* at 473-74. *Louisiana* was also decided before the Supreme Court's decision in *Nuclear Regulatory Commission*, which further narrowed the availability of *ultra vires* review.

Finally, API's argument that the actions of "other defendants," aside from the President, are subject to judicial review does not advance its cause because the Plaintiffs identify no other actions that they are challenging. As already demonstrated, although Plaintiffs have named agency officials as Defendants, they have not identified any final agency actions by the relevant agencies that are subject to review under the APA. *See* Defs. Mem. at 14.

**B.    Plaintiffs' Statutory and Constitutional Claims Fail for Lack of a Private Right of Action.**

Plaintiffs also fail to identify a right of action that would allow them to pursue either their OCSLA claim or constitutional claim. Beginning with the statutory claim, API ignores the fact that OCSLA *does* create a right of action—just not one that would allow it to bring its OCSLA claim. OCSLA contains a citizen-suit provision allowing litigants to challenge certain actions taken under the statute, and specifying where such actions can be filed. *See* 43 U.S.C. § 1349(a)-(c). The right of action in OCSLA allows challenges to agency actions relating to "any operation on the [OCS] which involves exploration, development, or production of minerals," or the "cancellation, suspension, or termination of a lease or permit under this subchapter," among other things. *Id.* § 1349(b). But the right of action does not encompass withdrawal decisions under 43 U.S.C. § 1341(a). Where Congress creates a right of action for challenges to actions under one

4

section of a statute, but not another, a right of action exists only for the section expressly indicated by Congress. *See Alexander v. Sandoval*, 532 U.S. 275, 293 (2001) (holding that no right of actions existed to challenge actions under section 602 of the Civil Rights Act).

Unable to rely on OCSLA's citizen-suit provision, API appears to rely on an equitable cause of action for its OCSLA claim. *See* API Opp. at 8-9. But the Supreme Court in *Armstrong v. Exceptional Child Center* rejected this same argument because the statute at issue in that case implicitly foreclosed such relief, by explicitly providing only for other forms of enforcement. 575 U.S. 320, 327-29 (2015); *see also Alexander v. Sandoval*, 532 U.S. 275, 293 (2001). As already explained, the same is true here—OCSLA contains a right of action that is limited to actions other than the President's withdrawal of areas of the OCS. *See* 43 U.S.C. § 1349(b)-(c). The Court cannot create a right of action in equity that does not exist in the statute. *Armstrong*, 575 U.S. at 328-29.

As for the constitutional claims, both API and Louisiana rely on an implied right of action to sue for constitutional violations. API Opp. at 8-9; Louisiana Opp. at 10. Both rely on *Armstrong*, but that reliance is misplaced. In *Armstrong*, the Court held that there was no implied right of action for a Supremacy Clause claim. 575 U.S. at 327. The cases where the Supreme Court has recognized an implied right of action for constitutional violations have instead involved the infringement of individual rights. *See* Defs.' Mem. at 15-16; *see also*, *e.g.*, *Free Enter. Fund v. Public Company Acct. Oversight Bd.*, 561 U.S. 477, 489-91 (2010) (an accounting firm that was investigated by an oversight board under Sarbanes-Oxley was entitled to challenge the constitutionality of the creation of the board). But no such individual rights are at issue here. API attempts to shoehorn this case into the *Free Enterprise Fund* rubric, *see* API Opp. at 8-9, but their arguments demonstrate the point—in that case, regulated entities sought to vindicate individual rights, and

here no such individual rights exist.  This is not a case where a regulated entity is challenging the legality of an agency action against the regulated entity.  API's reliance on *Harmon v. Brucker*, 355 U.S. 579 (1958), is likewise misplaced because it was decided over 65 years ago (before the APA amendments in 1976) and does not address the right of action issue.  *See id.* at 581-82.

## II.    If the Court Finds that President Biden's Withdrawals Are Permanent, They Exceeded the President's Authority Under Section 12(a) of OCSLA.

