# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAKE CHARLES DIVISION

| | |
|---|---|
| **STATE OF LOUISIANA ET AL** | **CASE NO. 2:25-CV-00071** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **JOSEPH R BIDEN JR ET AL** | **MAGISTRATE JUDGE LEBLANC** |

## MEMORANDUM RULING

Before the court are cross-motions for summary judgment filed, respectively, by plaintiffs the State of Louisiana, Gulf Energy Alliance, the State of Alaska, the State of Georgia, and the State of Mississippi (collectively, "plaintiff states") [doc. 47]; plaintiff American Petroleum Institute ("API") [doc. 48]; the federal government defendants [doc. 55]; and intervenor-defendants Friends of the Earth, Healthy Gulf, Oceana, and Surfrider Foundation [doc. 61]. All motions are opposed.

## I.
### BACKGROUND

This suit arises from two memoranda ("Withdrawal Memoranda") issued by President Biden on January 6, 2025, withdrawing certain areas of the Outer Continental Shelf ("OCS") from potential oil and gas leasing "for a period of time without specific expiration." The first pertained to areas of the OCS off the coast of Alaska while the second pertained to areas off the East Coast, West Coast, and within the eastern Gulf of America. *See* Withdrawal of Certain Areas of the United States OCS from Oil and Gas Natural Leasing, 90 Fed. Reg. 6,739 (Jan. 6, 2025); Withdrawal of Certain Areas of the United

States OCS from Oil and Gas Natural Leasing, 90 Fed. Reg. 6,743 (Jan. 6, 2025). Plaintiffs, comprising the states of Louisiana, Alabama, Alaska, Georgia, and Mississippi, as well as the American Petroleum Institute and the Gulf Energy Alliance, filed suit in this court on January 17, naming a number of federal defendants in their official capacity and challenging the Withdrawal Memoranda under the U.S. Constitution and the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.* Doc. 1. They sought declaratory and injunctive relief, asserting under Counts I and II that the Withdrawal Memoranda are unlawful because § 12(a) of OCSLA, 43 U.S.C. § 1341(a), violates the U.S. Constitution, and under Count III that the Withdrawal Memoranda are unlawful because they exceed the scope of the President's authority under § 12(a). *Id.*

Three days later, immediately after his inauguration to a second term, President Trump issued an executive order rescinding the Withdrawal Memoranda along with several other actions taken by President Biden. *See* Exec. Order No. 14148 § 2(vvv), (www), Initial Rescissions of Harmful Executive Orders and Actions, 90 Fed. Reg. 8,237, 8,240 (Jan. 20, 2025) ("Rescission Order"). A month later, a coalition of environmental groups challenged the Rescission Order via suit filed in the United States District Court for the District of Alaska. *N. Alaska Envtl. Ctr. v. Trump*, No. 3:25-cv-38, doc. 1 (D. Alaska Feb. 19, 2025). Many of the groups are also involved in another Alaska case, initiated in President Trump's first term and challenging his executive order reversing an earlier withdrawal by President Obama. *See* Exec. Order No. 13795, Implementing an America-First Offshore Energy Strategy, 82 Fed. Reg. 20,815 (Apr. 28, 2017) ("2017 Order"). The Alaska district court concluded that President Trump lacked authority under § 12(a) of OCSLA to reverse

President Obama's withdrawal of areas of the OCS. On appeal, however, the Ninth Circuit vacated the district court's order as moot following President Biden's issuance of an executive order rescinding the 2017 Order. *League of Conservation Voters v. Trump*, 363 F.Supp.3d. 1013, 1030–31 (D. Alaska 2019), *vacated as moot and remanded*, 843 F. App'x 937 (9th Cir. 2021); *see* Exec. Order No. 13990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7,037 (Jan. 20, 2021). Because President Trump's Rescission Order also rescinded other actions taken by President Biden to enact or reinstate OCS withdrawals, including Executive Order 13990, plaintiffs in the *League of Conservation Voters* have a Rule 60(b) motion asking the district court to reinstate its prior order. *League of Conserv. Voters v. Trump*, No. 3:17-cv-101, doc. 99 (D. Alaska Apr. 1, 2019). To that end they argued that the Rescission Order effectively revived President Trump's 2017 Order. *Id.* The court recently denied the motion, finding under the mandate rule that the Ninth Circuit's subsequent ruling foreclosed any reexamination of mootness in that matter. *Id.* at doc. 117.