Despite Plaintiffs' insistence that the Biden withdrawals were permanent, they have, in fact, been revoked and are no longer in effect.  On January 20, 2025, President Trump revoked President Biden's withdrawals.  *See* Exec. Order No. 14148, § 2(vvv), (www), Initial Rescissions of Harmful Executive Orders, 90 Fed. Reg. 8,237, 8,240 (Jan. 20, 2025).  No party disputes that President Trump did so, and no party seriously disputes that President Trump's executive order had the actual effect of revoking President Biden's withdrawals.  Louisiana agrees that, due to President Trump's order, "the Withdrawal Memos currently are not in effect." LA Opp. at 4.  API previously acknowledged that President Trump rescinded the Biden withdrawals, *see* API's Mem. in Supp. of Mot. for Summ. J. ("API Mem.") at 13, Dkt. No. 48-1, but it avoids the issue in its opposition.  Instead, API asserts that contemporaneous statements from the Biden administration show that President Biden intended the withdrawals to be permanent.  API Opp. at 1-2, 9.  Such contemporaneous statements, however, cannot change the actual legal effect of the withdrawals. *See Trump v. Hawaii*, 585 U.S. 667, 706 (2018) (relying on the text of a Presidential proclamation to interpret its meaning).  The withdrawal memoranda themselves stated that the withdrawal would be "for a time period without specific expiration," 90 Fed. Reg. at 6,739, not that the withdrawals would be permanent and irrevocable.  Further, regardless of whether President Biden intended the withdrawals to be permanent, President Trump lawfully revoked them, and neither Louisiana nor API disputes that.

For their part, Intervenors appear to agree that President Trump's executive order had the actual effect of revoking the Biden withdrawals. *See* Int-Defs.' Combined Mem. Supp. Mot. for Summ. J. and Opp. to Pls.' Mots. for Summ. J. ("Ints. Mem.") at 7 (arguing that the claims are moot because "President Trump rescinded the withdrawals"), at 15 (arguing that Louisiana lacks standing for the same reason), Dkt. No. 58-1. But at the same time, they defend President Biden's ability to issue a permanent withdrawal, *id.* at 20-29, and claim in a separate case that President Trump's rescission of the withdrawals was unlawful because it "purport[ed] to revoke *permanent withdrawals* established by President Biden." Pls.' Opp. to Defs.' Mot. to Dismiss for Lack of Jurisdiction at 1 (emphasis added), *N. Alaska Envtl. Ctr. v. Trump*, No. 3:25-cv-38-SLG (D. Alaska July 8, 2025), Dkt. No. 48. Regardless of the environmental groups' claim in another case that President Trump's action was unlawful (a claim that Federal Defendants will vigorously dispute), they make no such arguments in this case. Thus, for purposes of this case, no party disputes that President Trump's revocation of the withdrawals is currently in effect. Therefore, there is no factual or legal basis for this Court to find that President Biden's withdrawals were permanent.

If the Court nevertheless concludes that President Biden's withdrawals are permanent, it should find that such permanent withdrawals exceeded President Biden's authority under Section 12(a) of OCSLA for the reasons already stated by Defendants, Defs. Mem. at 18-25, and API, API Mem. at 13-19; API Opp. at 9-17. The issuance of permanent withdrawals would exceed statutory authority because it would conflict with the "from time to time" qualifier in Section 12(a). As API aptly argues, statutes use the phrase "from time to time" in several instances, and courts have concluded that agencies can go back and change decisions that were made "from time to time." API Opp. at 11. Issuance of a permanent withdrawal would also exceed authority in Section 12(a) because the statute does not explicitly prohibit Executive Branch reconsideration. *See Macktal v.*

*Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002) ("[I]n the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.")