Meanwhile, federal defendants in *Northern Alaska Environmental Center* have moved to dismiss that suit for lack of jurisdiction on the grounds that (1) plaintiffs fail to show any imminent harms resulting from the Rescission Order; (2) the claims are not ripe; (3) the claims against the President are barred by the doctrine of sovereign immunity; (4) plaintiffs lack a private right of action; and (5) the claims against the Secretary of the Interior and Secretary of Commerce must be dismissed for failure to identify a final agency action taken by either individual. *N. Alaska Envtl. Ctr. v. Trump*, No. 3:25-cv-38, doc. 42 (D. Alaska). They further assert that claims against the Secretary of Interior and Secretary

of Commerce must be dismissed for failure to identify a final action taken by either individual. *Id.* The motion is opposed and awaiting decision.

In this matter, several environmental groups also intervened as defendants. Docs. 20, 33. They then filed a motion for judgment on the pleadings on the basis of mootness, which the court denied. Docs. 36, 43. Pursuant to a joint briefing schedule adopted by the court, the parties have now filed cross-motions for summary judgment. The plaintiff states and API seek declaratory judgment on the grounds that President Biden's actions under § 12(a) are unlawful.[1] Docs. 47, 48. As in *Northern Alaska Environmental Center*, federal defendants argue that the court lacks jurisdiction over plaintiffs' claims because their statutory claims are barred by the doctrine of sovereign immunity and there is no private right of action underlying their statutory or constitutional claims. Doc. 55. If the court does reach the merits, however, federal defendants assert that President Biden's actions exceeded the authority of § 12(a) but that the statute itself is not unconstitutional. *Id.* Meanwhile, the intervenor-defendants maintain that (1) the action is moot, (2) there is no case or controversy because the government has adopted API's interpretation of OCSLA, (3) the court should dismiss for improper venue because Louisiana lacks standing, (4) the remaining plaintiffs also lack standing, and (5) plaintiffs' ultra vires and constitutional claims fail as a matter of law.

---

[1] The plaintiff states argue that § 12(a) itself is unconstitutional under the non-delegation doctrine, while API only goes as far as asserting that President Biden's use of the statute to allow for "permanent and immutable withdrawals" constitutes an impermissible interpretation.

## II.
### SUMMARY JUDGMENT STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## III.
## LAW & APPLICATION

### A. Jurisdictional arguments

Federal courts generally "address subject-matter jurisdiction at the outset in the 'mine run of cases' and reach other issues first only where the jurisdictional issue is 'difficult to determine' and the other grounds are relatively 'less burdensome.'" *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 100 (5th Cir. 2018) (quoting *Sinachem Int'l Co. v. Malay Int'l Shipping*, 549 U.S. 422, 436 (2007)). Accordingly, the court first addresses the jurisdictional arguments raised by intervenor-defendants on mootness, lack of adversity, standing, and sovereign immunity before proceeding to the merits.

#### 1. Mootness

First, intervenor-defendants renew their argument that any dispute relating to President Biden's Withdrawal Memoranda was rendered moot by President Trump's Rescission Order. Because Article III of the Constitution limits federal jurisdiction to "cases" and "controversies," a case must be dismissed as moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome[.]" *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980). "Generally, any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Ctr. for Indiv. Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006). Additionally, "[m]ootness applies when intervening circumstances render the court no longer capable of applying meaningful relief to the plaintiff." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013). As intervenor-

defendants acknowledge, the court addressed their arguments on mootness in the motion for judgment on the pleadings. There is no basis for revisiting that ruling.

### 2. Lack of Adversity

"Essential to the concept of a controversy, under Article III, is an on-going adversarial posture between the parties before the court." *Tex. Dep't of Family & Protective Servs. v. Azar*, 476 F.Supp.3d 570, 579 (S.D. Tex. 2020) (quoting *In re S.L.E., Inc.*, 674 F.2d 359, 364 (5th Cir. 1982)). "In order for a controversy to be presented to a federal court, the resolution of the issues at hand must matter to the pertinent parties. It does not matter that in the future this litigation may be used as a strategic instrument; there must be an adversarial relationship between the parties as to the question and the judicial process must be capable of adjudicating it." *Matter of South Marine, LLC*, 2011 WL 13177519, at *2 (E.D. La. Oct. 19, 2011) (citing *Matter of Talbott Big Foot, Inc.*, 924 F.2d 85, 87 (5th Cir. 1991)).