Intervenors' argument that Section 12(a) must allow permanent withdrawals because it has historically been implemented that way is an attempt to rewrite the history of presidential withdrawals under OCSLA. They argue that Presidents have regularly issued withdrawal memoranda stating that withdrawals are to be "for a time period without specific expiration," which is the language used in the Biden withdrawals. Ints. Mem. at 26. But historically, that language has not suggested permanence. President Clinton used that language in a June 12, 1998 withdrawal, but the same withdrawal stated that it was "subject to revocation by the President in the interest of national security." June 12, 1998 Memo., ECF No. 48-9. The use of the phrase "for a time period without specification" has not been understood to mean that a withdrawal will be permanent, and it was only recently that environmental groups argued that withdrawals by President Obama were, in fact, permanent. *See* API Opp. at 15. Moreover, Intervenors are wrong that Presidents have not revoked or modified prior withdrawals. *See* Defs.' Mem. at 22-23. They attempt to explain away several instances of revocations or modifications, but their argument that a President has never before revoked a "permanent" withdrawal, Ints. Mem. at 26, falls flat because, until recently, withdrawals were not claimed to be permanent.

Finally, Intervenors fail to rebut Defendants' argument that Congress has acquiesced to the Executive Branch's historical practice of revoking withdrawals under Section 12(a). They argue that the Court should draw no inferences from Congress's acquiescence because "acquiescence faces a high bar." Ints. Mem. at 27. To be sure, the bar is high, but this case clears it. Presidents have taken withdrawal actions under Section 12(a) for over seven decades, and despite amending OCSLA at least seven times over the course of that period, Congress never amended Section 12(a)

8

or countermanded a presidential withdrawal or modification of a withdrawal.  *See* Defs. Mem. at 23-24.  Thus, this is the rare instance where there has been "a systematic, unbroken, executive practice, long pursued to the knowledge of Congress and never before questioned."  *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (citation omitted).

In sum, the statute's language, context and structure, historical practice, and legislative history support interpreting Section 12(a) as authorizing temporary, not permanent, withdrawals of areas of the OCS.  Thus, if the Court deems President Biden's withdrawals to be permanent and irrevocable, the withdrawals violate OCSLA.

## III.    It Is Not Necessary for the Court to Resolve the Constitutional Issues, and Therefore the Court Should Avoid Them.

As discussed above, Defendants agree with API that Section 12(a) of OCSLA should be construed to allow Presidents to withdraw areas of the OCS on a temporary basis, subject to modification or revocation by a subsequent President.  If the Court construes President Biden's withdrawals as permanent, then it should find that the withdrawals exceeded his authority under Section 12(a) of OCSLA and decide the case on that basis.  Having done so, there would be no need to decide the constitutional issues, and based on the doctrine of constitutional avoidance, the Court should avoid deciding them.  *See United States v. Hansen*, 599 U.S. 762, 781 (2023).  API agrees that, if the Court decides that President Biden's withdrawals were permanent and therefore violated OCSLA, it should avoid the constitutional issues.  *See* API Mem. at 21-22.  If the Court construes the Biden withdrawals as temporary, then President Trump's subsequent revocation of the withdrawals is valid, and there is nothing left for the Court to resolve.

## IV.    If the Court Reaches the Constitutional Claims, It Should Reject Them.

But if the Court reaches Plaintiffs' constitutional claims, it should reject them.  Section 12(a) of OCSLA did not impermissibly delegate Congress's legislative authority to the President, and the President Biden's withdrawals did not violate the Property Clause or the Take Care Clause.

### A.    Section 12(a) of OCSLA Does not Violate the Non-Delegation Doctrine.

Section 12(a) of OCSLA does not violate the non-delegation doctrine.  That statutory provision was enacted over seventy years ago.  *See* 83 Cong. Ch. 345, 83rd Cong., 1st Sess. (Aug. 7, 1953), 67 Stat. 462.  Since then, Presidents have implemented it numerous times, *see* Defs. Mem. at 4-7, and until now, no one has even claimed that Section 12(a) was unconstitutional.  Nor has Congress countermanded any withdrawals under Section 12(a) or amended the statute in response to actions taken by a President.  During that seventy-year period, Presidents have made withdrawals for a set period or for "a time period without specific expiration," which is the language used in President Biden's withdrawal.  Properly understood, withdrawals using the latter language are revocable by subsequent Presidents and therefore do not pose the broad constitutional concern claimed by Plaintiffs.