Intervenor-defendants argue that this matter does not present a justiciable case or controversy because API and the federal defendants have now taken the same position with respect to the legality of President Biden's actions. But intervenors oppose plaintiffs at every point, providing the necessary adversity on all issues before the court. Additionally, while federal defendants appear to agree with API's interpretation of OCSLA, they oppose plaintiff states' position that § 12(a) is per se unconstitutional. The case therefore presents a justiciable controversy on the merits.

3. **Standing**

Intervenor-defendants argue (1) Louisiana lacks standing, requiring dismissal of this matter for improper venue, and (2) the remaining plaintiffs also lack standing because they fail to demonstrate imminent harm. As to Louisiana, it is entitled to a share of royalties from offshore leasing under the revenue-sharing model created by the Gulf of Mexico Energy Security Act ("GOMESA") of 2006, Pub. L. No. 109-432, 120 Stat. 3000. For Fiscal Year 2023, Louisiana and its coastal political subdivisions received $156,329,442.65. Doc. 61, att. 8. The states provide a declaration from Kevin Bruce, executive director of Gulf Energy Alliance Association, Inc., who describes the harm done by a permanent withdrawal to stakeholders who receive no opportunity to weigh in on the decision. And API emphasizes that it is also raising injury based on denial of its procedural right under OCSLA, which requires that the Secretary of the Interior consult with interested parties, consider enumerated factors, and issue a proposed five-year plan for public comment. "A procedural right can be asserted 'without meeting all the normal standards for redressability and immediacy.'" *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 503 (5th Cir. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n. 7 (1992)). Instead, a litigant asserting a procedural right "has standing "if there is 'some possibility' that enforcing the procedural right 'will prompt the [defendant] to reconsider the decision.'" *Id.* (quoting *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007)).

As in *National Infusion Center Association*, plaintiffs allege a concrete interest in the subject matter of the executive action and a procedural injury based on their lack of opportunity to weigh in on key determinations. Specifically, the complaint notes the

consultation requirements of OCSLA and the infringement on the states' sovereign interests in offshore development by permanent withdrawal. *See* doc. 1, ¶¶ 36–37, 51–52. And though the injury has been remedied for the time being with the reversal of the permanent withdrawal, the likelihood of recurrence remains whenever a change in administrations or political pressures occurs. Accordingly, all plaintiffs have met the minimal standing requirements necessary to assert their procedural rights.

4. **Sovereign Immunity**

Federal defendants assert that plaintiffs' claims against the President is barred by the doctrine of sovereign immunity. The United States enjoys sovereign immunity from suit unless it has consented to be sued. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). But sovereign immunity does not shield an officer from suit if the officer "acted either 'unconstitutionally *or* beyond his statutory powers.'" *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (quoting *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 691 n. 11 (1949)) (emphasis in *Dalton*). Here, plaintiffs allege that President Biden acted beyond his delegated powers under OCSLA and the scope of executive authority under the U.S. Constitution. Doc. 1. The claim is thus *ultra vires* and sovereign immunity does not apply. *Accord League of Conserv. Voters v. Trump*, 303 F.Supp.3d 985, 993–94 (D. Alaska 2018). And despite federal defendants' claim that plaintiffs lack a private right of action under OCSLA, an *ultra vires* claim is a "nonstatutory" form of judicial review derived from the court's equitable powers. *FedEx Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764–65 (D.C. Cir. 2022). "Courts have on occasion adjudicated causes of action alleging that the President exceeded his constitutional or statutory authority." *League of Conserv.*

*Voters*, 303 F.Supp.3d at 994 (collecting cases). Here plaintiffs' properly pled *ultra vires* claims do not require statutory authorization under OCSLA. *La. v. Biden*, 622 F.Supp.3d 267, 288 (W.D. La. 2022).

### B. Merits

Plaintiff states argue that the Withdrawal Memoranda are unlawful because § 12(a) is an unconstitutional delegation of legislative authority, and that it violates both the principles of separation of powers as well as the Property Clause. Meanwhile, both API and the federal defendants assert that the Withdrawal Memoranda are unlawful because they exceed the scope of the President's authority under § 12(a). Finally, intervenor-defendants maintain that the Withdrawal Memoranda are both constitutional and within OCSLA's scope.