Louisiana argues that, for purposes of the non-delegation analysis, it is not important whether a President may permanently withdraw areas of the OCS from leasing.  *See* LA Opp. at 11.  It argues that if a President can make permanent withdrawals, he wields "unlimited legislative authority," and if a President can "decide whether withdrawals are reversible," then he likewise "wields unlimited legislative authority."  *Id.*  But neither of those points accurately characterizes Defendants' position.  Defendants' position is that a President *cannot* make permanent withdrawals, and therefore a President may not choose to make withdrawals permanent.

At bottom, Louisiana's non-delegation argument relies on particular statutory text in isolation rather than considering the statute as a whole.  Louisiana argues that the language of the

10

statute "grants the President complete discretion to withdraw areas from leasing." LA Opp. at 11. But that statutory language is just one part of the analysis. As the Supreme Court has explained, "our cases did not examine those statutory phrases in isolation but instead looked to the broader statutory contexts, which informed their interpretation and supplied the necessary content to satisfy the intelligible-principle test." *Fed. Comm. Comm'n v. Consumers' Research*, 145 S. Ct. 2482, 2503 (2025). Statutory provision must be understood in light of "the purpose of the Act, its factual background and the statutory context in which they appear." *Am. Power & Light Co. v. Sec. and Exchange Comm'n*, 329 U.S. 90, 104 (1946). Louisiana's failure to consider the purpose of OCSLA, the statutory background, and the relevant factual background is fatal to its non-delegation claim. Louisiana makes several arguments in rebuttal, but none have merit.

First, Louisiana argues that the text of Section 12(a) places no limits on the President's authority. LA Opp. at 11-12. Even considering just that provision, Louisiana ignores the guidance that Congress provided. Section 12(a) specifies that the President may only withdraw "unleased lands" on the OCS from leasing, 43 U.S.C. § 1341(a), and thus provides a boundary on the President's authority by eliminating the possibility that the President could withdraw previously leased lands that are currently being explored or developed. Louisiana instead focuses on the phrase "from time to time," which it argues provides no limitation on the President's authority. As previously demonstrated, this phrase should be interpreted to mean that a President may withdraw lands from leasing on a temporary basis subject to later revocation. *See* Defs. Mem. at 18-25. API makes the same point and demonstrates that the phrase "from time to time," when used in multiple statutory contexts, does not mean that an agency's action is permanent and irrevocable. *See* API Opp. at 11. The Supreme Court has cautioned against interpreting statutory language "extravagantly, the better to create a constitutional problem." *Federal Comm. Comm'n*, 145 S. Ct. at 2507.

11

The court should refrain from doing so here because the statute has never been understood to confer the broad authority that Louisiana claims.

Indeed, for the first fifty years following the enactment of Section 12(a), it was commonly understood that withdrawals were revocable, and no one suggested that a subsequent President could not revoke or modify a prior withdrawal. *See* Defs. Mem. at 4-6, 22-24. As API notes, it was not until the litigation over President Trump's revocation of President Obama's withdrawals that environmental groups began referring to some withdrawals as "permanent." *See* API Opp. at 15. Until then, the revocation or modification of a prior withdrawal was uncontroversial, as when President Bush modified prior withdrawals in 2007 and 2008 and President Obama modified his own withdrawal in 2014. Defs. Mem. at 22-23. The word "permanent" is not actually used in any withdrawal. *See id.* Louisiana argues that the temporary nature of withdrawals is not an actual limitation because it is dependent on "another President's whim, not any principle Congress supplied." LA Opp. at 11. Again, Louisiana misunderstands Defendants' arguments. Withdrawals are temporary, not because of another President's whim, but because a President *cannot* make a withdrawal permanent and irrevocable based on the textual guidance supplied by Congress.