Government defendants contend, and API agrees, that under the doctrine of constitutional avoidance, the court should construe § 12(a) to avoid the constitutional concerns raised by plaintiffs and instead decide this matter based on whether President Biden's actions exceeded his statutory authority. The doctrine of constitutional avoidance is a "cardinal principle" of statutory interpretation under which the court "will first ascertain whether a construction of the statute is fairly permissible by which the [constitutional] question may be avoided." *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). In other words, "if an otherwise acceptable construction of a statute would raise constitutional problems, and . . . an alternative interpretation of the statute is fairly possible, [courts] are obligated to construe the statute to avoid such problems." *I.N.S. v. St. Cyr*, 533 U.S. 289, 299–300

(2001). This principle is followed out of deference to Congress, which is presumed to "legislate[] in the light of constitutional limitations." *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998). A permissible reading of § 12(a), infra, allows the court to decide the case on the question of whether President Biden's orders exceeded his statutory authority rather than whether OCSLA provides an impermissible delegation of executive authority. Under this reading, the power delegated by Congress is limited in scope, within OCSLA's broad grant of authority to the executive, and furthermore consistent with the long-established practice of presidents withdrawing lands for public purposes absent an act of Congress. *See Withdrawal of Public Lands*, 40 U.S. Op. Att. Gen. at 83; *see also United States v. Midwest Oil Co.*, 236 U.S. 459, 469–83 (1915). Accordingly, the court will engage no further with the constitutional challenges raised by the plaintiff states.

Section 12(a) of OCSLA provides: "The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf." 43 U.S.C. § 1341(a). As API notes, this power was exercised sparingly between 1953 and 2008 and was subject to significant limitations each time:

- In 1960, President Eisenhower established the Key Largo Coral Reef Preserve to protect coral reefs from destruction, without specifying whether the withdrawal would expire. 25 Fed. Reg. 2352 (Mar. 19, 1960), doc. 48, att. 6.

- In 1969, Interior Secretary Walter Hickel used the authority vested in him by President Nixon to create the Santa Barbara Channel Ecological Preserve following a significant oil spill. Again, this order did not specify if or when

the withdrawal would expire. 34 Fed. Reg. 5655–56 (Mar. 26, 1969), doc. 48, att. 7.

- In 1990, President George H.W. Bush recognized a ten-year moratorium on the development of OCS lands off the coasts of California and Florida. Statement on Outer Continental Shelf Oil and Gas Development, 26 Weekly Comp. Pres. Doc. 1006, 1006 (July 2, 1990), doc. 48, att. 8.

- In 1998 President Clinton withdrew areas already designated as Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972 "for a time period without specific expiration" and other regions of the OCS under an existing moratorium[2] "through June 30, 2012." Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 34 Weekly Comp. Pres. Docs. 1111, 1111 (June 22, 1998), doc. 48, att. 9.

- In 2007, President George W. Bush modified the moratorium ordered by President Clinton through June 2012 to cover different areas stemming from the Department of the Interior, Environment, and Related Agencies Appropriations Act of 2005, P.L. 109-54, 119 Stat. 499. Memorandum on Modification of the June 12, 1998, Withdrawal of Certain Areas of the

---

[2] The moratorium stemmed from the Department of Interior and Related Agencies Appropriation Act of 1998, which provided in relevant part that the funds provided under that title could not be expended to conduct offshore leasing and related activities in certain defined areas. P.L. 105-83, 111 Stat. 1543, Secs. 108–11.

> United States Outer Continental Shelf From Leasing Disposition, 43 Weekly Comp. Pres. Docs. 19, 19 (Jan. 15, 2007), doc. 48, att. 10.

- In 2008, President George W. Bush also modified prior memoranda of withdrawal issued by himself, President Clinton, and President George H.W. Bush to only withdraw those areas designated as marine sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972 "for a time period without specific expiration[.]" Memorandum on the Modification of the Withdrawal of Areas of the United States Outer Continental Shelf From Leasing Disposition, 44 Weekly Comp. Pres. Docs. 986 (July 21, 2008), doc. 48, att. 12.

President Clinton expressly recognized that his withdrawals under § 12 of the OCSLA are "subject to revocation by the President in the interest of national security." Doc. 48, att. 9. Similarly, President George H.W. Bush issued a memorandum withdrawing certain tracts for a time-limited period, "subject to revocation should the President determine the scheduling of a lease sale to be required in the interest of national security." Memorandum re Outer Continental Shelf Oil and Gas Program for 1992–1997 (Aug. 4, 1992), doc. 48, att. 11. President George W. Bush also exercised his authority under § 12(a) to modify prior memoranda of withdrawal issued by himself and his predecessors. Doc. 48, atts. 10 & 12.