Second, Louisiana argues that Defendants attempt to "salvage" Section 12(a) of OCSLA by pointing to the purposes of the statute as a whole. *Id.* at 12-13. This is not a salvage operation—a court must analyze "the purpose of the Act, its factual background and the statutory context in which they appear" before reaching a conclusion regarding the non-delegation claim. *Am. Power & Light Co.*, 329 U.S. at 104. The general purpose of OCSLA is to develop the resources on the OCS, subject to appropriate environmental safeguards. *See* Defs. Mem. at 29; *see also* 43 U.S.C. § 1332(3). It would be contrary to that purpose for a President to permanently withdraw large portions of the OCS for environmental conservation. By making the purpose of the statute clear,

Congress provided a limiting principle for Presidents to follow, and that purpose is more than sufficient to survive a non-delegation challenge. *See*, *e.g.*, *Big Time Vapes, Inc. v. Food & Drug Admin.*, 963 F.3d 436, 444 (5th Cir. 2020) ("The plaintiffs improperly discount other materials that we must consider, namely the [Tobacco Control Act's] purpose and the relevant factual background. Both factors support upholding section 901's delegation."); *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 30-31 (D.C. Cir. 2008) ("Our review of the purpose and structure of the [Indian Reorganization Act] confirms that . . . the statute provides an intelligible principle . . . when it authorizes the Secretary to acquire land 'for purposes of providing land for Indians' . . . .").

Louisiana insists that Congress did not provide the necessary context or purpose to survive the intelligible principle test, but its arguments on this point ignore the relevant language in the statutory provisions in question, as discussed in Defendants' opening brief. *See* Defs. Mem. at 20-22, 29. Instead, Louisiana doubles down on its textual argument and focuses on Section 12(a) in isolation. LA Opp. at 12-13. But the Court must not consider the text of Section 12(a) in isolation and instead should consider the purpose of the statute and relevant context. *See Federal Comm. Comm'n*, 145 S. Ct. at 2503 ("[O]ur cases did not examine phrases in isolation but instead looked to the broader statutory contexts . . . .").

Third, Louisiana argues that the statutory context does not limit the President's withdrawal authority. Misconstruing Defendants' arguments, Louisiana argues that withdrawals are not limited to national security purposes. *See* LA Opp. at 12, 14-15. But that is not Defendants' argument—rather, Defendants made clear that "withdrawals may be for national security reasons, among others." Defs. Mem. at 22. In any case, the surrounding text at least suggests that a President *may* use the withdrawal authority for national security purposes. *See* Defs.' Mem. at 22; *see also*, *e.g.*, 43 U.S.C. § 1341(b) (the President has the right, during war time, to purchase minerals

produced on the OCS). Thus, the withdrawal authority under Section 12(a) of OCSLA intersects with the President's inherent authority over national security as Commander in Chief. That authority thus falls within "a zone of twilight in which [the President] and Congress may have concurrent authority." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Given that dual authority, the concern that the President has usurped Congress's authority is inapplicable. *Loving v. United States*, 517 U.S. 748, 773-74 (1996). In *Loving*, with respect to the rules governing court martials, the court declared that, "[s]eparation-of-powers principles are vindicated, not disserved, by measured cooperation between the two political branches of the Government, each contributing to a lawful objective through its own processes." *Id.* at 773. So too here—Congress's delegation to the President to decide whether a withdrawal would serve the national security interests of the United States does not present a separation of powers issue because Congress and the President share that power.[2]

Louisiana also misconstrues Defendants' arguments regarding legislative history. *See* LA Opp. at 12. Defendants made those arguments in the OCSLA section to show that the legislative history, to the extent it is relevant, supports the view that OCS withdrawals are temporary. *See* Defs. Mem. at 25. Louisiana's retort—that the legislative history suggests withdrawals are not limited to national security purposes—takes aim at a strawman. Defendants do not dispute that other purposes can animate a withdrawal decision. But what matters here is that a President *may*

---

[2] Louisiana argues that recognizing a national security component to the withdrawal authority would "recast Congress's [Property Clause authority] . . . as an executive national-security power." LA Opp. at 14-15. But it is clear that Congress did, in fact, recognize the President's national security role in Section 12 of OCLSA by delegating the authority to the President to take particular actions in "time of war," "during a state of war or national emergency," and as necessary for "national defense." 43 U.S.C. § 1341(b)-(d).

withdraw areas of the OCS for national security purposes, which falls within the core power of the President and therefore overlaps with Congress's authority.