In his second term, however, President Obama ordered withdrawals of areas of the Arctic Circle and off the Alaska and Atlantic coasts for "a time period without specific expiration," i.e., indefinitely. *See* Memorandum on Withdrawal of Certain Areas of the

United States Outer Continental Shelf From Leasing Disposition, 2014 Pub. Papers 1621 (Dec. 16, 2014), doc. 48, att. 13; Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska From Leasing Disposition, 2015 Pub. Papers 115, 116 (Jan. 27, 2015), doc. 48, att. 14; Northern Bering Sea Climate Resilience, 81 Fed. Reg. 90,669 (Dec. 14, 2016), doc. 48, att. 15; Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf from Mineral Leasing, 2016 Pub. Papers 1654 (Dec. 20, 2016), doc. 48, att. 16; Memorandum on Withdrawal of Certain Areas of the United States Arctic Outer Continental Shelf from Mineral Leasing, 2016 Pub. Papers 1653–54 (Dec. 20, 2016), doc. 48, att. 17. President Biden followed suit with the Withdrawal Memoranda challenged here, which purported to withdraw large swaths of the OCS surrounding the continental United States and Alaska from mineral leasing.

  The language of § 12(a) itself establishes that withdrawals must be subject to reversal or modification. The statute specifies that the president may exercise this authority "from time to time," which courts have recognized as encouraging an ongoing duty to revisit and amend regulations. *Texas v. Dep't of Labor*, 756 F.Supp.3d 361, 385, 394 (E.D. Tex. 2024); *accord Earth Island Inst. v. Wheeler*, 464 F.Supp.3d 1138, 1144 (N.D. Cal. 2020). Additionally, "it is generally accepted that in the absence of a specific statutory limitation, an [executive actor] has the inherent authority to reconsider its decisions." *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002) (collecting cases). This is illustrated by provisions of the National Forest Management Act and the Federal Land Policy and Management Act, restricting the executive's authority to modify or revoke land

withdrawals. P.L. 94-588, § 9, 90 Stat. 2949, 2957 (1976) (codified at 16 U.S.C. § 1600 *et seq.*); P.L. 94-579, § 204, 90 Stat. 2743 (1976) (codified at 43 U.S.C. § 1701 *et seq.*). Presidential interpretations of their limited authority under § 12(a) support this reading. While some early withdrawals did not specify an expiration date, subsequent orders for several decades either specified an expiration date or expressly recognized the authority of subsequent administrations to review the withdrawal. And in that time, presidents have exercised this authority to modify the withdrawals of prior administrations. The orders of President Obama and President Biden, on the other hand, purported to apply for "a period of time without specific expiration," i.e., indefinitely. To the extent these were indeed supposed to overcome the power of subsequent executives to revoke or modify their withdrawals, they constituted a departure from the executive branch's longstanding practice and exceed the authority granted under § 12(a).³ Accordingly, summary judgment and declaratory relief will be granted for plaintiffs on Count III of their complaint.

---

³ Intervenor-defendants assert that this language did not restrict the action of future administrations, but that OCSLA does not require at any rate that withdrawals be time-bound. The court agrees that the language is ambiguous at best, but that such terms exceed the authority of § 12(a) to the extent they would deter subsequent modification or revocation.

# IV.
## Conclusion

For the reasons stated above, the court will **GRANT IN PART** and **DENY IN PART** the Motions for Summary Judgment [docs. 47, 55] filed by the plaintiff states and the federal defendants, **GRANT** the Motion for Summary Judgment [doc. 48] filed by plaintiff American Petroleum Institute, and **DENY** the Motion for Summary Judgment [doc. 61] filed by intervenor-defendants, to the effect that summary judgment is **GRANTED** on Count Three of Plaintiffs' Complaint, **DENIED** on Counts One and Two, and **DENIED AS MOOT** as to plaintiffs' request for injunctive relief. Accordingly, judgment will be entered for plaintiffs to the effect that the Withdrawal Memoranda are declared unlawful for exceeding the authority granted under § 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1341(a).

**THUS DONE AND SIGNED** in Chambers on the 2nd day of October, 2025.

_____
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**