Fourth, Louisiana argues that comparisons to the Pickett Act and the Antiquities Act undermine Defendants' arguments. LA Opp. at 13. API disagrees with Louisiana regarding the Pickett Act. As API points out, a Senate Report accompanying the Pickett Act stated that the power to revoke a prior withdrawal of public lands "already existed in the President." API Opp. at 14 (quoting *Withdrawal of Public Lands*, 40 Op. Atty. Gen. 73, 78 (1941)). Thus, the inclusion of language in the statute regarding the President's authority to revoke prior actions under the statute was merely a "belt and suspenders approach." *Id.* As for the Antiquities Act, Louisiana argues that it is distinguishable, but they point to no analogous case finding that a delegation of land-management authority violates the non-delegation doctrine. Indeed, a Ninth Circuit opinion recently found just the opposite. *United States v. Pheasant*, 129 F.4th 576, 580 (9th Cir. 2025) (rejecting a non-delegation challenge to a provision delegating to the Secretary of the Interior the authority to issue regulations that are "necessary to implement the provisions of [the Federal Land Policy and Management Act]") (quoting 43 U.S.C. § 1733(a)).

Finally, in an attempt to construed Section 12(a) as broadly as possible, Louisiana argues that historical practice and congressional acquiescence do not support the view that a President's withdrawal authority is limited to temporary withdrawals. LA Opp. at 13-14. Again, API disagrees, API Opp. at 14-15, and even Louisiana concedes that Congress "has largely acquiesced" to presidential withdrawals under Section 12(a). LA Opp. at 13. Louisiana falls back on the principle that congressional acquiescence alone is not dispositive, *id.* at 13-14, but where Presidents have taken a consistent view over a long period of time, "Presidential authority can derive support from 'congressional inertia, indifference or quiescence.'" *Medellin v. Texas*, 552 U.S. 491, 524 (2008)

(quoting *Youngstown*, 343 U.S. at 637). Here, Congress has acquiesced in a variety of presidential actions under Section 12(a) of OCSLA for over seventy years, regardless of their size or duration, even while amending OCSLA several times, including earlier this year. *See* Defs. Mem. at 23-24 & n.7. Under these circumstances, congressional acquiescence strongly supports that the actions taken by Presidents are a lawful exercise of authority delegated by Congress.

## B. The Withdrawals Did Not Violate the Property Clause or the Take Care Clause.

President Biden's withdrawals did not violate the Property Clause or the Take Care Clause because the withdrawals were not permanent and have, in fact, already been revoked.[3] As already demonstrated, and as API agrees, *see* API Opp. at 9-16, presidential withdrawals under Section 12(a) are necessarily temporary. Congress delegated that authority to Presidents to make such temporary withdrawals in 1953, and it has not overturned or questioned any prior withdrawals. Therefore, there is no indication that Congress believes that Presidents have usurped its Property Clause authority. Similarly, no violation of the Take Care Clause has occurred because President Biden's withdrawals were temporary and did not bind President Trump, who has subsequently revoked the withdrawals.

## CONCLUSION

For the reasons above and in Defendants' opening summary judgment brief, the Court should find that it lacks jurisdiction over Plaintiffs' claims. If the Court, nevertheless, determines that it has jurisdiction and that President Biden's withdrawals were permanent, the Court should find that the withdrawals exceeded the President's authority under Section 12(a) of OCSLA. The Court should not reach the constitutional claims, but if it does, it should reject them.

---

[3] Defendants understand API's position to be that President Biden's withdrawals *would violate* the Property Clause and Take Care Clause only if the withdrawals were construed to be permanent, but not if the withdrawals are deemed to be temporary. *See* API Mem. at 19-22.

Respectfully submitted this 24th day of September 2025.

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment and Natural Resources Division

/s/ *Luther L. Hajek*
LUTHER L. HAJEK
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace – Suite 370
Denver, CO 80202
Telephone: (303) 844-1376
Facsimile: (303) 844-1350
Email: luke.hajek@usdoj.gov

*Counsel for Federal Defendants*

17